**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION**

| | | |
|---|---|---|
| **In re:** | ) | **Chapter 11** |
| | ) | |
| **ASTROTURF, LLC,** | ) | **Case No. 16-41504** |
| | ) | |
| | ) | |
| **Debtor.** | ) | |
| | ) | |

**DEBTOR'S MOTION FOR ENTRY OF AN ORDER PURSUANT TO 11 U.S.C. §§ 105, 363, AND 365: (I) AUTHORIZING THE SALE OF THE DEBTOR'S PROPERTY FREE AND CLEAR OF LIENS, CLAIMS AND ENCUMBRANCES; (II) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND LEASES; AND (III) GRANTING RELATED RELIEF**

AstroTurf, LLC (the "Debtor") files this motion (the "Motion"), pursuant to Sections 105(a), 363 and 365 of title 11 of the United States Code (11 U.S.C. §§ 101 *et seq*., the "Bankruptcy Code") and Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for entry of an order: (i) authorizing the private sale of substantially all of the Debtor's assets to APT Acquisition Construction Corp. (the "Purchaser") free and clear of liens, claims and encumbrances of any kind or nature whatsoever (other than Assumed Liabilities and Permitted Liens); (ii) authorizing the proposed assumption and assignment of certain of the Debtor's executory contracts and unexpired leases and approving proposed cure costs related thereto; and (iii) granting related relief. Capitalized terms used but

not otherwise defined herein shall have the meanings ascribed to such terms in the Agreement (as hereinafter defined). In support of this Motion, the Debtor respectfully shows the Court as follows:

## Jurisdiction and Venue

1.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). The statutory predicates for the relief requested herein are Sections 105, 363 and 365 of the Bankruptcy Code.

## Relief Requested

2.      By this Motion, the Debtor requests that the Court enter the proposed Approval Order substantially in the form attached hereto as Exhibit A: (a) authorizing the sale of substantially all of the Debtor's assets to the Purchaser free and clear of liens, claims and encumbrances (other than Assumed Liabilities and Permitted Liens); (b) authorizing the proposed assumption and assignment of certain of the Debtor's executory contracts and unexpired leases and approving proposed cure costs related thereto; and (c) granting related relief. The Debtor also seeks authorization to take all commercially reasonable and necessary steps to complete and implement the Agreement after the approval of the sale.

## Background

A. **The Chapter 11 Case**.

3.      On June 28, 2016 (the "Petition Date"), the Debtor filed a voluntary petition with the Court under chapter 11 of the Bankruptcy Code.

2

4.      The factual background relating to the Debtor's commencement of this case is set forth in detail in the *Declaration of Sean M. Harding in Support of First Day Motions and Applications* filed on the Petition Date and incorporated herein by reference (the "<u>Harding Declaration</u>").

5.      The Debtor has continued in possession of its properties and has continued to operate and manage its business as a debtor-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

6.      As of the date of the filing of this Motion, no official committee of unsecured creditors has been appointed in this case and no request has been made for the appointment of a trustee or examiner.

**B.      <u>The Debtor's Business</u>.**

7.      The Debtor is currently engaged in the marketing, sale, and installation of high-quality indoor and outdoor synthetic grass athletic surfaces, including field, track, indoor and outdoor tennis surfaces (collectively, the "<u>Business</u>"). The Debtor's majority equity holder is Textile Management Associates, Inc. ("<u>TMA</u>"). The Debtor, in combination with TMA and the following separate, non-debtor entities: Synthetic Turf Resources, LLC; Crystal Products Co., Inc.; and UTGH Equipment, LLC (together with TMA, the "<u>Other Sellers</u>"), contribute to what is referred to herein and in the proposed sale transaction as the "Turf Business".[1] The foregoing entities contribute to the Turf Business pursuant to separately negotiated agreements that define

---

[1] The "Turf Business" consists of the development, manufacturing, marketing, selling and installing of artificial turf products for athletic fields and landscape applications through the efforts of the separate entities that provide the services and materials necessary to conduct the business.

each of the parties' role in the business. The Debtor's contribution to the Turf Business is primarily to market, sell, and install synthetic turf. The Other Sellers contribute to the Turf Business through research and development of new turf products and the provision of other services and materials. Unlike the Debtor, each of the Other Sellers engages in a variety of other business activities that are unrelated to the Turf Business.

**C.**    **Sale Background**.

8.    In October 2013, Sportfield Deutschland Holding GmbH ("Sportfield")[2] (or one of its affiliates) contacted TMA and initiated discussions regarding the possibility of combining the Turf Business with an artificial turf business owned by Sportfield. Thereafter, the parties engaged in periodic discussions during 2014 regarding the possibility of a transaction. In April 2015, Equistone Partners Europe (a private equity firm based in Europe) acquired Sportfield and discussions regarding a potential sale of the Turf Business to Sportfield intensified and progressed.

9.    These discussions culminated in an offer by Sportfield to acquire (the "Turf Acquisition") the assets of the Turf Business (*i.e.*, substantially all of the assets of the Debtor and certain assets of the Other Sellers directly related to the Turf Business). In the summer of 2015, the parties reached a preliminary agreement on total purchase price and other material terms.

10.    On December 17, 2015, Sportfield, the Debtor, and the Other Sellers entered into a non-binding letter of intent (the "Letter of Intent") setting forth the proposed terms of the Turf Acquisition. The Letter of Intent contemplated a purchase price of $100 million for the Turf Business, but did not allocate the purchase price among the Debtor or the Other Sellers.

---

[2] The Purchaser is a newly formed entity that is an affiliate of Sportfield.

Sportfield then conducted extensive due diligence regarding the Turf Business and, in connection with its due diligence investigation, Sportfield retained KPMG to perform a "quality of earnings" review and to otherwise assist Sportfield in connection with the Turf Acquisition. After Sportfield completed a substantial amount of due diligence and after further negotiation among the parties, the parties agreed to reduce the cash purchase price for the Turf Acquisition from $100 million to $92.5 million.

**D.**    **The License Agreement.**

11.    In connection with conducting the Business, the Debtor uses certain trademarks and patents related to the "AstroTurf" brand that are owned by TMA. Pursuant to a License Agreement, dated as of March 1, 2012, between the Debtor and TMA (the "License Agreement"), the Debtor has the exclusive right (subject to certain limitations in the License Agreement) to use those patents and trademarks in the United States.[3] The current term under the License Agreement expires on December 31, 2018. The right to use TMA's intellectual property in connection with the business is one of the Debtor's most important assets because (among other things) the "AstroTurf" name is a brand that is recognized in the United States and throughout the world.

12.    The License Agreement provides that the Debtor's rights under the License Agreement may not be assigned without TMA's consent (which, pursuant to the License Agreement, may be withheld or conditioned by TMA in its sole discretion). Furthermore, TMA has taken the position that: (a) TMA's consent is required under Section 365(c) of the Bankruptcy Code in order for the Debtor to assume, or assume and assign, the License

---

[3] A copy of the License Agreement is attached hereto as Exhibit B.

Agreement; and (b) it will not consent to the assignment of the License Agreement by the Debtor

to any third party other than in connection with the Turf Acquisition.[4]

**E.      The Patent Litigation.**

13.      Since 2010, the Debtor has been the defendant in a patent infringement lawsuit

brought by FieldTurf USA, Inc. and FieldTurf Tarkett Inc. (collectively, "FieldTurf") against the

Debtor in the United States District Court for the Eastern District of Michigan (the "Patent

Litigation"). FieldTurf is the holder of patent number 6,723,412, which upon information and

belief expires on March 10, 2017. On October 9, 2015, the jury in the Patent Litigation rendered

a verdict finding that FieldTurf is entitled to recover damages from the Debtor in the amount of

$30,000,000 (the "Verdict"). Certain post-verdict motions are currently pending and a judgment

---

[4] Although the Debtor reserves all rights with respect to the assumption and/or assignment of the
License Agreement, it would be difficult (if not impossible) to assign the License Agreement
over TMA's objection. Section 365(c) provides that a debtor "may not assume or assign any
executory contract . . . if–(1)(A) applicable law excuses a party, other than the debtor, to such
contract or lease from accepting performance from or rendering performance to an entity other
than the debtor . . .; and (B) such party does not consent to such assumption or assignment." 11
U.S.C. § 365(c). Licenses of intellectual property generally fall within the prohibitions of
Section 365(c). *See* 3 Collier on Bankruptcy ¶ 365.07[d]. The Eleventh Circuit has adopted the
following rule (referred to as the "Hypothetical Test"): "a debtor in possession may not assume
an executory contract if (1) applicable law would excuse the other party to that contract from
accepting performance from a party other than debtor in possession and (2) that other party does
not consent to the assumption." *In re Taylor Inv. Partners II, LLC*, 533 B.R. 837, 842 (Bankr.
N.D. Ga. 2015) (citing *In re James Cable Partners, L.P.*, 27 F.3d 534 (11th Cir. 1994)). Federal
law generally bars the assignment of trademark license agreements without the consent of the
licensor. *In re Trump Entm't Resorts, Inc.*, 526 B.R. 116, 127 (Bankr. D. Del. 2015); *Tap
Publ'ns, Inc. v. Chinese Yellow Pages (New York) Inc.*, 925 F.Supp. 212, 218 (S.D.N.Y. 1996)
("The general rule is that unless the license states otherwise, the licensee's right to use the
licensed mark is personal and cannot be assigned to another"); *In re N.C.P. Mktg. Grp., Inc.*, 337
B.R. 230, 237 (D. Nev. 2005) *aff'd*, 279 F. App'x 561 (9th Cir. 2008) ("under applicable
trademark law, trademarks are personal and non-assignable without the consent of the licensor").

on the Verdict (the "Judgment") has not yet been entered by the District Court. As set forth in the Harding Declaration, the Debtor intends to appeal any Judgment and believes that it has several meritorious bases for obtaining a reversal, remand or modification of the Judgment.

14.     The Patent Litigation and adverse publicity regarding the Verdict have caused substantial disruption to the Business. FieldTurf and the Debtor compete almost daily for customers and new business, and the Debtor believes that FieldTurf is using the Patent Litigation to deter potential customers from entering into contracts with the Debtor for the purchase and installation of synthetic turf surfaces. In fact, the Debtor believes that FieldTurf's primary objective with respect to the Patent Litigation is to put the Debtor out of business in order to eliminate future competition.

**F.       The Asset Purchase Agreement.**

15.     After evaluating its alternatives, and in light of the uncertainty and instability caused by the Patent Litigation, the Debtor has determined that a sale of substantially all of its assets would result in the best recovery for its stakeholders. A sale of the Business as part of the Turf Acquisition will permit the Debtor to monetize the Purchased Assets and to make substantial distributions to creditors, whereas continued operation of the Debtor's business under a cloud of litigation would likely result in a decrease in value that would be detrimental to the Debtor's stakeholders.

16.     Accordingly, on June 27, 2016, the Debtor, the Purchaser and APT Acquisition Corp. entered into that certain Asset Purchase Agreement (the "Agreement"), a copy of which (excluding Schedules) is attached hereto as Exhibit C. The Agreement contemplates the sale (the

"Sale") of the Purchased Assets to the Purchaser pursuant to a private sale and contains the

following material terms:[5]

- **Purchased Assets.** The Purchased Assets include substantially all of the Debtor's assets including, but not limited to, all rights of the Debtor under the executory contracts and unexpired leases of the Debtor that are set forth on Schedule 2.1(a) of the Agreement (the "Assumed Contracts"); all Accounts Receivable; all Inventory; all tangible personal property; all Permits (to the extent they are transferable); all Intellectual Property Rights; all cars, trucks, forklifts, other industrial vehicles and other motor vehicles set forth on Schedule 2.1(g) of the Agreement; all credits, prepaid expenses, deferred charges, advance payments, security deposits and customer deposits other than those set forth in Schedule 2.2(b) of the Agreement; all books, records, files and papers of the Debtor relating solely to the Business or the Purchased Assets; certain Claims and causes of action of the Debtor; certain prepaid insurance policies; and all rights of the Debtor to the name "AstroTurf" or any combination of words in which the name "AstroTurf" appears, and any rights associated with any such name and any right to use any such name, in all jurisdictions in which Debtor either currently uses any such name or has any right to use any such name.

- **Purchase Price.** $16,096,000.00, subject to a working capital adjustment at Closing, as well as a post-Closing true-up.

- **Assumed Liabilities.** All trade payables and accrued expenses of the Debtor arising in the ordinary course of business after the Petition Date that are entitled to priority status under Section 503(b) of the Bankruptcy Code; all billings in excess of cost of Seller arising in the ordinary course of business at any time; all Claims, liabilities and obligations related to or arising in connection with the Business or ownership of the Purchased Assets from and after the Closing; all liabilities and obligations of the Debtor related to or arising under the Assumed Contracts from and after the Closing; all liabilities and obligations of Debtor related to or arising from and after the Closing under the Permits and Intellectual Property Rights that are Purchased Assets; all costs, expenses and liabilities prorated to Purchaser as set forth in the Agreement; all Warranty Liabilities; all obligations and liabilities of the Debtor and its Affiliates under any Pre-Petition Performance Bond and under any Post-Petition Performance Bond entered into in the ordinary course of

---

[5] The following description of the Agreement is qualified in its entirety by the language of the Agreement. In the event there is any conflict between the description of the Agreement contained in this Motion and the provisions of the Agreement, the provisions of the Agreement shall govern and control.

business, consistent with past practice; and all Transfer Taxes for which Purchaser is liable pursuant to <u>Section 9.2</u> of the Purchase Agreement; all Cure Costs up to $1,200,000; and all customer claims against Debtor arising in the ordinary course of the Business.

- **Cure Costs.** The Purchaser shall have sole responsibility for paying any Cure Costs due in connection with the assumption and assignment of the Assumed Contracts in an amount up to $1,200,000 (the "<u>Estimated Cure Costs</u>"). If the Cure Costs exceed the Estimated Cure Costs, then the Purchase Price shall be reduced by the amount that the Cure Costs exceed the Estimated Cure Costs.

- **Deposit**. $804,800 (*i.e.*, 5% of Purchase Price); <u>provided</u>, <u>however</u>, that the deposit shall be paid to the Escrow Agent no later than one (1) business day after the entry by the Bankruptcy Court of the Approval Order (*i.e.*, the order granting this Motion and authorizing the Transactions).

- **Post-Closing indemnification by Debtor.** Each of Purchaser and the Debtor agrees to indemnify the other with respect to any investment banking fees, financial advisory fees, brokerage fees, finders' fees, or other similar fees which are alleged to be due and payable with respect to the Transactions and which are asserted as a result of the actions of the indemnifying party. There shall be no other post-Closing indemnification by Debtor. Although the Debtor is not responsible for any other post-closing indemnification, the Other Sellers have agreed to indemnify the Purchaser for certain breaches of the Debtors' representations and warranties.

- **Working Capital Escrow.** The Agreement provides for a Working Capital Escrow Amount in an amount equal to five percent (5%) of the Purchase Price. The Working Capital Escrow Amount will secure any amounts due to the Purchaser after the Closing in connection with the post-Closing working capital true-up.

- **License Agreement.** The Debtor is required to deliver at Closing documents executed by the Debtor and TMA terminating the License Agreement effective as of the Closing.

17.    As described above, the aggregate purchase price for the Turf Acquisition is $92.5 million. Following initial discussions among the Debtor and the Other Sellers regarding various allocations of the $92.5 million amount among the seller parties, they agreed to accept

the allocation of the aggregate purchase price for the assets comprising the Turf Acquisition as determined by the Purchaser (after consulting with KPMG).

18.    The Purchaser's allocation of the total purchase price with respect to the Debtor's assets is fair and reasonable and acceptable to the Debtor. Among other things, prior to receiving the Purchaser's allocation of value, the Debtor requested that its Chief Restructuring Officer (Sean Harding of FTI Consulting) ("CRO") perform an independent evaluation (in consultation with the Debtor's senior management) of the value of the Business and determine a range of reasonable values. The Purchase Price proposed by the Purchaser (and reflected in the Agreement) was within the CRO's range of values.

19.    The terms of the Agreement were independently and directly negotiated on the Debtor's behalf through arms-length negotiations by the Debtor's CRO and King & Spalding LLP, counsel for the Debtor.

**G.    The Other Purchase Agreements.**

20.    Contemporaneously with the execution of the Agreement, affiliates of Sportfield executed separate asset purchase agreements with each of the Other Sellers (collectively, the "Other Purchase Agreements"). The Other Purchase Agreements provide for the sale of certain assets of the Other Sellers related to the Turf Business. The consummation of the transactions set forth in the Other Purchase Agreements is a condition to the consummation of the sale of the Purchased Assets. The Other Sellers are represented by Miller & Martin PLLC, who negotiated (along with certain officers of the Other Sellers) the Other Purchase Agreements with Sportfield on behalf of the Other Sellers.  Sportfield and its affiliates were represented in the negotiations by the law firm of Thompson Hine LLP.

## Argument

21.     The Debtor has determined in its business judgment that a sale of substantially all of its assets pursuant to the Agreement would result in the best recovery for its stakeholders. The Debtor believes the Agreement provides the Debtor with the best (if not the only) opportunity to preserve and maximize the value of the Business and the Purchased Assets for the benefit of its estate. As such, the Debtor submits that approval of this Motion and the sale of the Purchased Assets is consistent with applicable law and should be granted.

**A.     Section 363(b) Authorizes the Proposed Sale.**

22.     Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Although Section 363 of the Bankruptcy Code does not set forth a standard for determining when it is appropriate for a court to authorize the sale or disposition of a debtor's assets, in applying this section, courts have required that it be based upon the sound business judgment of the debtor. *See In re Chateaugay Corp.*, 973 F.2d 141 (2d Cir. 1992) (holding that a judge determining a Section 363(b) application must find from the evidence presented before him a good business reason to grant such application); *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983) (same); *Stephens Indus. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986) (holding that a "bankruptcy court can authorize a sale of all of a chapter 11 debtor's assets under § 363(b)(1) when a sound business purpose dictates such action"); *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169 (D. Del. 1991); *In re Phoenix Steel Corp.*, 82 B.R. 334, 335-36 (Bankr. D. Del. 1987) (stating that judicial approval of a Section 363 sale requires a showing that the proposed sale is fair and equitable, a good business reason exists for completing

the sale and that the transaction is in good faith). As discussed further below, the sale of the Purchased Assets is a sound exercise of the Debtor's business judgment because it provides the Debtor with the best opportunity to preserve and maximize the value of the Business and the Purchased Assets for the benefit of its estate.

**B.**     **Sound Business Reasons Support a Private Sale.**

23.     Bankruptcy Rule 6004(f)(1) permits private sales by a debtor. Fed. R. Bankr. P. 6004(f)(1) ("All sales not in the ordinary course of business may be by private sale or by public auction."). Although the majority of Section 363 sales are conducted subject to competitive bidding procedures and pursuant to processes that contemplate the possibility of an auction, courts have noted that private sales are appropriate and permissible under Section 363. *See In re Bakalis*, 220 B.R. 525, 531 (Bankr. E.D.N.Y. 1998) ("the sale of estate property under the Bankruptcy Code is conducted by a trustee, who has ample discretion to conduct public or private sales of estate property"); *Penn Mut. Life Ins. Co. v. Woodscape Ltd. P'ship (In re Woodscape Ltd. P'ship)*, 134 B.R. 165, 174 (Bankr. D. Md. 1991) (noting that, with respect to sales of estate property pursuant to Section 363 of the Bankruptcy Code, "[t]here is no prohibition against a private sale . . . and there is no requirement that the sale be by public auction").

24.     Courts (including courts in this district) often allow a chapter 11 debtor to sell assets outside the ordinary course of business by private sale when the debtor demonstrates that the sale is permissible pursuant to section 363(b) of the Bankruptcy Code. *See, e.g., Catalyst Natural Gas, LLC v. Constellation Energy Commodities Grp. (In re Catalyst Natural Gas, LLC)*, Case No. 08-79390, (Bankr. N.D. Ga. Dec. 19, 2008) (Bihary, J.); *In re Magnolia Beach, LLC*,

No. 07-79221 (Bankr. N.D. Ga. Jan. 17, 2008) (Mullins, J.); *In re Christian Bros. Inst.*, Case No. 11-22820 (RDD) (Bankr. S.D.N.Y. Nov. 7, 2012); *In re Waterscape Resort LLC*, Case No. 10-11593 (SMB) (Bankr. S .D.N.Y. May 31, 2011); *In re Lehman Brothers Holdings Inc.*, Case No. 08-13555 (Bankr. S.D.N.Y. Feb. 24, 2009); *Palermo v. Pritam Realty, Inc. (In re Pritam Realty, Inc.)*, 233 B.R. 619 (D.P.R. 1999); *In re Condere Corp.*, 228 B.R. 615 (Bankr. S.D. Miss. 1998); *In re Wieboldt Stores, Inc.*, 92 B.R. 309 (N.D. Ill. 1988) (affirming right of chapter 11 debtor to transfer assets by private sale).

25.     The Agreement provides a greater net recovery for the Debtor's estate than could realistically be achieved by any other practically available alternative. As noted above, TMA (as a separate entity with independent business interests) has taken the position that the License Agreement—which is critical to the Debtor's operations—cannot be assumed, or assumed and assigned, without the consent of TMA, and TMA has indicated that it will not consent to the assignment of the License Agreement except in connection with the Turf Acquisition.[6] Without the License Agreement, any potential buyer (other than the Purchaser) could not conduct the Business as it currently exists and, as a result, any purchase price offered by a buyer other than the Purchaser would be lower than that provided for in the Agreement. The Debtor is also vitally interested in its relationships with its customers and the fulfillment of its obligations to them. Approval of the sale will help to assure that its customers' interests are protected going forward. In addition, the Business is a component of the larger Turf Business and the value of the

---

[6] As noted above, the Agreement provides that the Debtor and TMA must terminate the License Agreement at Closing. The Purchaser does not need to take an assignment of the Debtor's rights under the License Agreement in order to conduct the Turf Business because the Purchaser is acquiring the underlying intellectual property from TMA pursuant to the terms of one of the Other Purchase Agreements.

Purchased Assets is enhanced by selling the entire Turf Business; a sale of the Purchased Assets in isolation would undoubtedly yield a lower purchase price. Moreover, if the Debtor is not authorized to consummate the transactions set forth in the Agreement, TMA will likely seek relief from the automatic stay to terminate the License Agreement. Without the License Agreement in effect, the Debtor would be virtually out of business to the detriment of its estate, customers, creditors, employees and other stakeholders. In the event the sale of the Purchased Assets is not approved, nothing would prevent the Debtor's employees from terminating their employment with the Debtor and working for TMA or any other employer (including affiliates of Sportfield, if Sportfield decided to acquire the Turf Business assets held by the Other Sellers). Furthermore, even if TMA's consent were not required, the current term of the License Agreement expires in less than 31 months. No rational buyer would be willing to spend a material amount of time and money acquiring only the Debtor's bundle of assets, which have such a limited useful life.

26.     Accordingly, the Debtor believes a public sale process that includes an auction feature has no chance of yielding a better outcome than that afforded by the Agreement; such a process would merely extend the length of this case and cause the Debtor's estate to incur substantial administrative expenses without any corresponding or offsetting benefit. For example, to conduct a public sale process, the Debtor would need to retain an investment banker to market its business. However, for the reasons discussed above, the investment banker would be marketing only a portion of the Debtor's assets (*i.e.*, the Business without the License Agreement), and the investment banker would undoubtedly expect to be compensated for its services. Moreover, any alternate transaction including only the Purchased Assets would have a

14

lower purchase price because the purchaser would not have the benefit of acquiring the Turf Business as a whole. The Debtor should not be required to conduct an expensive and lengthy marketing and sale process when such a process would not yield any net benefit to the Debtor's estate.

27.     The Debtor's decision to enter into the Agreement and to sell the Purchased Assets to the Purchaser in a private sale transaction is a valid and sound exercise of the Debtor's business judgment. The Debtor has considered all of its options under the circumstances and has determined that a private sale to the Purchaser will result in the greatest recovery. For all of the foregoing reasons, the relief requested in this Motion is a product of sound business judgment and is in the best interests of the Debtor, its customers, creditors, employees, estate and other stakeholders, and should be granted.

**C.      Section 363(f) Authorizes the Sale Free and Clear of Liens and Other Claims.**

28.     The Debtor requests that the sale and transfer of the Purchased Assets be approved free and clear of all Liens (other than Assumed Liabilities and Permitted Liens). Such relief is consistent with the provisions of Section 363(f) of the Bankruptcy Code.

29.     Section 363(f) provides that a debtor-in-possession may sell property free and clear of any lien, claim or interest of another entity in such property if any of the following circumstances pertain:

> (1)     applicable non-bankruptcy law permits sale of such property free and clear of such interest;

> (2)     such entity consents;

> (3)     such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

        (4)      such interest is in bona fide dispute; or

        (5)      such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

30.     As indicated by the use of the disjunctive term "or," satisfaction of any one of the five requirements listed in Section 363(f) is sufficient to permit the sale of assets free and clear of Liens. *See In re Elliott*, 94 B.R. 343, 345 (E.D. Pa. 1988) (stating that Section 363(f) is written in the disjunctive; the court may approve a sale "free and clear" provided that at least one of the subsections is met).

31.     In this instance, the Debtor believes that all entities asserting a lien or security interest in the Debtor's assets have (or will) consent to the sale. Accordingly, the Purchased Assets may be sold free and clear of liens and security interests pursuant to Section 363(f)(2) of the Bankruptcy Code.

32.     Moreover, the Debtor can also satisfy Section 363(f)(5) of the Bankruptcy Code. Specifically, the "cram down" provision of Section 1129(b) of the Bankruptcy Code sets forth a "legal or equitable proceeding" pursuant to which a secured creditor can be compelled to "accept a money satisfaction" on account of its security interest in satisfaction of Section 363(f)(5) of the Bankruptcy Code. *See, e.g. In re Grand Slam U.S.A. Inc.*, 178 B.R. 460 (E.D. Mich. 1995) (holding that "cram down" provisions of Section 1129(b) satisfy "legal or equitable proceeding" requirement of Section 363(f)(5)); *In re Gulf States Steel, Inc. of Alabama*, 285 B.R. 497 (Bankr. N.D. Ala. 2002) (same); *In re Terrace Chalet Apartments Ltd.*, 159 B.R. 821 (N.D. Ill. 1993) (same); *but see In re PW, LLC*, 391 B.R. 25 (B.A.P. 9th Cir. 2008) (holding that "cram down" provision of Section 1129(b) did not satisfy "legal or equitable" proceeding requirement of

Section 363(f)(5)). Under Section 1129(b) of the Bankruptcy Code, a secured creditor is generally entitled to either (a) retain its security interest in its collateral, (b) receive payment(s) on account of the value of its security interest (if any), or (c) have its security interest attach to the net proceeds of the sale of its collateral. *See* 11 U.S.C. §§ 1129(b)(2)(A)(i)-(ii); *see also In re Riverside Inv. P'ship*, 674 F.2d 634, 640 (7th Cir. 1982) (holding that liens attach to sale proceeds in same order and priority as liens held against collateral sold by trustee under prior Bankruptcy Act). In this case, the Debtor proposes that any Liens in the Purchased Assets (other than Permitted Liens and Assumed Liabilities) held by creditors will attach to the net proceeds of the sale, subject to any claims and defenses that the Debtor may possess with respect thereto.

33.      It is also appropriate to sell the Purchased Assets free and clear of successor liability claims. Such limitations on successor liability ensure that the Purchaser is protected from any claims or lawsuits premised on the theory that the Purchaser is a successor in interest to the Debtor. Courts have consistently held that a buyer of a debtor's assets pursuant to a Section 363 sale takes free and clear from successor liability relating to the debtor's business. *See e.g., In re Tran World Airlines, Inc.,* 322 F.3d 283, 288-90 (3d Cir. 2003) (sale of assets pursuant to section 363(f) barred successor liability claims for employment discrimination and rights under travel voucher program); *In re Leckie Smokeless Coal Co.*, 99 F.3d 573, 585–86 (4th Cir. 1996) (affirming the sale of debtors' assets free and clear of certain taxes); *In re Dixie Pellets LLC*, 2009 WL 8189341 (Bankr. N.D. Ala. Sept. 13, 2009) (approving sale of substantially all of Debtor's assets free and clear of all liens, including but not limited to "all rights or claims based on any theory or principle of successor liability"); *In re Ormet*, 2014 WL 3542133 (Bankr. D. Del. July 17, 2014) (permitting a sale free and clear of successor liability claims relating to an

under-funded pension plan); *In re Insilco Techs., Inc.*, 351 B.R. 313, 322 (Bankr. D. Del. 2006) (stating that a 363 sale permits a buyer to take ownership of property without concern that a creditor will file suit based on a successor liability theory); *see also In re General Motors Corp.*, 407 B.R. 463, 505-06 (Bankr. S.D.N.Y. 2009) (holding that "the law in this Circuit and District is clear; the Court will permit GM's assets to pass to the purchaser free and clear of successor liability claims, and in that connection, will issue the requested findings and associated injunction"); *In re Chrysler LLC*, 405 B.R. 84, 111 (Bankr. S.D.N.Y. 2009) ("[I]n personam claims, including any potential state successor or transferee liability claims against New Chrysler, as well as in rem interests, are encompassed by section 363(f) and are therefore extinguished by the Sale Transaction").

34.     The purpose of a Bankruptcy Court sale order purporting to authorize the transfer of assets free and clear of all claims, liens and encumbrances would be defeated if claimants could thereafter use the transfer as a basis to assert claims against a purchaser arising from a seller's pre-sale conduct. Indeed, Courts in the Northern District of Georgia frequently enter orders pursuant to Section 363 of the Bankruptcy Code containing provisions regarding successor liability similar to those found in the Approval Order. *See*, *e.g., In re South. Reg'l Health Sys., Inc.*, Case No. 15-64266-wlh, Docket No. 373, ¶ 31 (Bankr. N.D. Ga. Oct. 27, 2015) (Hagenau, J.); *In re Cagle's, Inc.*, Case No. 11-80202, Docket No. 439, ¶ 33 (Bankr. N. D. Ga. May 11, 2012) (Bihary, J.); *In re Lake Burton Dev., LLC*, Case No. 09-22830, Docket No. 142, ¶¶ 31–32 (Bankr. N.D. Ga. Apr. 13, 2010) (Bonapfel, J.).

35.     Accordingly, the requirements of Section 363(f) of the Bankruptcy Code can be satisfied, and the sale of the Purchased Assets free and clear of all Liens (other than Assumed Liabilities and Permitted Liens) is appropriate.

**D.     Section 365 Authorizes the Assumption and Assignment of Executory Contracts and Unexpired Leases.**

36.     The Agreement also contemplates the assumption of certain executory contracts and unexpired leases and the assignment of these contracts and leases to the Purchaser. Accordingly, the Debtor also seeks provisions in the Approval Order: (i) authorizing the Debtor to assume and assign the Assumed Contracts pursuant to Section 365 of the Bankruptcy Code; (ii) fixing the cure amounts identified in the schedule to be filed by the Debtor (the "Cure Schedule")[7] as the exact amounts that must be paid to the non-debtor parties to the Assumed Contracts (the "Cure Costs"); (iii) authorizing and directing the Purchaser to pay the Cure Costs at the Closing; and (iv) deeming the parties to the Assumed Contracts adequately assured of future performance.

37.     Section 365(a) of the Bankruptcy Code provides that a debtor-in-possession "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Courts evaluate a decision to assume or reject an executory contract or unexpired lease under the "business judgment" standard. *See Chateaugay Corp*, 973 F.2d at 141; *see also In re Gardinier, Inc.*, 831 F.2d 974, 976 n.2 (11th Cir. 1987); *In re Wells*, 227 B.R. 553, 564 (Bankr. M.D. Fla. 1998); *see also NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 523 (1984). This standard is satisfied if the debtor determines in its business judgment that the

---

[7] The Debtor will file the Cure Schedule within ten (10) days after the Petition Date and will serve the Cure Schedule on all non-debtor parties to the Assumed Contracts.

assumption or rejection of the contract or lease would benefit the estate. *See Sharon Steel Corp. v. National Fuel Gas Distr. Corp.*, 872 F.2d 36, 39-40 (3d Cir. 1989); *In re Bicoastal Corp.*, 125 B.R. 658, 667 (Bankr. M.D. Fla. 1991). The business judgment standard requires that the court approve the debtor's business decision unless that judgment is the product of bad faith, whim or caprice. *See Lubrizol Enter. v. Richmond Metal Finishers, Inc.*, 756 F.2d 1043, 1047 (4th Cir. 1985); *In re Prime Motor Inns*, 124 B.R. 378, 383 (S.D. Fla. 1991).

38.    Here, the Assumed Contracts are integral assets of the Business, and the Debtor has determined, in the exercise of its business judgment, that the assumption and assignment of the Assumed Contracts in connection with a sale of the Purchased Assets is necessary to yield significant value and benefit to the Debtor and its estate.

39.    The Debtor also requests that the Court fix the amount of Cure Costs due under the Assumed Contracts in connection with the requirement in Section 365(b)(1) of the Bankruptcy Code that the debtor in possession, at the time of assumption, cure defaults in any executory contract or unexpired lease being assumed, or provide adequate assurance that the default will be promptly cured. The Debtor will file the Cure Schedule within ten (10) days after the Petition Date and will serve the Cure Schedule on all non-debtor parties to the Assumed Contracts. The Cure Schedule will be based on the Debtor's careful review of its books and records and calculation of all of the arrearages and overdue amounts owing on the Assumed Contracts and will set forth the Debtor's determination of the exact amounts that should be paid to the non-debtor parties to the Assumed Contracts.

40.    To the Debtor's knowledge, there are no defaults under the Assumed Contracts that are required to be cured or for which there is compensation due, other than the Cure Costs.

Accordingly, the Debtor respectfully requests that this Court include in the Approval Order provisions: (i) authorizing the Debtor to assume and assign the Assumed Contracts to the Purchaser pursuant to Section 365 of the Bankruptcy Code; (ii) fixing the Cure Costs as the exact amounts needed to cure any defaults under the Assumed Contracts; (iii) authorizing and directing the Purchaser to pay the Cure Costs at the Closing; and (iv) deeming the parties to the Assumed Contracts adequately assured of future performance by the Purchaser.

### E.    **The Purchaser Should Be Afforded All Protections Under Bankruptcy Code Section 363(m) as a Good Faith Purchaser.**

41.    Section 363(m) of the Bankruptcy Code provides that "the reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith . . . ." 11 U.S.C. § 363(m).

42.    The transaction reflected in the Agreement was negotiated by the parties at arm's length and in good faith. The Purchaser is neither an "insider" nor an affiliate of the Debtor, and the Purchaser does not have any relationship to the Debtor that has not been fully disclosed to the Court. Accordingly, the Debtor requests that the Purchaser be determined to have acted in good faith and be entitled to the protections of a good faith purchaser under Section 363(m) of the Bankruptcy Code. *See, e.g., In re United Press Int'l, Inc.*, No. 91 B 13955 (FGC), 1992 U.S. Bankr. LEXIS 842, at *3 (Bankr. S.D.N.Y. May 18, 1992); *see also Miami Ctr. L.P. v. Bank of N.Y.*, 838 F.2d 1547, 1554 (11th Cir. Fla. 1988) ("The "good faith purchaser" is one who buys in good faith, that is, free of any fraud or misconduct and for value and without knowledge of any adverse claim.").

F.    **Deemed Consent.**

43.    The Debtor requests that: (a) each holder of a Lien of any kind in or with respect to the Purchased Assets that does not object, or that withdraws its objection, to the sale of the Purchased Assets and this Motion be deemed to have consented to the sale of the Purchased Assets free and clear of all Liens (other than Assumed Liabilities and Permitted Liens); (b) each non-debtor party to an Assumed Contract that does not object, or that withdraws its objection, to the sale of the Purchased Assets and this Motion be deemed to have consented to assumption and assignment of the applicable Assumed Contract pursuant to Section 365(c)(1)(B) of the Bankruptcy Code; and (c) each Governmental Authority that has issued or granted a Permit and that does not object, or that withdraws its objection, to the sale of the Purchased Assets and this Motion be deemed to have consented to the transfer of such Permit to the Purchaser as of the Closing Date. *See FutureSource LLC v. Reuters Ltd.*, 312 F.3d 281, 285 (7th Cir. 2002) (Posner, J.) (holding that a licensee's failure to object to a sale constituted consent to the sale of intellectual property "free and clear" of the licensee's interests under Section 363 of the Bankruptcy Code); *In re Christ Hospital*, 502 B.R. 158, 174–75 (Bankr. D.N.J. 2013) (adopting the conclusion in *FutureSource* that failure to object to a section 363 sale constitutes consent); *Hargrave v. Township of Pemberton (In re Tabone, Inc.)*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) ("As the Township did not offer any objection, it may be deemed to have consented to the sale for purposes of section 363(f)(2)."); *In re Shary*, 152 B.R. 724, 725 (Bankr. N.D. Ohio 1993) (state's failure to object to transfer of liquor license in connection with a section 363 sale constituted consent to the transfer). Courts in this jurisdiction have granted similar relief in connection with sales pursuant to Section 363 of the Bankruptcy Code. *See*, *e.g., In re South.*

*Reg'l Health Sys., Inc.*, Case No. 15-64266-wlh, Docket No. 373, ¶¶ X, 14, 24 (Bankr. N.D. Ga. Oct. 27, 2015) (Hagenau, J.); *In re Cagle's, Inc.*, Case No. 11-80202, Docket No. 439, ¶¶ W, 16, 26 (Bankr. N. D. Ga. May 11, 2012) (Bihary, J.); *In re Lake Burton Dev., LLC*, Case No. 09-22830, Docket No. 142, ¶¶ T, 39 (Bankr. N.D. Ga. Apr. 13, 2010) (Bonapfel, J.).

<u>**Notice**</u>

44.      A copy of this Motion (together with a notice of hearing setting forth the time and location of the hearing on this Motion and the deadline for filing objections to this Motion) has been provided to the Office of the United States Trustee, TMA, the Debtor's twenty (20) largest unsecured creditors, the district director of the Internal Revenue Service, the Attorney General for the State of Georgia, the United States Attorney for the Northern District of Georgia, the First Bank of Dalton, counsel to FieldTurf, counsel to the Purchaser (Thompson Hine LLP), all counterparties to the Assumed Contracts, all persons or entities known or reasonably believed to have asserted an interest in the Purchased Assets, all parties who have filed notices of appearance and requests for pleadings in this chapter 11 case, and all entities (including Governmental Authorities) known to the Debtor that may have the right to file a Claim, fine, penalty or Lien against the Purchased Assets or the Debtor. In addition, a copy of this Motion (excluding <u>Exhibits B</u> and <u>C</u>)[8] (together with a notice of hearing setting forth the time and location of the hearing on this Motion and the deadline for filing objections to the Motion) has been mailed to all other persons and entities listed in the Debtor's Mailing Matrix (which includes, among other things, all current and former customers of the Debtor that are subject to

---

[8] Copies of <u>Exhibits B</u>, and <u>C</u> are available upon written request by contacting counsel for the Debtor: Karyn D. Heavenrich, kheavenrich@kslaw.com, 1180 Peachtree Street, Atlanta, Georgia 30309.

an outstanding warranty contract (as reflected in the Debtor's business records) and all Employees of the Debtor).

45.    Upon filing of the Cure Schedule with the Court, the  Debtor will mail a copy of the Cure Schedule to all non-debtor parties to the Assumed Contracts.

46.    The Debtor respectfully submits that such notice is sufficient and proper under the circumstances, and that no other or further notice is required.

### Conclusion

WHEREFORE, based upon the foregoing, the Debtor respectfully requests that the Court enter the Approval Order in the form attached hereto as Exhibit A: (a) approving the sale of the Purchased Assets free and clear of all Liens (other than Assumed Liabilities and Permitted Liens); (b) authorizing the proposed assumption and assignment of the Assumed Contracts and approving the Cure Costs related thereto; and (c) granting such other and further relief as the Court deems just and proper.

24

Dated: June 28, 2016                    Respectfully submitted,
        Atlanta, Georgia
                                        KING & SPALDING LLP

                                        /s/ Paul K. Ferdinands
                                        Paul K. Ferdinands
                                        Georgia Bar No. 258623
                                        pferdinands@kslaw.com
                                        Mark. M. Maloney
                                        Georgia Bar No. 468104
                                        mmaloney@kslaw.com
                                        Jeffrey R. Dutson
                                        Georgia Bar No. 637106
                                        jdutson@kslaw.com
                                        Karyn D. Heavenrich
                                        Georgia Bar No. 334083
                                        kheavenrich@kslaw.com
                                        1180 Peachtree Street
                                        Atlanta, Georgia 30309-3521
                                        Telephone:    (404) 572-4600
                                        Facsimile:    (404) 572-5131

                                        PROPOSED COUNSEL FOR THE
                                        DEBTOR-IN-POSSESSION