# EXHIBIT C

## Asset Purchase Agreement

**Execution Version**

---

**ASSET PURCHASE AGREEMENT**


**BY AND AMONG**

**APT ACQUISITION CONSTRUCTION CORP.,**

**APT ACQUISITION CORP.**

**AND**

**ASTROTURF, LLC**


**JUNE 27, 2016**

---

## ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT**, dated as of June 27, 2016 (this "Agreement"), is entered into by and among APT Acquisition Construction Corp., a Georgia corporation ("Purchaser"), APT Acquisition Corp., a Georgia corporation ("Parent"), and AstroTurf, LLC, a Michigan limited liability company (the "Seller"). Purchaser, Parent and Seller are sometimes individually referred to in this Agreement as a "Party" and collectively as the "Parties."

## RECITALS:

**WHEREAS**, Seller is currently engaged in the marketing, sale, and installation of high-quality indoor and outdoor synthetic grass athletic surfaces, including field, track, indoor and tennis surfaces (the "Business");

**WHEREAS**, Seller desires to sell, transfer, convey, assign and deliver the Purchased Assets (as defined below) and to assign the Assumed Liabilities (as defined below), and Purchaser desires to purchase, take delivery of, and acquire such Purchased Assets and to assume such Assumed Liabilities, upon the terms and subject to the conditions set forth herein;

**WHEREAS**, as contemplated by Section 7.4(a) of this Agreement, within five (5) days following the execution of this Agreement by the Parties, Seller shall file and commence a Chapter 11 bankruptcy case (the "Bankruptcy Case") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Northern District of Georgia (the "Bankruptcy Court"); and

**WHEREAS,** the transactions contemplated by this Agreement (the "Transactions") will be consummated pursuant to an Approval Order (as defined below) to be entered in the Bankruptcy Case under Sections 105, 363, 365 and other applicable provisions of the Bankruptcy Code, and the Transactions and this Agreement are subject to the approval of the Bankruptcy Court.

**NOW**, **THEREFORE**, in consideration of the foregoing and the mutual agreements, covenants, representations, warranties and promises set forth herein, and in order to prescribe the terms and conditions of such purchase and sale, intending to be legally bound, the Parties agree as follows:

1.     **Definitions**.

      1.1.     Definitions.     The following terms, as used herein, have the following meanings:

      (a)     "Accounts Receivable" means all accounts and notes receivable (whether current or non-current) of Seller in respect of goods shipped, products sold or services rendered prior to the Closing Date, including all accounts receivable due to Seller from any of Seller's Affiliates.

(b)    "<u>Affiliate</u>" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with, such other Person.

(c)    "<u>Base Working Capital</u>" means an amount equal to $17,321,795, representing the total current Purchased Assets minus the total current Assumed Liabilities as of April 30, 2016, as set forth on <u>Exhibit A</u>; <u>provided</u>, <u>however</u>, the line items for Seller's trade payables, accrued expenses and billings in excess of cost on <u>Exhibit A</u> shall be the amount of trade payables, accrued expenses and billings in excess of cost outstanding as of April 30, 2016 (even though such liabilities were incurred prior to the Petition Date). Each of the amounts set forth on <u>Exhibit A</u> is unaudited and was prepared in accordance with GAAP.

(d)    "<u>Business Day</u>" means a day other than Saturday, Sunday or other day on which commercial banks in Atlanta, Georgia are authorized or required by Law to close.

(e)    "<u>CERCLA</u>" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended (42 U.S.C. § 9601 <u>et</u> <u>seq</u>.), and any Laws promulgated thereunder.

(f)    "<u>Claim</u>" means a "claim" as defined in Section 101 of the Bankruptcy Code.

(g)    "<u>Closing Date</u>" means the date of the Closing.

(h)    "<u>Code</u>" means the Internal Revenue Code of 1986, as amended.

(i)    "<u>Confidentiality Agreement</u>" means the Confidentiality and Non-Disclosure Agreement dated September 9, 2014, between TMA and Sportfield Deutschland Holding GmbH (an Affiliate of Purchaser), as amended to date.

(j)    "<u>Contract</u>" means any oral or written contract, agreement, option, indenture, instrument, lease, license, mortgage, deed of trust, purchase order, bill of sale, commitment or other legally binding arrangement.

(k)    "<u>Controlled Group</u>" means the Seller and any entity that is aggregated with the Seller under Code Section 414(b), (c), (m) or (o).

(l)    "<u>Cure Costs</u>" means all amounts that must be paid and all obligations that otherwise must be satisfied, including pursuant to Sections 365(b)(1)(A) and (B) of the Bankruptcy Code, in connection with the assumption and/or assignment of the Assumed Contracts to Purchaser as provided herein. Within ten (10) days of the Petition Date, Seller shall file with the Bankruptcy Court a schedule that sets forth the proposed Cure Costs with respect to each Contract of Seller.

(m)    "<u>Environmental Claim</u>" means any written notice by a Person alleging potential liability (including potential liability for any investigatory costs,

cleanup costs, governmental response costs, natural resource damages, property damages, personal injuries, or penalties) arising out of, based on or resulting from (a) the presence, Release or threatened Release into the environment of any materials at any location, or (b) circumstances forming the basis of a violation, or alleged violation, of any Environmental Law.

(n)    "Environmental Laws" means any Law (a) relating to pollution (or the cleanup thereof), natural resources or natural resource damages, endangered or threatened species, human health or safety or the environment (including ambient air, soil, surface water or groundwater or subsurface strata) or (b) concerning the presence of, exposure to, or the management, manufacture, use, Release, containment, storage, recycling, reclamation, reuse, treatment, licensing, reporting, permitting, investigation, generation, discharge, transportation, processing, production, disposal or remediation of any Hazardous Substances, including the following (including their implementing regulations and any state analogs):  CERCLA; the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act of 1976, as amended by the Hazardous and Solid Waste Amendments of 1984, 42 U.S.C. §§ 6901 et seq.; the Federal Water Pollution Control Act of 1972, as amended by the Clean Water Act of 1977, 33 U.S.C. §§ 1251 et seq.; the Toxic Substances Control Act of 1976, as amended, 15 U.S.C. §§ 2601 et seq.; the Emergency Planning and Community Right-to-Know Act of 1986, 42 U.S.C. §§ 11001 et seq.; the Clean Air Act of 1966, as amended by the Clean Air Act Amendments of 1990, 42 U.S.C. §§ 7401 et seq. and the Occupational Safety and Health Act of 1970, as amended, 29 U.S.C. §§ 651 et seq.

(o) "ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and all Laws issued thereunder.

(p)    "Escrow Agent" means U.S. Bank, N.A.

(q)    "Escrow Agreement" means that certain Escrow Agreement, dated as of the date hereof, by and among Seller, the Purchaser and the Escrow Agent.

(r)    "Estimated Cure Costs" means an amount equal to $1,200,000.

(s)    "Existing Litigation" means the civil lawsuit captioned FieldTurf USA, Inc., et al. vs. AstroTurf, LLC, case no.: 2:10-cv-12492-SJM-MJH, pending in the United States District Court for the Eastern District of Michigan, together with all appeals and related proceedings.

(t)    "GAAP" means, at a given time, United States generally accepted accounting principles, consistently applied.

(u)    "Governmental Authority" means any federal, state, local, municipal, foreign, supranational or other governmental or quasi-governmental authority of any nature (including any governmental agency, branch, bureau, commission, department, official or entity and any court or other tribunal), or any administrative, executive, judicial, legislative, police, regulatory or Taxing Authority, or arbitral body.

3

(v)      "Hazardous Substances" means any pollutants, contaminants or chemicals, and any industrial, toxic or otherwise hazardous materials, substances or wastes and any other substance with respect to which liability or standards of conduct may be imposed under any Environmental Laws, including petroleum and petroleum related substances, products, by products and wastes, asbestos, urea, formaldehyde and lead based paint.

(w)      "Indemnity Agreement" means the Price Adjustment and Indemnity Agreement, dated as of the date hereof, by and among TMA, Synthetic Turf Resources, LLC, Crystal Products Co., Inc., UTGH Equipment, LLC, APT Acquisition Manufacturing and Distribution Corp., Parent, and Purchaser.

(x)      "Intellectual Property" means (i) all inventions (whether patentable or unpatentable and whether or not reduced to practice), all improvements thereto, and all patents, patent applications and patent disclosures, together with all reissuances, continuations, continuations-in-part, revisions, extensions, and reexaminations thereof; (ii) all trademarks, service marks, trade dress, logos, trade names, corporate names and social media user names, together with all translations, adaptations, derivations, and combinations thereof and including all goodwill associated therewith, and all applications, registrations, and renewals in connection therewith; (iii) all copyrightable works (including all photographic images in the possession of the Seller), all copyrights, and all applications, registrations, and renewals in connection therewith and all tangible media containing such copyrightable works; (iv) all mask works and all applications, registrations, and renewals in connection therewith; (v) all trade secrets and confidential business information (including ideas, research and development, know-how, formulas, compositions, manufacturing and production processes and techniques, technical data, designs, drawings, specifications, customer and supplier lists, pricing and cost information and business and marketing plans and proposals); (vi) all computer software (including data and related documentation and internet applications); (vii) all domain names and website content; (viii) all other proprietary rights; and (ix) all copies and tangible embodiments thereof (in whatever form or medium).

(y)      "Intellectual Property Licenses" means all licenses, sublicenses and other agreements by or through which other Persons, including any Affiliate of Seller, grant to Seller exclusive or non-exclusive rights or interests in or to any Intellectual Property that is used in, or necessary for, the operation of the Business as presently conducted.

(z)      "Intellectual Property Rights" means all of Seller's Intellectual Property rights, including all of Seller's rights under any Intellectual Property Licenses and the goodwill represented by all such Intellectual Property.

(aa)      "Inventory" means all supplies, goods, finished goods, materials, raw materials, work in process (including construction work in process), and stock in trade owned by Seller, whether or not prepaid, and wherever located, held or owned.

4

(bb)    "IP License" means that certain License Agreement, dated March 1, 2012, between TMA (as licensor) and Seller (as licensee), as amended to date.

(cc)    "Knowledge of Seller" or any other similar knowledge qualification in this Agreement means all facts actually known or that could have been known after due inquiry by the following individuals: Heard Smith, Tommy Boggs and Sean Harding. For purposes of this definition, due inquiry will include a review of such Person's relevant files and records with respect to the conduct of the Business and an inquiry of such Person's direct reports with respect to the subject matter in question.

(dd)    "Law" means any law, statute, regulation, rule, code, constitution, ordinance, treaty, rule of common law, or Order of, administered or enforced by or on behalf of, any Governmental Authority.

(ee)    "Leased Real Property" means the parcels of real property of which Seller is the lessee (together with all fixtures and improvements thereon).

(ff)    "Lien" means, with respect to any property or asset, any mortgage, lien (statutory or otherwise), pledge, security interest, Claim, encumbrance, restriction, charge, instrument, preference, priority, option, or right of first refusal, of any kind or nature, whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, recorded or unrecorded, contingent or non-contingent, material or non-material, known or unknown. For the avoidance of doubt, the definition of Lien shall not be deemed to include the grant of any license or sublicense by Seller of Intellectual Property Rights.

(gg)    "Material Adverse Effect" means a material adverse effect on the Business and the Purchased Assets, taken as a whole, excluding any such effect to the extent resulting from or arising in connection with: (i) the pendency or consummation of the Transactions or the public announcement thereof; (ii) changes or conditions affecting the industries generally in which Seller operates; (iii) changes in national or international business, economic, political or social conditions, including the engagement by the United States of America in hostilities, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack upon the United States of America or any of its territories, possessions or diplomatic or consular offices or upon any military installation, equipment or personnel of the United States of America; (iv) changes in financial, banking or securities markets (including any disruption thereof or any decline in the price of securities generally or any market or index); (v) changes in Law or in GAAP or interpretations thereof; (vi) changes resulting from the commencement and continuation of the Bankruptcy Case; (vii) the entry of any Order in, or the taking of any action in connection with or relating to, the Existing Litigation; or (viii) any action taken by Seller as required or contemplated by this Agreement.

(hh)    "Multiemployer Plan" means any "multiemployer plan" as defined in ERISA§ 3(37).

5

(ii)    "<u>Multiple Employer Welfare Arrangement</u>" has the meaning set forth in ERISA Sec. 3(40).

(jj)    "<u>Nonpartisan Accountants</u>" has the meaning given to such term in the Indemnity Agreement.

(kk)    "<u>Order</u>" means any award, decision, decree, order, directive, injunction, ruling, judgment, or consent of or entered, issued, made or rendered by any Governmental Authority.

(ll)    "<u>ordinary course of business</u>" means the ordinary course of business of Seller and the Business consistent with past practices (taking into account that, after the Petition Date, Seller will be a debtor in possession in the Bankruptcy Case).

(mm)    "<u>Other Purchase Agreements</u>" means: (i) the Asset Purchase Agreement, dated as of the date hereof, by and between Parent and TMA; (ii) the Asset Purchase Agreement, dated as of the date hereof, by and among Parent, APT Acquisition Manufacturing and Distribution Corp., and Synthetic Turf Resources, LLC; (iii) the Asset Purchase Agreement, dated as of the date hereof, by and among Parent, APT Acquisition Manufacturing and Distribution Corp., and Crystal Products Co., Inc.; and (iv) the Asset Purchase Agreement, dated as of the date hereof, by and between Parent and UTGH Equipment, LLC.

(nn)    "<u>Other Transactions</u>" means the transactions contemplated by the Other Purchase Agreements.

(oo)    "<u>Performance Bond</u>" means each surety bond, guaranty or indemnity obligation, and/or letter of credit relating exclusively to the Business and/or the businesses being conveyed pursuant to the Other Purchase Agreements and with respect to which Seller or any of its Affiliates has any liability or obligation.

(pp)    "<u>Permits</u>" means licenses, permits, approvals, certificates of occupancy, authorizations, operating permits, registrations, plans and the like.

(qq)    "<u>Permitted Liens</u>" means (i) Liens granted by Purchaser at or after the Closing in connection with any financing of Purchaser related to the purchase of the Purchased Assets pursuant to this Agreement; (ii) non-monetary Liens that do not materially interfere with the ability of Purchaser to own and operate the Purchased Assets in substantially the manner as operated immediately prior to the execution of this Agreement; (iii) Liens that arise under zoning, building codes, land use and other similar Laws, none of which would materially interfere with the ownership or operation by Purchaser of the Purchased Assets following the Closing in substantially the manner as owned and operated immediately prior to the execution of this Agreement; (iv) Liens for Taxes not yet due and payable; and (v) with respect to leased or licensed property (including the Leased Real Property), the terms and conditions of the lease or license applicable thereto to the extent constituting an Assumed Contract.

6

(rr)    "Person" means an individual, corporation, partnership, limited liability company, association, joint venture, trust or other entity or organization, including a Governmental Authority.

(ss)    "Petition Date" means the date on which Seller commences the Bankruptcy Case.

(tt)    "Post-Closing Tax Period" means (a) any Tax period beginning after the Closing Date, and (b) with respect to a Tax period that commences on or before and ends after the Closing Date, the portion of such period beginning the day after the Closing Date.

(uu)    "Post-Petition Contracts" means all leases, agreements and executory contracts entered into by Seller after the Petition Date (except any contracts related to money loaned to Seller by any bank, financial institution, or other third party lender), including all agreements with vendors, suppliers and customers.

(vv)    "Post-Petition Performance Bond" means each Performance Bond that is issued on behalf of Seller or any of its Affiliates after the Petition Date and is outstanding on the Closing Date.

(ww)    "Pre-Closing Straddle Period Taxes" means (a) with respect to Taxes imposed on or measured by sales, use, value-added, income, receipts, profits or payment of wages, the portion of any such Tax that would have been due had the Straddle Period ended on and included the Closing Date, and (b) with respect to all other Taxes, an amount equal to any such Tax multiplied by a fraction, the numerator of which is the number of days in the portion of the Straddle Period ending on and including the Closing Date, and the denominator of which is the number of days in the entire Straddle Period.

(xx)    "Pre-Closing Tax Period" means (i) any Tax period ending on or before the Closing Date, and (ii) with respect to a Tax period that commences on or before and ends after the Closing Date, the portion of such period up to and including the Closing Date.

(yy)    "Pre-Petition Performance Bond" means each Performance Bond that is outstanding as of the date of this Agreement.  A list of all Pre-Petition Performance Bonds is set forth on Schedule 1.1(yy).

(zz)    "Property Taxes" means all real property Taxes, personal property Taxes and similar ad valorem obligations levied with respect to the Purchased Assets for any Taxable period.

(aaa)    "Release" has the meaning set forth in CERCLA.

(bbb)    "Straddle Period" means any taxable period beginning on or before and ending after the Closing Date.

7

(ccc)    "Tax" means (i) any federal, state, local, or foreign income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental (including taxes under Section 59A of the Code), unclaimed funds, customs, duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, intangible, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax, governmental fee or other like assessment or charge of any kind whatsoever (including withholding on amounts paid to or by any Person), together with any interest, penalty, addition to tax or additional amount imposed by any Governmental Authority (a "Taxing Authority") responsible for the imposition of any such tax (domestic or foreign), or (ii) liability for the payment of any amounts of the type described in clause (i) as a result of being party to any agreement or any express or implied obligation to indemnify any other Person.

(ddd)    "TMA" means Textile Management Associates, Inc., a Georgia corporation.

(eee)    "Treasury Regulations" means final and temporary regulations promulgated under the Code.

(fff)    "Warranty Liabilities" means all liabilities of Seller arising from any warranty issued by Seller to any of its customers, whether such liabilities are known or unknown and whether asserted before or after the Closing Date.

1.2.    Cross References.  Each of the following terms is defined in the Section set forth opposite such term:

| Term | Section |
|------|---------|
| Agreement | Preamble |
| Allocation Schedule | 2.6(c) |
| Annual Financial Statements | 3.7 (a) |
| Apportioned Obligations | 9.3 |
| Approval Order | 7.4(b) |
| Assignment and Assumption Agreement | 2.10(a) |
| Assumed Contracts | 2.1(a) |
| Assumed Liabilities | 2.3 |
| Bankruptcy Case | Recitals |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Business | Recitals |
| Certified Working Capital | 2.7(b) |
| Closing | 2.9 |
| Closing Payment | 2.6(a) |
| Contractor License | 3.10(b) |
| Customer Certification | 5.2 |
| Customer Disclosures | 5.2 |
| Eligible Employee | 10.1(a) |

8

| | |
|---|---|
| Employee Benefit Plan | 3.20(a) |
| Employees | 3.19(a) |
| End Date | 13.1(b) |
| Estimated Final Working Capital Statement | 2.6(b) |
| Estimated Working Capital Amount | 2.6(b) |
| Excluded Assets | 2.2 |
| Excluded Liabilities | 2.4 |
| Final Working Capital | 2.7(a) |
| Final Working Capital Statement | 2.7(a) |
| Financial Statements | 3.7(a) |
| Good Faith Deposit | 2.8(a) |
| Interim Financial Statements | 3.7(a) |
| Parent | Preamble |
| Party or Parties | Preamble |
| Purchase Price | 2.6(a) |
| Purchased Assets | 2.1 |
| Purchaser | Preamble |
| Real Property Leases | 3.12(c) |
| Relevant Customers | 5.2 |
| Schedule Supplement | 14.10 |
| Seller | Preamble |
| Taxing Authority | 1.1(bbb) |
| Transaction Documents | 3.2(a) |
| Transactions | Recitals |
| Transfer Taxes | 9.2 |
| Transferred Employee | 10.1(b) |
| Transferred Employees' Employment Date | 10.5 |
| WARN Act | 3.19(c) |
| Working Capital Escrow Amount | 2.6(a) |

2. <u>**Purchase and Sale**</u>.

2.1.   <u>Purchase and Sale</u>.  Subject to the terms and conditions set forth in this Agreement, at the Closing, Seller agrees to sell, transfer and deliver to Purchaser, and Purchaser agrees to purchase, acquire and accept from Seller, all right, title and interest of Seller as of the Closing Date in and to all assets, properties and rights of the Seller, wherever located (in all cases, excluding the Excluded Assets), that are owned, held or primarily used in, or necessary for, the conduct of the Business (the "<u>Purchased Assets</u>"), free and clear of all Liens (other than Permitted Liens and the Assumed Liabilities) to the maximum extent permitted by Section 363 of the Bankruptcy Code, including the following:

(a) subject to <u>Section 2.5(a)</u>, all rights of Seller under the executory contracts and unexpired leases of Seller that are set forth on <u>Schedule 2.1(a)</u> and all Post-Petition Contracts entered into in the ordinary course of business (collectively, the "<u>Assumed Contracts</u>");

9

(b) all Accounts Receivable and all Claims against third parties related to the collectability thereof;

(c) all Inventory;

(d) all tangible personal property, including all machinery, equipment, tools, computers, mobile phones, personal digital assistants, computer equipment, hardware, peripherals, information technology infrastructure, telephone systems, furniture, fixtures, furnishings, and other tangible personal property of any kind owned by Seller (including any of the foregoing property that is subject to a capital lease, but only to the extent that Purchaser assumes such capital lease as an Assumed Contract), wherever located, including all such items which are located in any building, warehouse, office or other space leased or occupied by Seller or any other space where any of Seller's properties and or any other assets may be situated;

(e) all Permits of Seller, but only to the extent such Permits are transferable without obtaining any third party consents or such consents have been granted at or prior to Closing (to the extent consent is required);

(f) all Intellectual Property Rights (other than the IP License, which shall be an Excluded Asset), including the items set forth on Schedule 2.1(f), except, in the case of Intellectual Property Licenses, to the extent the consent of any third party is required to transfer such Intellectual Property Licenses and any such consent has not been granted at or prior to the Closing;

(g) all cars, trucks, forklifts, other industrial vehicles and other motor vehicles set forth on Schedule 2.1(g);

(h) all credits, prepaid expenses, deferred charges, advance payments, security deposits and customer deposits other than those set forth in Schedule 2.2(b);

(i) all books, records, files and papers of Seller reasonably necessary for Purchaser to run the Business or related to the Purchased Assets, including equipment logs, operating guides and manuals, creative materials, advertising materials, promotional materials, studies, reports, correspondence, financial and accounting records, Tax records and other similar documents and records (all in the state in which such records and information currently exist), provided that Seller shall be entitled to retain and use copies of all such books, records, files and papers;

(j) all Claims or causes of action of Seller arising under Section 547 of the Bankruptcy Code as against any non-debtor party to an Assumed Contract (including any Post-Petition Contract) with Seller, any party to whom an Assumed Liability is owed, or any other non-debtor party identified on Schedule 2.1(j), and all Claims or causes of action related to the operation of the Business or the Purchased Assets, other than (i) Claims relating to the Existing Litigation, (ii) Claims against directors, officers or other Affiliates of Seller (except: (A) Claims against Affiliates relating to the collection of Accounts Receivable; and (B) Claims against Synthetic Turf Resources, LLC arising under or related to that certain Supply Agreement, dated January 1, 2010, by and between

10

Seller and Synthetic Turf Resources, LLC), and (iii) other Claims excluded in Section 2.2(c) hereof;

(k) the following prepaid warranty insurance policies and all causes of action and rights thereunder:    Colonial National Insurance Company policy #103GL000140702 and Great American E&S Insurance Company policy #XS642060606; and

(l) all rights of Seller to the name "AstroTurf" or any combination of words in which the name "AstroTurf" appears, and any rights associated with any such name and any right to use any such name, in all jurisdictions in which Seller either currently uses any such name or has any right to use any such name.

2.2.    Excluded Assets.  Notwithstanding any other provision of this Agreement to the contrary, the Purchased Assets shall not include any assets, properties or rights identified below (the "Excluded Assets"):

(a) all of Seller's cash and cash equivalents on hand (including all undeposited checks) and in banks or other financial institutions;

(b) all deposits listed in Schedule 2.2(b);

(c) other than the Claims described in Section 2.1(b) and 2.1(j) above, all avoidance Claims or other Claims or causes of action of Seller, whether arising under the Bankruptcy Code, applicable state Law or otherwise and the proceeds thereof, including actions available to Seller under chapter 5 of the Bankruptcy Code, of whatever kind or nature, and whether asserted or unasserted;

(d) all Permits of Seller to the extent such Permits are not transferable without obtaining a third party consent and such consent has not been obtained as of the Closing Date;

(e) Seller's minute books and organizational documents;

(f) subject to Section 2.5(a), any unexpired lease or executory contract not identified in this Agreement as an Assumed Contract;

(g) except as provided in Section 2.1(k), all insurance policies relating to the Business and all Claims arising under such policies prior to the Closing, and all credits, premium refunds, proceeds, causes of action or rights thereunder;

(h) all rights of Seller in or under the Employee Benefit Plans, including all pre-payments, deposits and refunds thereunder and any assets maintained pursuant thereto or in connection therewith;

(i) all rights of Seller arising under this Agreement or in connection with the Transactions;

11

(j) any Tax refund or reimbursement due to Seller relating to any Pre-Closing Tax Period;

(k) any shares of stock or other equity interests held by Seller; and

(l) all other assets listed on Schedule 2.2(l).

2.3.    Assumed Liabilities.  Upon the terms and subject to the conditions of this Agreement, Purchaser agrees, effective at the time of the Closing, to assume, pay, perform and discharge, promptly when payment or performance is due or required, the following liabilities and obligations of Seller or the Business (the "Assumed Liabilities"):

(a) all trade payables and accrued expenses of Seller, including all trade payables and accrued expenses due from Seller to any of Seller's Affiliates, arising in the ordinary course of business after the Petition Date that are entitled to priority status under Section 503(b) of the Bankruptcy Code, and all billings in excess of cost of Seller arising in the ordinary course of business at any time (it being understood that trade payables, accrued expenses and billings in excess of cost shall not include any fees or expenses due to professional persons retained by Seller or any other party involved in the Bankruptcy Case, including any creditors' committee);

(b) all Claims, liabilities and obligations related to or arising in connection with the conduct of the Business or the ownership of the Purchased Assets from and after the Closing;

(c) all liabilities and obligations under the Assumed Contracts (to the extent provided under Section 365 of the Bankruptcy Code) to the extent relating to the performance thereunder following the Closing;

(d) all liabilities and obligations of Seller related to or arising from and after the Closing under the Permits and Intellectual Property Rights that are Purchased Assets, but excluding, for the avoidance of doubt, any liabilities and obligations relating to the conduct of the Business prior to the Closing;

(e) all costs, expenses and liabilities prorated to Purchaser as set forth in this Agreement (including Section 9.3);

(f) all Warranty Liabilities; provided, however, the treatment of Warranty Liabilities as Assumed Liabilities shall not alter or modify the terms and conditions of the Indemnity Agreement;

(g) all obligations and liabilities of Seller and its Affiliates under any Pre-Petition Performance Bond and under any Post-Petition Performance Bond entered into in the ordinary course of business;

(h) Transfer Taxes for which Purchaser is liable pursuant to Section 9.2;

(i)  all Cure Costs (irrespective of when such Cure Costs are incurred or paid to the nondebtor party); provided, however, that if the total Cure Costs for all Assumed Contracts exceed the total amount of the Estimated Cure Costs, the Purchase Price shall be reduced by the amount of such excess; and

(j)  all customer claims against Seller arising in the ordinary course of business, whether such claims are known or unknown and whether asserted before or after the Closing Date.

2.4.  Excluded Liabilities.  Notwithstanding any other provision of this Agreement to the contrary, Purchaser is assuming only the Assumed Liabilities and is not assuming any other Claim against or obligation of Seller of whatever nature, whether presently in existence or arising hereafter.  All such other Claims and obligations shall be retained by and remain obligations and liabilities of Seller (all such liabilities and obligations not being assumed being herein referred to as the "Excluded Liabilities"), including any liabilities or obligations for (a) Taxes, including Pre-Closing Straddle Period Taxes, relating to the Business, the Purchased Assets or the Assumed Liabilities for any Pre-Closing Tax Period, (b) any other Taxes of Seller (other than Transfer Taxes for which the Purchaser is liable pursuant to Section 9.2) for any taxable period, and (c) any liabilities relating to or arising out of the Existing Litigation.

2.5.  Assumption/Assignment of Contracts and Rights.

(a) From time to time, at any time prior to the Closing Date, Purchaser may update Schedule 2.1(a) to add or remove Contracts (other than any Post-Petition Contracts); provided, however, that the addition or removal of any such Contract shall not result in an adjustment to the Purchase Price.  Any Contract added to Schedule 2.1(a) shall be deemed an Assumed Contract for all purposes of this Agreement.  Any Contract removed from Schedule 2.1(a) shall be deemed an Excluded Asset for all purposes of this Agreement.

(b) Seller shall provide Purchaser within two (2) Business Days following the execution and delivery of each Post-Petition Contract and Post-Petition Performance Bond, a copy of such Post-Petition Contract and Post-Petition Performance Bond, with all exhibits and attachments.

(c) To the maximum extent permitted by the Bankruptcy Code, the Assumed Contracts shall be assumed by Seller and assigned to Purchaser at the Closing pursuant to Section 365 of the Bankruptcy Code.  Subject to Section 2.3(i), Purchaser shall have sole responsibility for paying any Cure Costs due in connection with the assumption and assignment of the Assumed Contracts.  Notwithstanding any other provision of this Agreement to the contrary, this Agreement shall not constitute an agreement to assign any Purchased Asset or any right thereunder if an attempted assignment, without the consent of a third party, would constitute a breach or in any way adversely affect the rights of Purchaser or Seller thereunder (unless such assignment is otherwise attainable pursuant to Sections 105, 363 and/or 365 of the Bankruptcy Code).  If such consent is not obtained or such assignment is not attainable pursuant to Sections 105, 363 and/or 365 of the Bankruptcy Code, then such Purchased Assets shall not be

13

transferred hereunder and the Closing shall proceed with respect to the remaining Purchased Assets without any reduction in the Purchase Price; provided, however, the Seller shall use commercially reasonable efforts to provide to the Purchaser, by any lawful and reasonable arrangement reasonably acceptable to Purchaser (such as subleasing, sublicensing or subcontracting), the economic claims, rights and benefits under any Purchased Asset with respect to which a consent is required but has not been obtained in accordance with this Agreement, in which event:

(i)    notwithstanding anything to the contrary set forth in this Agreement, to the extent the Purchaser is receiving the economic claims, rights and benefits under a Purchased Asset:  (A) the obligations and liabilities under such Purchased Asset (but not the Purchased Asset itself) shall be included in the Assumed Liabilities to the extent such obligations and liabilities relate to the performance thereunder following the Closing, (B) the claims, rights, and benefits of Seller arising under the Purchased Asset or resulting therefrom (but not the Purchased Asset itself) shall be included in the Purchased Assets and transferred to the Purchaser hereunder, (C) the Purchaser shall, as agent or subcontractor for the Seller, pay, perform and discharge fully the liabilities and obligations of the Seller thereunder from and after the Closing Date, as reasonably directed by the Seller, (D) the Seller shall enforce, at the request of and for the benefit of the Purchaser, any rights of the Seller arising thereunder against any Person, including the right to seek any available remedies or to elect to terminate in accordance with the terms thereof, and (E) to the extent permitted under applicable Law, any payments or other benefits received by the Seller therefrom after the Closing shall immediately be transferred by Seller to the Purchaser; provided, however, that the Seller shall be permitted to set off against such amounts all reasonable, documented direct costs associated with the retention and maintenance of such Purchased Assets upon delivering to the Purchaser appropriate supporting documentation; and

(ii)    for a period of three (3) months after the Closing, the Seller shall have the continuing obligation to use its commercially reasonable efforts to obtain all necessary consents to the assignment or transfer of any such Purchased Assets, and the Purchaser shall have the continuing obligation to cooperate with and provide reasonable assistance to the Seller in connection with such efforts, and each of the Seller and the Purchaser shall promptly execute all documents necessary to complete the transfer of such Purchased Assets to the Purchaser if such consents are obtained (whereupon such Purchased Assets shall be deemed a Purchased Asset for all purposes hereunder); provided, however, that neither the Seller nor its Affiliates shall be required to pay any consideration therefor, commence any litigation or offer or grant any unreasonable accommodation (financial or otherwise) to any nondebtor party to obtain any such consent.

2.6.    Purchase Price; Allocation of Purchase Price.

(a) In addition to the assumption of the Assumed Liabilities, in consideration for the sale, transfer and delivery of the Purchased Assets, at the Closing,

Purchaser shall pay an amount equal to SIXTEEN MILLION NINETY-SIX THOUSAND DOLLARS ($16,096,000.00) (the "Purchase Price"). The Purchaser shall pay an amount equal to (i) ninety-five percent (95%) of the Purchase Price, as adjusted pursuant to Section 2.6(b) below, to Seller (the "Closing Payment") by wire transfer of immediately available federal funds to a bank account (or accounts) as shall be designated in writing no later than one (1) day prior to the Closing Date by Seller to Purchaser, which amount shall be reduced by the amount of the Good Faith Deposit retained by Seller as a credit against the Purchase Price in accordance with Section 2.8(b), and (ii) five percent (5%) of the Purchase Price, as adjusted pursuant to Section 2.6(b) below, to Escrow Agent (the "Working Capital Escrow Amount") by wire transfer of immediately available federal funds to the Escrow Account designated in the Escrow Agreement, to be held in accordance with the terms of the Escrow Agreement.

(b) Not less than three (3) Business Days prior to the anticipated Closing Date, Seller shall deliver to Purchaser a statement (the "Estimated Final Working Capital Statement"), signed by the Chief Restructuring Officer of Seller (on behalf and in the name of Seller), setting forth the Seller's good faith estimate of the Final Working Capital (the "Estimated Working Capital Amount"). Seller shall consider in good faith such changes to the Estimated Final Working Capital Statement, if any, as are reasonably requested by Purchaser. In connection with the preparation of the Estimated Final Working Capital Statement, Purchaser and its representatives and advisors shall have reasonable access to Seller's books and records relating to the preparation of the Estimated Final Working Capital Statement. The Purchase Price at Closing will be (i) decreased dollar-for-dollar by an amount equal to the excess, if any, of the Base Working Capital over the Estimated Working Capital Amount, and (ii) increased dollar-for-dollar by an amount equal to the excess, if any, of the Estimated Working Capital Amount over the Base Working Capital.

(c) Purchaser and Seller agree that the Purchase Price, applicable Assumed Liabilities and other relevant items shall be allocated in accordance with Section 1060 of the Code and the regulations thereunder and Schedule 2.6 hereof (such schedule, as determined jointly by Purchaser and Seller prior to Closing, the "Allocation Schedule"). Each of Purchaser and Seller agrees to provide the other promptly with any other information required to complete the Allocation Schedule. The Allocation Schedule shall be binding on Purchaser and Seller for all purposes, including the reporting of gain or loss and determination of basis for income tax purposes, and each of Purchaser and Seller agrees that it will file a statement (on IRS Form 8594 or other applicable form) setting forth such allocation with its federal and applicable state income Tax returns and will also file such further information or take such further actions as may be necessary to comply with the Treasury Regulations that have been promulgated pursuant to Section 1060 of the Code and similar applicable state Laws and regulations. The Parties agree that the Allocation Schedule will be revised pursuant to Section 1060 of the Code and similar applicable state Laws and regulations to reflect any adjustments to Purchase Price pursuant to Section 2.7 or to the Indemnity Agreement.

2.7.    <u>Adjustment of Purchase Price</u>.

(a) Within sixty (60) days after the Closing Date, Purchaser shall cause to be prepared, at Purchaser's expense, a final working capital statement of the Business (together with supporting calculations in reasonable detail, the "<u>Final Working Capital Statement</u>") adjusted to show the following as of the Closing Date: the total current Purchased Assets minus the total current Assumed Liabilities, calculated and determined in the same manner (and including the same categories of Purchased Assets and Assumed Liabilities) as set forth in <u>Exhibit A</u> (the "<u>Final Working Capital</u>"); <u>provided</u>, <u>however</u>, it being understood that the line items for Seller's trade payables, accrued expenses and billings in excess of cost shall be as described in <u>Section 2.3(a)</u>. Upon completion of such statement, Purchaser shall deliver the Final Working Capital Statement to Seller.

(b) If the Final Working Capital, as set forth on the Final Working Capital Statement as conclusively determined as set forth in <u>Section 2.7(d)</u> (the Working Capital as so determined, the "<u>Certified Working Capital</u>"), is less than the Estimated Working Capital Amount, then Seller and Purchaser will deliver a joint written instruction to the Escrow Agent authorizing a disbursement from the Working Capital Escrow Amount to Purchaser in the amount of such deficiency and the balance of the Working Capital Escrow Amount, if any, to Seller; provided, that if the amount of such deficiency exceeds the Working Capital Escrow Amount, in addition to the disbursement of the entire Working Capital Escrow Amount to Purchaser, Seller will pay to Purchaser an amount equal to such excess.  Any disbursement or payment pursuant to this <u>Section 2.7(b)</u> shall be made within three (3) Business Days following the date on which the Final Working Capital Statement (including the Certified Working Capital calculation) becomes final pursuant to <u>Section 2.7(d)</u>.  Any payment made pursuant to this <u>Section 2.7(b)</u> shall be made by wire transfer of immediately available federal funds to an account designated by Purchaser.

(c) If the Certified Working Capital is greater than the Estimated Working Capital Amount, then (i) Seller and Purchaser will deliver a joint written instruction to the Escrow Agent authorizing the disbursement of the Working Capital Escrow Amount to Seller, and (ii) in addition to the disbursement of the entire Working Capital Escrow Amount to Seller, Purchaser will pay to Seller an amount equal to such excess.  Any payments pursuant to this <u>Section 2.7(c)</u> shall be made within three (3) Business Days following the date on which the Final Working Capital Statement (including the Certified Working Capital calculation) becomes final pursuant to <u>Section 2.7(d)</u>.  Any payments made pursuant to this <u>Section 2.7(c)</u> shall be made by wire transfer of immediately available federal funds to an account designated by Seller.

(d) Unless Seller notifies Purchaser in writing within thirty (30) days after receipt by Seller of the Final Working Capital Statement of any objections thereto (specifying in reasonable detail the basis therefor), such statement shall be final and binding for all purposes.  If Seller timely notifies Purchaser of any such objection, Purchaser and Seller shall attempt in good faith to reach an agreement as to the matter in dispute.  If the Parties shall have failed to resolve any such dispute within fifteen (15) days after receipt of timely notice of such objection, then any such disputed matter may,

at the election of Purchaser or Seller, be submitted to and determined by the Nonpartisan Accountants, and Purchaser and Seller shall have no more than thirty (30) days to present their positions as to the disputed items to the Nonpartisan Accountants, who shall act as an arbitrator and not as an expert and limit their review and determination to only those items in dispute, meaning the Nonpartisan Accountants shall be authorized to choose either Purchaser's or Seller's positions or determine that such disputed items are between such positions, based solely on the respective presentations of such positions. The fees and expenses of such Nonpartisan Accountants incurred in resolving the disputed matter shall be equitably apportioned by such accountants based on the extent to which Purchaser, on the one hand, or Seller, on the other hand, is determined by such accountants to be the prevailing party in the resolution of such disputed matters. The Final Working Capital Statement shall, after resolution of any dispute pursuant to this Section 2.7(d), be final, binding and conclusive on all Parties hereto.

       2.8.      Good Faith Deposit.

      (a) Not later than one (1) Business Day after entry by the Bankruptcy Court of the Approval Order, Purchaser and Seller shall execute the Escrow Agreement and Purchaser shall deposit with the Escrow Agent cash in immediately available federal funds by wire transfer to an account designated by the Escrow Agent, an amount equal to EIGHT HUNDRED FOUR THOUSAND EIGHT HUNDRED DOLLARS ($804,800) (the "Good Faith Deposit"), to be applied as provided in Section 2.8(b). The Good Faith Deposit shall be held in escrow by the Escrow Agent in an interest bearing bank account.

      (b) The Parties shall cause the Escrow Agent to disburse the Good Faith Deposit and interest earned thereon to Seller (i) at the Closing as a credit against the Purchase Price, (ii) if this Agreement is terminated pursuant to Section 13.1(e), (iii) if this Agreement is terminated pursuant to Section 13.1(b) and any of the conditions of Section 11.3 have not been satisfied, or (iv) if this Agreement is terminated pursuant to Section 13.1(c)(ii) and any of the Other Purchase Agreements shall have been terminated due to a breach of (or failure to perform under) such Other Purchase Agreement(s) by Purchaser or any of its Affiliates. Except as described in the previous sentence, the Parties shall cause the Escrow Agent to return the Good Faith Deposit and interest earned thereon to Purchaser within five (5) Business Days after any termination of the Agreement pursuant to Section 13.1.

      2.9.    Closing. The closing (the "Closing") of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities shall take place at the offices of King & Spalding LLP, 1180 Peachtree Street, Atlanta, Georgia, no later than five (5) Business Days after satisfaction of the conditions set forth in Section 11 (other than those requiring a delivery, or the taking of other action, at the Closing), or at such other time or place as Purchaser and Seller may agree.

2.10.   <u>Deliveries by Seller</u>.  At the Closing, Seller will deliver or cause to be delivered to Purchaser (unless delivered previously) the following:

(a) a Bill of Sale, Assignment and Assumption Agreement substantially in the form attached hereto as <u>Exhibit B</u> (the "<u>Assignment and Assumption Agreement</u>"), duly executed by Seller;

(b) originals (or, to the extent originals are not available, copies) of all Assumed Contracts (together with all material amendments, supplements or modifications thereto) to the extent not already located at the Leased Real Property;

(c) physical possession of all of the Purchased Assets capable of passing by delivery with the intent that title in such Purchased Assets shall pass by and upon delivery;

(d) a duly executed assignment agreement or agreements transferring the Intellectual Property Rights to Purchaser, in form and substance reasonably satisfactory to Purchaser;

(e) certificates of title and title transfer documents to all titled motor vehicles included within the Purchased Assets;

(f) documents duly executed by Seller and TMA terminating the IP License effective as of the Closing, in form and substance reasonably satisfactory to Purchaser;

(g) a certificate, dated the Closing Date and signed by a duly authorized officer of Seller, certifying that each of the conditions set forth in <u>Section 11.1</u> and <u>Section 11.2</u> have been satisfied;

(h) a Non-Competition and Non-Solicitation Agreement substantially in the form attached hereto as <u>Exhibit C</u>, duly executed by Seller; and

(i)  all other documents, instruments and writings reasonably requested by Purchaser to be delivered by Seller at or prior to the Closing pursuant to this Agreement.

2.11.   <u>Deliveries by Purchaser</u>.  At the Closing, Purchaser will deliver or cause to be delivered to Seller (unless previously delivered) the following:

(a) the Purchase Price less the Good Faith Deposit and the Working Capital Escrow Amount;

(b) the Assignment and Assumption Agreement, duly executed by Purchaser;

(c) a letter instructing Escrow Agent to release the Good Faith Deposit to Seller, duly executed by Purchaser;

18

(d) documents evidencing the release of Seller and its Affiliates from all obligations and liabilities under each Pre-Petition Performance Bond and each Post-Petition Performance Bond, in each case in form and substance reasonably satisfactory to Seller;

(e) a certificate, dated the Closing Date and signed by a duly authorized officer of Purchaser, certifying that each of the conditions set forth in Section 11.1 and Section 11.3 have been satisfied; and

(f) all other documents, instruments and writings reasonably requested by Seller to be delivered by Purchaser at or prior to the Closing pursuant to this Agreement.

**3.**    **Representations and Warranties of Seller**.  Subject to the terms, conditions and limitations set forth in this Agreement, Seller hereby represents and warrants to Purchaser as of the date of this Agreement as follows:

3.1.    Organization and Existence. The Seller is a limited liability company duly organized, validly existing, and in good standing under the Laws of the State of Michigan.  The Seller is duly registered, licensed or otherwise qualified to do business and in good standing under the Laws of each jurisdiction set forth on Schedule 3.1, which constitute all such registrations, licenses or qualifications that are required given the character of the Seller's assets and properties or in which the transaction of the Business makes such registration, license or qualification necessary.  The Seller has full limited liability company power and authority necessary to carry on the Business and to own and use the properties owned and used by it.

3.2.    Authorization; Execution and Delivery.

(a) The Seller has full limited liability company power and authority (i) to execute and deliver this Agreement and each other agreement, document and instrument contemplated to be executed and delivered by the Seller to the Purchaser in connection herewith (collectively, the "Transaction Documents"), and (ii) to perform its obligations under this Agreement and the Transaction Documents.  The execution and delivery by the Seller of this Agreement and the Transaction Documents and the consummation by the Seller of the transactions contemplated hereby and thereby have been duly authorized by all requisite limited liability company action on the part of the Seller.  Assuming due authorization, execution and delivery by the Purchaser, and subject to entry by the Bankruptcy Court of the Approval Order in the Bankruptcy Case, this Agreement and the Transaction Documents constitute the valid and legally binding obligations of the Seller, enforceable against it in accordance with their respective terms and conditions.

(b) The Seller need not give any notice to, make any filing with, or obtain any authorization, consent, or approval of any Governmental Authority in order to consummate the Transactions contemplated by this Agreement, other than (i) consents, approvals or authorizations of, or declarations or filings with, the Bankruptcy Court, and (ii) any such action or filing as to which the failure to make or obtain would not have a Material Adverse Effect.

19

3.3.    No Conflicts with Other Instruments. Subject to entry by the Bankruptcy Court of the Approval Order in the Bankruptcy Case, the execution, delivery and performance by the Seller of this Agreement and the Transaction Documents, and the consummation of the transactions contemplated hereby and thereby, do not and will not: (a) violate Seller's certificate of formation or operating agreement; (b) assuming compliance with the matters referred to in Section 3.2(b), violate any applicable Law; (c) constitute a default under or give rise to any right of termination, cancellation or acceleration of any right or obligation or to a loss of any benefit relating to any Purchased Asset to which Seller is entitled under any provision of any agreement or other instrument binding upon Seller except for breaches and defaults referred to in Section 365(b)(2) of the Bankruptcy Code, or (d) result in the creation or imposition of any Lien on any Purchased Asset, except for Permitted Liens, Assumed Liabilities and Liens that will be released at or prior to Closing.

3.4.    Required Consents.  Except for consents, approvals or authorizations of, or declarations or filings with, the Bankruptcy Court, and except as otherwise set forth on Schedule 3.4, (a) there is no agreement or other instrument binding upon Seller, or Permit of Seller, requiring a consent or other action by any Person as a result of the execution, delivery and performance of this Agreement, and (b) Seller is not required to give any notice to, make any filing with, or obtain any authorization, consent, or approval of any Governmental Authority in order to transfer any Permit.

3.5.    Subsidiaries. The Seller has no subsidiaries and holds no equity interest in any Person.

3.6.    Brokers' Fees.  The Seller has no liability or obligation to pay any fees or commissions to any broker, finder, or agent with respect to the Transactions.

3.7.    Financial Statements.

(a) Schedule 3.7(a) sets forth unaudited balance sheets and statements of profit or loss of the Seller for each of the years ended and as at January 3, 2015 and January 2, 2016 (the "Annual Financial Statements") and the unaudited balance sheet and statement of profit or loss of the Seller for the three (3) month period ended and as at April 2, 2016 (the "Interim Financial Statements" and, collectively with the Annual Financial Statements, the "Financial Statements").  The Financial Statements are based on the books and records of the Seller and fairly present in all material respects in accordance with GAAP applied on a consistent basis through the periods involved the financial position of the Business, results of operations and cash flows of the Seller for the periods and as of the dates indicated thereon, as applicable, except (i) that the Financial Statements do not include footnotes and (ii) the Interim Financial Statements are subject to normal year-end adjustments.  The books of account of Seller from which the Financial Statements have been prepared have been made available to Purchaser for review, and such books of account are accurate and complete in all material respects, have been maintained in accordance with good business and financial practices and accurately reflect in all material respects all of the properties, revenues, assets, liabilities and transactions of the Business as of and to the date hereof.

(b) With respect to the Business, Seller does not have any costs, debts, liabilities or obligations, whether accrued or fixed, absolute or contingent, matured or unmatured, determined or determinable, asserted or unasserted that are of a type required (if the amount and/or timing were known) to be reflected as a liability on or otherwise disclosed in audited financial statements prepared in accordance with GAAP, except for any such liabilities, claims and obligations that (i) are adequately reserved against or reflected in the Financial Statements; (ii) are adequately reserved against or reflected in the final calculation of the Final Working Capital or the Certified Net Working Capital Value (as defined in the Indemnity Agreement); (iii) have been incurred in the ordinary course of business since the date of the Interim Financial Statements; or (iv) are set forth on Schedule 3.7(b).

     3.8.   Purchased Assets.

(a) The Seller has good and valid title to all of the Purchased Assets that constitute personal property, free and clear of all Liens, other than the Permitted Liens, Assumed Liabilities and Liens that will be released at or prior to Closing.  Upon consummation of the Transactions at the Closing, Purchaser will have acquired good, valid and marketable title in and to, or a valid leasehold interest in, each of the Purchased Assets, free and clear of all Liens (other than Assumed Liabilities and Permitted Liens) to the maximum extent permitted by Section 363 of the Bankruptcy Code.

(b) The Purchased Assets and Contractor Licenses are sufficient for the continued conduct of the Business after the Closing in substantially the same manner as conducted by the Seller prior to the Closing and constitute all of the rights, property and assets necessary to conduct the Business as currently conducted (except for the Excluded Assets).  Except as set forth on Schedule 3.8(b), all items of tangible personal property constituting Purchased Assets that are used by Seller in connection with the Business as currently conducted are in good operating condition and repair (normal wear and tear in relation to age excepted) and adequate for the uses to which they are put, and no such items of tangible personal property is in need of maintenance or repairs except for ordinary, routine maintenance and repairs that are not material in nature or cost.

     3.9.   Absence of Certain Changes.   Except for the commencement and continuation of the Bankruptcy Case (and the actions taken by Seller as debtor in possession), the entry of Orders in (and/or the taking of any action in connection with, relating to, or as a result of) the Existing Litigation or as set forth in Schedule 3.9, since December 31, 2015 until the date of this Agreement, the Seller has operated the Business in the ordinary course of business substantially consistent with past practices in all material respects; without limiting the generality of the foregoing, since December 31, 2015, except for the commencement and continuation of the Bankruptcy Case (and the actions taken by Seller as debtor in possession), the entry of Orders in (and/or the taking of any action in connection with, relating to, or as a result of) the Existing Litigation or as set forth in Schedule 3.9, in connection with or related to the Business:

(a) there has not been any event, occurrence or development that has had, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect;

(b) the Seller has not sold, transferred, assigned or otherwise disposed of any of the assets or properties used or held for use in, or related to the conduct of, the Business, other than in the ordinary course of business;

(c) the Seller has not entered into any Contract (or series of related Contracts) that would materially restrict the conduct of the Business or, with the exception of purchase orders and amendments to purchase orders executed in the ordinary course of business, require payments of more than $50,000 in any calendar year;

(d) no Lien has been imposed upon any of the Purchased Assets, except for Permitted Liens, Assumed Liabilities and Liens that will be released at or prior to the Closing;

(e) the Seller has not delayed or postponed the payment of accounts payable outside the ordinary course of business;

(f) the Seller has not canceled or waived any material right or Claim (or series of related rights and Claims) outside the ordinary course of business;

(g) the Seller has not granted any license or sublicense of any rights under or with respect to any Intellectual Property Rights except as such rights may be licensed or sublicensed in the ordinary course of business;

(h) there has been no material change or modification of any existing accounting method, principle, or practice, other than any change required by applicable Law or change in GAAP;

(i) the Seller has not experienced any damage, destruction or casualty loss (whether or not covered by insurance) materially and adversely affecting the Purchased Assets (taken as a whole);

(j) the Seller has not granted any increase in the base compensation or incentive compensation, or made any other change in employment terms or other terms and conditions of engagement, of any of its directors, officers or employees other than regular periodic adjustments made in the ordinary course of business;

(k) the Seller has not adopted, amended, modified, or terminated any bonus, profit-sharing, incentive, commission, severance or other plan, Contract, or commitment for the benefit of any of its directors, officers, employees, or independent sales representatives except in the ordinary course of business;

(l) the Seller has not acquired (whether by merger, consolidation or acquisition of stock or assets) any business or substantially all of the assets of any other Person;

(m) the Seller has not made any capital expenditure in an aggregate amount exceeding $50,000 except in accordance with the current capital expenditure plan and/or budget of the Business; and

22

(n) the Seller has not committed to do any of the foregoing.

3.10.    <u>Legal Compliance; Permits</u>.

(a) The Seller has complied in all material respects, and is now complying in all material respects, with all Laws applicable to the conduct of the Business as currently conducted. To the Knowledge of Seller, neither Seller nor any Person acting on behalf of the Seller has directly or indirectly (i) made any contribution, gift, bribe, rebate, payoff, influence payment, kickback or other payment to any Person, regardless of form, whether in money, property or services, (A) to obtain favorable treatment in securing business for the Business, (B) to pay for favorable treatment for business secured by the Business or (C) to obtain special concessions or for special concessions already obtained, for or in respect of the Business or (ii) established or maintained any fund or asset with respect to the Business that has not been reflected in Seller's books and records. Nothing in this <u>Section 3.10</u> requires any disclosure with respect to any matters specifically covered by any other representation or warranty in <u>Sections 3.11</u> (Taxes), <u>3.18</u> (Litigation), <u>3.19</u> (Employees), <u>3.20</u> (Employee Benefits) and <u>3.21</u> (Environmental Matters), it being acknowledged and agreed that all representations and warranties with respect to matters specifically described in such other representations and warranties are excluded from the representations and warranties in this <u>Section 3.10</u>.

(b) <u>Schedule 3.10(b)(i)</u> sets forth a list of all contractor licenses and similar Permits held by Eligible Employees and required to conduct and operate the Business in a manner consistent with the current practices of Seller (each, a "<u>Contractor License</u>"), including, for each such Contractor License, the name of the holder and the date of issuance and expiration. <u>Schedule 3.10(b)(ii)</u> sets forth a list of all other material Permits required to conduct and operate the Business in a manner consistent with the current practices of Seller, including, for each such Permit, the date of issuance and expiration. Except as set forth on <u>Schedule 3.10(b)(ii)</u>, (i) all such Permits are in full force and effect, and (ii) all fees and charges with respect to such Permits have been paid in full as of the Closing Date. No event has occurred or circumstance exists that, with notice or the lapse of time, would reasonably be expected to result in the revocation, suspension, lapse or limitation of any Permit set forth (or required to be set forth) on <u>Schedule 3.10(b)(ii)</u>.

3.11.    <u>Taxes</u>.

(a) From and after the Closing, Purchaser shall not have liability for any of Seller's Taxes relating to the Pre-Closing Tax Period.

(b) No claim has been made by a Taxing Authority in a jurisdiction where the Seller does not file Tax returns that the Seller is or may be subject to taxation in that jurisdiction in part or in whole because of the Business or the Purchased Assets.

(c) The consummation of the Transactions will not result in the loss of any Tax holiday, Tax abatement or similar Tax benefit that would have an adverse impact on the Business or the Purchased Assets in a Post-Closing Tax Period.

23

(d)      The Seller (i)(A) in the case where a foreign country does not have a tax treaty with the U.S., is not engaged in business in any such foreign country, or (B) in the case where a foreign country has a tax treaty with the U.S., does not have a permanent establishment in any such foreign country, (ii) does not have an office or fixed place of business in any foreign jurisdiction, or (iii) is not otherwise subject to Tax in any foreign jurisdiction.  To the extent required by applicable Law, the Seller has duly and timely filed each Form TD F 90-22.1, Report of Foreign Bank and Financial Accounts, and each FinCEN Report 114, Report of Foreign Bank and Financial Accounts, required to be filed by the Seller, and all such forms are true, complete and correct in all respects.

(e) All withholding taxes resulting from cross-border payments or transfers (or deemed payments or transfers) of any kind by the Seller have been withheld by the Seller and paid over to the appropriate Taxing Authority.

(f) The Seller is not required to file Tax returns with any Taxing Authority other than those listed on Schedule 3.11(f).

3.12.      Real Property.

(a) The Leased Real Property constitutes all of the real property used by Seller in connection with the Business.

(b) The Seller does not own any real property.

(c) Schedule 3.12(c) lists each lease, including all amendments, modifications, supplements or guarantees thereof, pursuant to which Seller occupies any Leased Real Property (collectively, the "Real Property Leases") and, in the case of any oral Real Property Lease, a complete and correct description of the terms of such Real Property Lease.  The Seller has delivered to the Purchaser a correct and complete copy of each written Real Property Lease.  With respect to each parcel of Leased Real Property:

(i)      to the Knowledge of Seller, each Real Property Lease is legal, valid, binding, enforceable, and in full force and effect;

(ii)      each Real Property Lease will continue to be legal, valid, binding, enforceable, and in full force and effect on identical terms following the consummation of the Transactions;

(iii)      as of the Closing (and following payment of any applicable Cure Cost), there will be no defaults or breaches on the part of Seller under any Real Property Lease and, to the Knowledge of Seller, no lessor under any Real Property Lease is in material breach or default, and no event has occurred that, with notice or lapse of time, would constitute a breach or default or permit termination, modification, or acceleration thereunder;

(iv)      no Real Property Lease is subject to any Lien (other than Permitted Liens, Assumed Liabilities or Liens that will be released at or prior to Closing);

24

(v)     to the Knowledge of Seller, all material approvals of Governmental Authorities (including licenses and permits) required in connection with the use or operation of the facilities in which the Seller operates on each parcel of Leased Real Property have been obtained and such facilities are and have been operated and maintained in all material respects in accordance with applicable Laws; and

(vi)     all facilities in which the Seller operates on each parcel of Leased Real Property are supplied with utilities and other services necessary for the operation of those facilities.

(d) To the Knowledge of Seller, there is no material defect in any of the structural components of any improvement on any Leased Real Property or its electrical, plumbing, HVAC, life safety, or other building systems.  All of the land, buildings, structures, and other improvements used by the Seller in connection with the Business are included in the Leased Real Property.  Except for the Real Property Leases, there are no leases, subleases or occupancy agreements in effect with respect to the Leased Real Property.  There are no pending or, to the Knowledge of Seller, threatened actions or proceedings regarding condemnation or other eminent domain actions or proceedings affecting any of the Leased Real Property or any part thereof, or of any sale or other disposition of the Leased Real Property or any part thereof in lieu of condemnation.  No portion of the Leased Real Property has suffered any material damage by fire or other casualty that has not heretofore been completely repaired and restored.

(e) No Person has any right to use or occupy any of the Leased Real Property other than the Seller and the applicable landlord.

(f) To the Knowledge of Seller, the Leased Real Property is in material compliance with all Laws applicable to the Leased Real Property, including zoning, land use and Environmental Laws.  The Seller has received no written notice of any violation of any Law with respect to the Leased Real Property that remains uncured or unaddressed.

3.13.    Intellectual Property.

(a) Except as would not have a Material Adverse Effect, the Seller owns or has the right to use all Intellectual Property used in, or necessary for, the operation of the Business as presently conducted.  All Intellectual Property Rights are held free and clear of any Liens other than Permitted Liens, Assumed Liabilities and Liens that will be released at or prior to Closing. Except as set forth on Schedule 3.13(a), Seller has not granted any licenses or sublicenses with respect to its Intellectual Property Rights that remain in effect.

(b) Except as would not have a Material Adverse Effect, to the Knowledge of Seller, the conduct of the Business as currently conducted does not infringe upon, misappropriate, dilute or otherwise violate any Intellectual Property rights of third parties.  To the Knowledge of Seller, during the two-year period prior to the date of this

Agreement, no third party has infringed upon, misappropriated, or otherwise violated any of the Intellectual Property Rights, except as set forth on Schedule 3.13(b).

(c) Schedule 2.1(f) identifies each patent, patent application, registered trademark, trademark application, registered copyright, copyright application, social media user name, software and domain name constituting the Intellectual Property Rights.  Each of the Intellectual Property Rights set forth on Schedule 2.1(f) is enforceable, valid and subsisting and has not been cancelled, expired or abandoned nor has any Person made a claim in writing, or to the Knowledge of Seller, threatened in writing that any such Intellectual Property Right is invalid, unenforceable or infringing upon a third party right.  The Seller has filed all documents and paid all Taxes, fees, and other financial obligations required to renew and maintain in full force and effect all patents or registrations with respect to such Intellectual Property Rights.  Furthermore, the Seller has taken the actions reasonably believed to be necessary to maintain (i) the validity and enforceability of the Intellectual Property Rights under applicable Law and (ii) the confidentiality of all confidential information and trade secrets material to the Business.  To the Knowledge of Seller, Seller has not conducted and is not conducting the Business in a manner that would reasonably be expected to result in the cancellation or unenforceability of any Intellectual Property Rights other than pursuant to a reasonable business judgment by the Seller to abandon or allow to lapse any Intellectual Property Rights not material to the Business.

(d) Set forth on Schedule 3.13(d) is a list of all Intellectual Property Licenses (other than licenses for desktop software).  The Seller is in compliance in all material respects with all provisions of Intellectual Property Licenses.  The execution and delivery of this Agreement and the consummation of the Transactions will not constitute a breach of any Intellectual Property License.

(e) The Seller has taken commercially reasonable efforts to obtain valid and enforceable written agreements from all Persons (including current and former employees and independent contractors) who created or contributed to any material portion of, or otherwise would have rights in or to, Intellectual Property Rights, excluding Intellectual Property Licenses, that are material to the Business that validly assign to the Seller all of each such Person's rights in and to such Intellectual Property Rights, or the Seller owns all such Intellectual Property Rights pursuant to applicable Law.

3.14.    Inventory; Accounts Receivable.

(a) Except for Inventory in-transit and Inventory onsite at customer locations, Schedule 3.14(a) sets forth the location where all Inventory is held.

(b) All Inventory consists of a quality and quantity usable and salable in connection with the Business in the ordinary course of business, except for obsolete, damaged, defective or slow-moving items that have been written off or written down to fair market value or for which adequate reserves have been established in the Financial Statements.  The quantities of each item of Inventory are not excessive, but are reasonable in the present circumstances of the Seller.  All Inventory is owned by the

Seller free and clear of all Liens, other than Permitted Liens, Assumed Liabilities and Liens that will be released at or prior to Closing, and no Inventory is held on a consignment basis.

(c) Schedule 3.14(c) contains an aging schedule by customer of Accounts Receivable of the Seller with respect to the Business as of the date hereof. All Accounts Receivable are valid and bona fide receivables representing amounts due with respect to actual transactions entered into in the ordinary course of business, and are not subject to any defense, set-off, counterclaims or Liens (other than Permitted Liens, Assumed Liabilities and Liens that will be released at or prior to Closing), in each case except to the extent of any reserve reflected in the Financial Statements. The reserves on the Financial Statements against the Accounts Receivable for returns, allowances and bad debt and have been calculated in accordance with GAAP and in a manner that is consistent with past practices. As of the date of this Agreement, no account debtor of the Seller has proposed any discount or reduction with respect to such account debtor's Accounts Receivable.

3.15.  Contracts.

(a) Schedule 3.15(a) lists:

(i)  all Contracts with any customer of the Business;

(ii)  all Contracts related to the Business that involve aggregate consideration in excess of $50,000;

(iii)  all Contracts related to the Business that involve the acquisition or disposition of any business, stock or assets of any other Person or any real property (whether by merger, sale of stock, sale of assets or otherwise);

(iv)  all broker, distributor, dealer, manufacturer's representative, franchise, agency, sales promotion, market research, marketing consulting and advertising Contracts related to the Business;

(v)  all employment agreements with Employees and Contracts with independent contractors or consultants (or similar arrangements) engaged in connection with the Business;

(vi)  all Contracts under which the Seller leases personal property in connection with the Business;

(vii)  all Contracts with any material supplier of the Business;

(viii)  all Contracts relating to the settlement or compromise of any action, suit, Claim, investigation or other legal proceeding involving the Business that were (A) entered into during the two (2) year period prior to the Closing Date or (B) under which the Seller has any outstanding liability or obligation;

(ix)    all Contracts with any Governmental Authority related to the Business;

(x)    all Contracts related to the Business that limit or purport to limit the ability of the Seller to compete in any line of business or with any Person or in any geographic area or during any period of time or contain any similar restriction;

(xi)    all Post-Petition Performance Bonds; and

(xii)    all other Contracts that are material to the operation of the Business and not previously disclosed pursuant to this <u>Section 3.15(a)</u>.

(b) With respect to each Contract that is or will be an Assumed Contract:

(i)    the Contract is valid and binding on the Seller in accordance with its terms and is in full force an effect and (A) to the Knowledge of Seller, each such Contract is a valid and binding obligation of the other party or parties thereto, enforceable against such party or parties in accordance with its terms, subject to the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other similar Laws relating to or affecting creditors rights generally, and general equitable principles, and is in full force and effect, (B) as of the Closing (and following payment of any applicable Cure Cost) Seller will not be in material breach of or material default under any such Contract, (C) the Seller has not provided or received any notice of any intention to terminate any such Contract, (D) to the Knowledge of Seller, no nondebtor party is in material breach of or material default under any such Contract, (E) the Seller has not received any written claim of material breach or material default or, to the Knowledge of the Seller, oral claim of material breach or material default, under any such Contract and (F) there are no disputes pending or, to the Knowledge of Seller, threatened under any such Contract;

(ii)    subject to any third-party consents set forth on <u>Schedule 3.4</u>, the Contract will continue to be legal, valid, binding, enforceable, and in full force and effect on identical terms following the consummation of the Transactions, and the consummation of the Transactions will not give rise to a right to terminate the Contract, or cause or permit the acceleration or other change of any right or obligation or the loss of any benefit thereunder; and

(iii)    the Seller has made available to the Purchaser complete and correct copies of the Contract, including all modifications, amendments and supplements thereto and waivers thereunder.

3.16.    <u>Product Warranties; Product Liability</u>. Except as set forth in <u>Schedule 3.16(a)</u>, there are no written or oral warranties with respect to the products sold and/or services conducted by the Seller within the past two (2) years. Except as set forth on <u>Schedule 3.16(b)</u>, with respect to the Business and the Purchased Assets, each product manufactured, sold and delivered by the Seller is in conformity in all material respects with all applicable contractual

commitments and all express and implied warranties, and the Seller has no liability for recall, replacement or repair thereof, except in each case for such non-conformance, liabilities or losses that occur in the ordinary course of business.  There have been no product recalls relating to products designed, sourced, manufactured, sold and/or delivered by the Seller during the past two (2) years, and there are no such recalls pending, or to the Knowledge of Seller, threatened in writing.

3.17.  <u>Insurance</u>.

(a) <u>Schedule 3.17</u> sets forth the following information with respect to each material insurance policy (including policies providing property, casualty, liability, fiduciary, and workers' compensation coverage and bond and surety arrangements) to which the Seller has been a party, a named insured, or otherwise the beneficiary of coverage at any time within the past two (2) years in connection with or related to the Business:  (i) the name of the insurer and the name of the policyholder; (ii) the policy number and the expiration date; (iii) a brief description of the type of insurance; and (iv) the coverage limits, amount of deductible and annual premiums.

(b) With respect to each such insurance policy that is currently in effect:

(i)        the policy is legal, valid, binding, enforceable, and in full force and effect (except as the enforceability of any such insurance policy may be limited by bankruptcy, insolvency, moratorium and other similar Laws relating to or affecting creditors' rights generally or by general equitable principles); and

(ii)        to the Knowledge of Seller, no party to the policy is in breach or default (including with respect to the timely payment of premiums or the giving of notices), and no event has occurred that, with notice or the lapse of time, would constitute such a breach or default, or permit termination, modification, or acceleration, under the policy.

3.18.  <u>Litigation</u>.  Except as set forth on <u>Schedule 3.18</u> and except in connection with or relating to the Existing Litigation or the Bankruptcy Case, Seller (a) is not subject to any outstanding Order in connection with or related to the Business or affecting the Purchased Assets, and (b) is not a party to and, to the Knowledge of Seller, has not been threatened in writing to be made a party to, any action, suit, proceeding, hearing, or investigation of, in, or before any Governmental Authority, in each case, that would reasonably be expected to have a Material Adverse Effect.

3.19.  <u>Employees</u>.

(a) <u>Schedule 3.19(a)</u> sets forth a list of all persons employed by the Seller in the Business (the "<u>Employees</u>"), including, for each Employee, the following: (i) name, (ii) title or position (including whether full or part time), (iii) hire date, (iv) current base compensation rate, (v) commission, bonus or other incentive-based compensation, (vi) accrued or deferred bonus payments, and (vii) status (active or inactive and if on leave, the type of leave).  All commissions and bonuses due and payable to Employees, consultants, or contractors of the Business for services performed

29

and revenue earned with respect to the 2015 calendar year have been paid in full, and all commissions payable to Employees, consultants, or contractors of the Business for services performed and revenue earned with respect to the 2016 calendar year have been accounted for on a basis substantially consistent with past practice.

(b) The Seller is not a party to or bound by any collective bargaining agreement, nor has it experienced any strikes, grievances, claims of unfair labor practices, or other collective bargaining disputes.  No proceeding regarding any unfair labor practice has been commenced nor is any such proceeding, to the Knowledge of Seller, threatened in writing.  To the Knowledge of Seller, there is no organizational effort presently being made or threatened by or on behalf of any labor union or bargaining representative with respect to employees of the Seller in connection with or related to the Business.

(c) Seller is and has been in material compliance with all requirements of applicable federal, state and local Laws and regulations pertaining to employment and employment practices to the extent they relate to the Employees, including all Laws relating to equal employment opportunities, pay equity, fair employment practices, employment standards, employment discrimination, harassment, retaliation, reasonable accommodation, disability rights or benefits, workers' compensation, unemployment insurance, immigration, wages, hours, labor relations, and occupational safety and health. There are no pending or, to the Knowledge of Seller, threatened lawsuits, complaints, investigations or other proceedings against or involving the Seller for violations of any applicable federal, state and local Laws and regulations pertaining to employment or employment practices.  The Seller has not taken any action that would reasonably be expected to invoke any obligations or result in any material liability under the Worker Adjustment and Retraining Notification Act of 1988 (the "WARN Act") or any similar state Law.

(d) All individuals characterized and treated by the Seller as consultants or contractors of the Business are set forth on Schedule 3.19(d) and have been properly treated as independent contractors under all applicable Laws. No Person classified and treated by the Seller as an independent contractor has made a claim to be provided employee benefits from the Seller.

3.20.    Employee Benefits.

(a) Schedule 3.20(a) lists each employee pension, retirement, profit sharing, stock bonus, stock option, stock purchase, bonus, incentive, deferred compensation, hospitalization, medical, dental, vision, vacation, insurance, sick pay, disability, severance, or other plans, funds, programs, policies, Contracts or arrangements, in each case, that the Seller  or any member of the Controlled Group maintains or to which the Seller or any member of the Controlled Group contributes or in which any current or former employee of the Business has accrued any benefits for which they remain entitled to receive or under which the Seller or any member of the Controlled Group may have any liability (each, an "Employee Benefit Plan"); provided, however, that the term "Employee Benefit Plan" shall exclude any statutory benefits provided

30

under applicable Law.

(b) Neither the Seller nor any member of the Controlled Group contributes to nor has been required to contribute to any Multiple Employer Welfare Arrangement or any Multiemployer Plan or has any liability (including withdrawal liability) under any Multiemployer Plan.

(c) To the Knowledge of Seller, the group health plan in which the Employees are currently participating and in which its current COBRA beneficiaries are participating will be continued after the Closing and will not be terminated in connection with the Agreement.

3.21.   Environmental Matters.

(a) Other than as set forth on Schedule 3.21(a), Seller has not received any written Environmental Claim, nor are any Environmental Claims threatened in writing or pending, in connection with the Business or any Leased Real Property.

(b) Other than as set forth on Schedule 3.21(b), no material amount of Hazardous Substance has been Released on or from the Leased Real Property during the Seller's operation thereof that has not been remediated to the extent required by Environmental Law or any Governmental Authority.

(c) There are no Orders relating to compliance with or liability under any Environmental Laws with respect to the Seller, the Leased Real Property or the operation of the Business, which have not been satisfied, complied with and discharged.

(d) Seller has obtained and is in compliance with all material Permits required pursuant to any Environmental Law and necessary for the lawful and efficient operation of the Business.  All such Permits are in full force and effect and are listed on Schedule 3.21(d).

(e) Other than as set forth on Schedule 3.21(e), there are not now, nor have there ever been, any underground or aboveground storage tanks or other storage containers of any kind on the Leased Real Property that contain any Hazardous Substances.

(f) The Seller has disclosed and made available to the Purchaser (i) all reports of environmental assessments, investigations, audits, studies or testing (including without limitation phase I and phase II reports) with respect to the Leased Real Property, and (ii) all material records and correspondence relating to environmental Permits or compliance with Environmental Law with respect to the Business.

(g) Other than as set forth on Schedule 3.21(g), Seller is and has been at all times in material compliance with all applicable Environmental Laws.

(h) To the Knowledge of Seller, Seller has not received any written, or, to the Knowledge of Seller, oral notice that any property or facility to which Seller

31

transported or arranged for disposal or treatment of Hazardous Substances is listed or proposed for listing as a site requiring investigation, cleanup or remediation or is otherwise the source of liability under Environmental Laws.

3.22.  <u>Relationships with Suppliers</u>.  The Seller has not received any written notice that any material supplier of the Seller has ceased, or intends to cease, to supply goods or services to the Business or to otherwise terminate or materially reduce its relationship with the Business.

3.23.  <u>Related Party Transactions</u>.  No Affiliate of the Seller has been during the five (5) year period prior to the date of this Agreement a party to any Contract or transaction involving any Purchased Asset, other than Contracts and transactions entered into in the ordinary course of business.

3.24.  <u>Full Disclosure</u>.  To the Knowledge of Seller, no representation or warranty made by Seller in <u>Section 3</u> of this Agreement (including related portions of the Schedules) contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements contained therein, in light of the circumstances in which they are made, not misleading.  To the Knowledge of Seller, Seller has not failed to disclose to Purchaser any information requested by Purchaser or any of its representatives which would reasonably be expected to have a Material Adverse Effect.

3.25.  <u>"AS IS" TRANSACTION</u>.  PURCHASER HEREBY ACKNOWLEDGES AND AGREES THAT, NOTWITHSTANDING THE REPRESENTATIONS AND WARRANTIES EXPRESSLY PROVIDED IN THIS <u>SECTION 3</u>, THE CONSENT OF A PARTY TO THE CLOSING SHALL CONSTITUTE A WAIVER BY SUCH PARTY OF ANY CONDITIONS TO CLOSING NOT SATISFIED AS OF THE CLOSING DATE, AND FOLLOWING CLOSING SELLER MAKES NO REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO ANY MATTER RELATING TO THE PURCHASED ASSETS, INCLUDING INCOME TO BE DERIVED OR EXPENSES TO BE INCURRED IN CONNECTION WITH THE PURCHASED ASSETS, THE PHYSICAL CONDITION OF ANY PERSONAL OR REAL PROPERTY COMPRISING A PART OF THE PURCHASED ASSETS OR WHICH IS THE SUBJECT OF ANY LEASE OR CONTRACT TO BE ASSIGNED TO PURCHASER AT THE CLOSING, THE ENVIRONMENTAL CONDITION OR ANY OTHER MATTER RELATING TO THE PHYSICAL CONDITION OF ANY REAL PROPERTY OR IMPROVEMENTS, THE ZONING OF ANY SUCH REAL PROPERTY OR IMPROVEMENTS, THE VALUE OF THE PURCHASED ASSETS (OR ANY PORTION THEREOF), THE TRANSFERABILITY OF THE PURCHASED ASSETS, THE TERMS, AMOUNT, VALIDITY OR ENFORCEABILITY OF ANY ASSUMED LIABILITIES, THE TITLE OF THE PURCHASED ASSETS (OR ANY PORTION THEREOF), THE MERCHANTABILITY OR FITNESS OF THE PERSONAL PROPERTY OR ANY OTHER PORTION OF THE PURCHASED ASSETS FOR ANY PARTICULAR PURPOSE, OR ANY OTHER MATTER OR THING RELATING TO THE PURCHASED ASSETS OR ANY PORTION THEREOF.  WITHOUT IN ANY WAY LIMITING THE FOREGOING, SELLER HEREBY DISCLAIMS ANY WARRANTY, EXPRESS OR IMPLIED, OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE AS TO ANY

PORTION OF THE PURCHASED ASSETS.  PURCHASER FURTHER ACKNOWLEDGES THAT PURCHASER HAS CONDUCTED AN INDEPENDENT INSPECTION AND INVESTIGATION OF THE PHYSICAL CONDITION OF THE PURCHASED ASSETS AND ALL SUCH OTHER MATTERS RELATING TO OR AFFECTING THE PURCHASED ASSETS AS PURCHASER DEEMED NECESSARY OR APPROPRIATE AND THAT IN PROCEEDING WITH ITS ACQUISITION OF THE PURCHASED ASSETS, EXCEPT FOR ANY REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN SECTION 3, PURCHASER IS DOING SO BASED SOLELY UPON SUCH INDEPENDENT INSPECTIONS AND INVESTIGATIONS.  ACCORDINGLY, UPON THE CLOSING DATE, PURCHASER WILL ACCEPT THE PURCHASED ASSETS AT THE CLOSING "AS IS," "WHERE IS," AND "WITH ALL FAULTS."   FOR THE AVOIDANCE OF DOUBT, NOTHING IN THIS SECTION 3.25 IS INTENDED TO LIMIT OR MODIFY ANY UNDERTAKING BY, OR OBLIGATION OF, ANY AFFILIATE OF SELLER PURSUANT TO THE INDEMNITY AGREEMENT.

**4.**    **Representations and Warranties of Purchaser and Parent**.  Purchaser and Parent represent and warrant to Seller as follows:

4.1.    Organization.

(a) Purchaser is a corporation duly organized, validly existing and in good standing under the Laws of the State of Georgia and has all corporate powers and all material governmental licenses, authorizations, permits, consents and approvals required to carry on its business as now conducted.  Purchaser is a wholly owned subsidiary of Parent.

(b) Parent is a corporation duly organized, validly existing and in good standing under the Laws of the State of Georgia.

4.2.    Corporate Authorization.

(a) The execution, delivery and performance by Purchaser of this Agreement and the Transaction Documents and the consummation of the Transactions are within the corporate powers of Purchaser and have been duly authorized by all necessary actions on the part of Purchaser.  Assuming due authorization, execution and delivery by Seller, this Agreement and the Transaction Documents constitute the valid and legally binding obligations of Purchaser, enforceable against it in accordance with their respective terms and conditions, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium, or other similar Laws affecting creditors' rights generally and by general principles of equity.

(b) The execution, delivery and performance by Parent of this Agreement are within the corporate powers of Parent and have been duly authorized by all necessary actions on the part of Parent.  Assuming due authorization, execution and delivery by Seller, this Agreement constitutes the valid and legally binding obligation of Parent, enforceable against it in accordance with its terms and conditions, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium, or

other similar Laws affecting creditors' rights generally and by general principles of equity.

4.3.    <u>Governmental Authorization</u>.  The execution, delivery and performance by Purchaser of this Agreement and the consummation of the Transactions by Purchaser require no action by or in respect of, or filing with, any Governmental Authority other than (a) consents, approvals or authorizations of, or declarations or filings with, the Bankruptcy Court, and (b) any such action or filing as to which the failure to make or obtain would not have a material adverse effect on the Purchaser or its ability to close the Transactions.

4.4.    <u>Noncontravention</u>.  Neither the execution and delivery of this Agreement nor the consummation of the Transactions will (a) conflict with or result in any breach of any provision of organizational documents of Purchaser; (b) require any filing with, or the obtaining of any permit, authorization, consent or approval of, any Governmental Authority; (c) violate, conflict with or result in a default (or any event which, with notice or lapse of time or both, would constitute a default) under, or give rise to any right of termination, cancellation or acceleration under, any of the terms, conditions or provisions of any note, mortgage, other evidence of indebtedness, guarantee, license, agreement, lease or other contract, instrument or obligation to which Purchaser is a party or by which Purchaser or any of its assets may be bound; or (d) violate any Law applicable to Purchaser, excluding from the foregoing clauses (b), (c) and (d) such requirements, violations, conflicts, defaults or rights (i) which would not adversely affect the ability of Purchaser to consummate the Transactions, or (ii) which become applicable as a result of any acts or omissions by, or the status of or any facts pertaining to, Seller.

4.5.    <u>Financing</u>.  Purchaser has sufficient cash, available lines of credit or other sources of immediately available funds to enable it to make payment of the Purchase Price and any other amounts to be paid by it hereunder.

4.6.    <u>Litigation</u>.  There is no action, suit, investigation or proceeding pending against or, to the knowledge of Purchaser, threatened against or affecting Purchaser before any Governmental Authority which in any manner challenges or seeks to prevent, enjoin, alter or materially delay the Transactions.

4.7.    <u>Certain Fees</u>.  Purchaser has not employed any broker, finder, investment banker, or other intermediary or incurred any liability for any investment banking fees, financial advisory fees, brokerage fees, finders' fees, or other similar fees in connection with this Agreement or the Transactions.

4.8.    <u>Inspections; No Other Representations</u>.  Purchaser is an informed and sophisticated purchaser, and has engaged expert advisors, experienced in the evaluation and purchase of properties and assets such as the Purchased Assets and assumption of liabilities such as the Assumed Liabilities as contemplated hereunder.  Purchaser has undertaken such investigation and has been provided with and has evaluated such documents and information as it has deemed necessary to enable it to make an informed and intelligent decision with respect to the execution, delivery and performance of this Agreement.  Purchaser acknowledges and agrees that the Purchased Assets are being sold on an "as is, where is" basis and Purchaser agrees to accept the Purchased Assets and the Assumed Liabilities in the condition they are in on the

Closing Date based on its own inspection, examination and determination with respect to all matters and without reliance upon any express or implied representations or warranties of any nature made by or on behalf of or imputed to Seller, except as expressly set forth in this Agreement.  Without limiting the generality of the foregoing, Purchaser acknowledges that Seller makes no representation or warranty with respect to (a) any projections, estimates or budgets delivered to or made available to Purchaser of future revenues, future results of operations (or any component thereof), future cash flows or future financial condition (or any component thereof) of the Business or the future prospects or operations of the Business or (b) any other information or documents made available to Purchaser or its counsel, accountants or advisors with respect to the Business, except as expressly set forth in this Agreement.

     **5.**      **Covenants of Seller**.  Seller agrees that:

     5.1.    <u>Conduct of the Business</u>.  From the date hereof until the earlier of the termination of this Agreement pursuant to <u>Section 13</u> or the Closing Date, except as permitted, contemplated or required by this Agreement (including the commencement and pendency of the Bankruptcy Case), as required by applicable Law (including the Bankruptcy Code), or as necessary in connection with the discharge of Seller's fiduciary duties during the Bankruptcy Case, or with the prior written consent of Purchaser (which consent shall not be unreasonably withheld, delayed or conditioned), Seller shall (a) use its commercially reasonable efforts to conduct the Business in the ordinary course of business in substantially the same manner as previously conducted and in material compliance with all applicable Laws (including with respect to maintenance of working capital balances, collection of accounts receivable, payment of accounts payable and Taxes and cash management practices generally), and (b) use its commercially reasonable efforts to preserve substantially intact its business organization, operations and business relationships with the material customers and suppliers of the Business, the Employees and others to whom the Seller has contractual obligations or material business dealings in connection with the Business.

     5.2.    <u>Access to Information</u>.  From the date hereof until the earlier of the termination of this Agreement pursuant to <u>Section 13.1</u> or the Closing Date, Seller shall reasonably afford, and shall cause its officers, employees, attorneys and other agents to reasonably afford, to Purchaser and its counsel, accountants and other representatives, access (at reasonable times during normal business hours) to officers and other employees of Seller for the purposes of evaluating the Business and all properties, books, accounts, records and documents of, or relating to, the Business, subject to the terms of the Confidentiality Agreement.  All access to the officers, employees, properties, books, accounts, records and/or documents of the Business shall be arranged on behalf of Seller by Sean Harding.  The Parties acknowledge that Purchaser has substantially completed its due diligence review of the Business and the Purchased Assets as of the date of this Agreement, except with respect to the names of certain customers (the "<u>Relevant Customers</u>") of the Business, and the terms of Seller's Contracts with the Relevant Customers, which have been withheld by Seller.  Promptly after the execution and delivery of this Agreement and the Other Purchase Agreements, Seller will disclose to Purchaser the names of the Relevant Customers, including by means of an amendment to the Schedules to this Agreement, and furnish unredacted copies of all Contracts between Seller and the Relevant Customers (collectively, the "<u>Customer Disclosures</u>"), and certify to Purchaser that Seller has complied with the foregoing disclosure obligation (the "<u>Customer Certification</u>").

35

Notwithstanding any other provision of this Agreement, Purchaser shall have three (3) days from and after its receipt of the Customer Certification to terminate this Agreement if Purchaser reasonably determines in good faith that Purchaser's assumptions regarding, and valuation of, the Business are materially and adversely affected by the Customer Disclosures.

     5.3.   <u>Notices of Certain Events</u>.  Seller shall promptly notify Purchaser of:

     (a) any notice or other written communication from any Person alleging that the consent of such Person is or may be required in connection with the consummation of the Transactions;

     (b) any material written communication from any Governmental Authority in connection with or relating to the Transactions; and

     (c) the commencement of any actions, suits, investigations or proceedings relating to Seller or the Business that, if pending on the date of this Agreement, would have been required to have been disclosed pursuant to <u>Section 3.18</u>.

**6.**    **Covenants of Purchaser**.  Purchaser agrees that:

     6.1.   <u>Confidentiality</u>.  Prior to and after the Closing Date and after any termination of this Agreement, the Confidentiality Agreement shall remain in full force and effect, including with respect to any of the Excluded Assets and Excluded Liabilities.

     6.2.   <u>Access</u>.  On and after the Closing Date, upon reasonable advance notice, Purchaser will afford promptly to Seller and its counsel, advisors and other agents reasonable access during normal business hours to Purchaser's properties, books, records, employees, auditors and counsel to the extent necessary for financial reporting and accounting matters, employee benefits matters, the preparation and filing of any Tax returns, reports or forms, the defense of any Tax audit, Claim or assessment, the reconciliation of Claims in the Bankruptcy Case, to permit Seller to determine any matter relating to its rights and obligations hereunder, any other reasonable business purpose related to the Excluded Assets or Excluded Liabilities, or in connection with addressing any other issues arising in connection with or relating to the Bankruptcy Case; <u>provided</u>, <u>however</u>, that any such access by Seller shall not unreasonably interfere with the conduct of the business of Purchaser.  Without limiting Seller's obligations under the Confidentiality Agreement, Seller will hold, and will use its commercially reasonable efforts to cause its officers, directors, employees, accountants, counsel, consultants, advisors and agents to hold, in confidence, unless compelled to disclose by judicial or administrative process or by other requirements of Law, all confidential documents and information concerning Purchaser or the Business provided to it pursuant to this <u>Section 6.2</u>.

     6.3.   <u>Insurance</u>.  To the extent that any insurance policies of Seller or any of its Affiliates cover any loss, liability, Claim, damage or expense relating to any Purchased Assets and such insurance policies continue after the Closing to permit Claims to be made thereunder with respect to events occurring prior to the Closing, Purchaser shall cooperate with Seller and its Affiliates in good faith in submitting and pursuing such Claims for the benefit of Seller.

6.4.    WARN Act.

(a) Purchaser shall assume all obligations and liabilities for the provision of notice or payment in lieu of notice and any applicable penalties under the WARN Act or any similar state or local Law arising as a result of the Transactions.  Purchaser hereby agrees to indemnify Seller against and agrees to hold Seller harmless from any and all expenses, losses, Claims and damages incurred or suffered by Seller with respect to the WARN Act or any similar state or local Law arising as a result of the Transactions.

(b) Purchaser shall not, at any time prior to ninety (90) days after the Closing Date, effectuate a "plant closing" or "mass layoff" as those terms are defined in the WARN Act without complying fully with the WARN Act.

**7.**    **Covenants of Purchaser and Seller**.  Purchaser and Seller agree that:

7.1.    Efforts; Further Assurances.  Subject to the terms and conditions of this Agreement, Purchaser and Seller will use their respective commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary or desirable under applicable Laws to consummate the Transactions; provided, however, Seller shall be entitled to take such actions as are required in connection with the discharge of its fiduciary duties during the Bankruptcy Case. From and after the Closing, Seller and Purchaser agree to execute and deliver such other documents, certificates, agreements and other writings and to take such other actions as may be necessary or desirable in order to vest in Purchaser good title to the Purchased Assets or to evidence the assumption by Purchaser of the Assumed Liabilities.

7.2.    Certain Filings and Actions.  Seller and Purchaser shall cooperate with one another in good faith (a) in determining whether any action by or in respect of, or filing with, any Governmental Authority is required (including with respect to the transfer of Permits), or any actions, consents, approvals or waivers are required to be obtained from parties to any Assumed Contracts or Intellectual Property Rights, in connection with the consummation of the Transactions, and (b) in using commercially reasonable efforts to take such actions or to make any such filings, to furnish information required in connection therewith and to seek timely to obtain any such actions, consents, approvals or waivers.

7.3.    Public Announcements.    Purchaser shall not make any public announcements or statements concerning the Transactions without the prior written consent of Seller.  Purchaser acknowledges and agrees that Seller may provide copies of this Agreement to parties in interest in the Bankruptcy Case or as otherwise necessary or desirable in connection with the Bankruptcy Case.  Seller also shall be entitled to file copies with the Bankruptcy Court or as otherwise required by Law and shall be entitled to publish notice of the contemplated Transactions in any newspaper selected by Seller.

7.4.    Bankruptcy Issues.

(a) Bankruptcy Filing; Sale Motion.  Not later than five (5) days following the date of this Agreement, Seller shall file a voluntary Chapter 11 petition for relief with the Bankruptcy Court.  Not later than one (1) day following the Petition Date, Seller shall file a

motion in the Bankruptcy Court seeking the entry by the Bankruptcy Court of the Approval Order (as defined below) and shall use commercially reasonable efforts to have the Bankruptcy Court issue and enter the Approval Order as soon as practicable following the date of filing such motion (it being acknowledged and agreed that Seller shall have no obligation to seek an expedited hearing date for the hearing to approve this Agreement and the Transactions). It is the intent of the Parties that the Transactions shall be consummated as a "private sale" and the terms of this Agreement shall not be subject to "higher or better" bids.

(b) <u>Bankruptcy Court Approval of Sale</u>. Seller and Purchaser shall each use their commercially reasonable efforts, and shall cooperate, assist and consult with each other, to secure the entry of an Order (the "<u>Approval Order</u>") of the Bankruptcy Court in the Bankruptcy Case (i) authorizing the assumption of this Agreement by Seller pursuant to Section 365 of the Bankruptcy Code, (ii) approving this Agreement, (iii) authorizing the sale of the Purchased Assets pursuant to Section 105, 363 and 365 of the Bankruptcy Code, free and clear of all Liens (other than Permitted Liens and Assumed Liabilities), including successor liability Claims and Claims arising from or related to the Existing Litigation,  (iv) authorizing the assumption and assignment of the Assumed Contracts pursuant to Section 365 of the Bankruptcy Code, (v) authorizing the Transactions, (vi) finding that Purchaser is a good faith purchaser within the meaning of Section 363(m) of the Bankruptcy Code, and (vii) finding that the proposed Transaction was not the product of collusive bidding within the meaning of Section 363(n) of the Bankruptcy Code,  <u>provided</u>, <u>however</u>, Seller shall be entitled to take such actions as may be required in connection with the discharge of its fiduciary duties in the Bankruptcy Case. In connection with the assumption and assignment of the Assumed Contracts pursuant to Section 365 of the Bankruptcy Code, Purchaser shall take all actions required to provide "adequate assurance of future performance" by Purchaser under the Assumed Contracts after the Closing. Seller and Purchaser shall consult with one another in good faith regarding pleadings that either of them intend to file, or positions either of them intend to take, with the Bankruptcy Court in connection with or that might reasonably affect the Bankruptcy Court's entry of the Approval Order.

7.5. <u>Reserved</u>.

7.6. <u>Reserved</u>.

7.7. <u>Notices</u>. If at any time (a) Purchaser becomes aware of any material breach by Seller of any representation, warranty, covenant or agreement contained herein and such breach is capable of being cured by Seller, or (b) Seller becomes aware of any breach by Purchaser or Parent of any representation, warranty, covenant or agreement contained herein and such breach is capable of being cured by Purchaser or Parent, as applicable, the Party becoming aware of such breach shall promptly notify the other Party, in accordance with <u>Section 14.1</u>, in writing of such breach. Upon such notice of breach, the breaching Party shall have until the earlier of (y) ten (10) days after receiving such notice, and (z) the End Date, to cure such breach prior to the exercise of any remedies in connection therewith.

**8.    <u>Guarantee</u>**. In consideration of Seller entering into this Agreement, Parent (a) guarantees to Seller the due and punctual performance and observance by Purchaser of all its obligations under this Agreement, and (b) covenants to Seller that, if and whenever Purchaser

defaults for any reason in the performance of any of its obligations under this Agreement, Parent shall immediately on demand perform or satisfy such obligation in the manner set out in this Agreement.  The obligations of Parent shall not be affected by any act, omission or matter that would reduce or release any obligations of Purchaser hereunder, including any dissolution of Purchaser, any change in the constitution, status or control of Purchaser, or any insolvency, liquidation, administration or other equivalent or similar proceedings of Purchaser, and in any such event, the obligations of Parent hereunder shall continue or be reinstated.  This guarantee shall remain in full force and effect until all amounts due to Seller have been paid and all obligations of Purchaser to Seller have been discharged in full. This guarantee is a guaranty of payment and performance and not a guaranty of collection.

9.    **Tax Matters**.

9.1.    Tax Cooperation.    Purchaser and Seller shall, and shall cause their respective Affiliates to, cooperate in good faith on all Tax matters relating to the Business or the Purchased Assets.  Purchaser and Seller agree to furnish or cause to be furnished to each other, upon request, as promptly as practicable, such information and assistance relating to the Business and the Purchased Assets (including access to books and records) as is reasonably necessary for the preparation and filing of all Tax returns, the making of any election relating to Taxes, the preparation for any audit by any Taxing Authority, and the prosecution or defense of any Claim, suit or proceeding relating to any Tax.  Such cooperation shall include promptly forwarding copies of appropriate notices, forms, or other communications received from or sent to any Taxing Authority and promptly providing reasonably requested copies of all relevant Tax returns together with accompanying schedules and related work papers, documents relating to rulings, audits, or other determinations by any Taxing Authority and records concerning the ownership and tax basis of property, in each case only to the extent such materials relate to the ownership and operation of the Purchased Assets.  Seller will timely notify all applicable federal, state and local Taxing Authorities of the sale of the Purchased Assets.  Seller and Purchaser shall cooperate with each other in good faith in the conduct of any audit or other proceeding relating to Taxes involving the Purchased Assets or the Business.

9.2.    Transfer Taxes.  Any and all sales, use, value added, documentary, stamp, gross receipts, registration, transfer, recording, conveyance, excise, real estate transfer Taxes or other similar Taxes or charges (the "Transfer Taxes") assessed at Closing or at any time thereafter on the transfer of any Purchased Assets shall be borne equally by Seller and Purchaser. The party responsible under applicable Law for the filing of any Tax return or other documents with respect to any Transfer Tax shall prepare and timely file such Tax return at its sole expense (and the other party shall promptly remit payment for fifty percent (50%) of such Transfer Taxes in accordance with Section 9.4).  Purchaser and Seller shall cooperate in providing each other with any appropriate resale exemption certifications and other similar documentation.

9.3.    Property Taxes.  All Property Taxes for a Straddle Period (collectively, the "Apportioned Obligations") shall be apportioned between Seller, on the one hand, and Purchaser, on the other hand, based on the number of days of the portion of the Straddle Period ending on and including the Closing Date and the number of days of the portion of the Straddle Period beginning on the day after the Closing Date.  Seller shall be liable for the proportionate amount of such Property Taxes that is attributable to the portion of the Straddle Period ending on and

including the Closing Date, and Purchaser shall be liable for the proportionate amount of such Property Taxes that is attributable to the portion of the Straddle Period beginning on the day after the Closing Date.

9.4.     Apportionment.    Apportioned Obligations and Transfer Taxes shall be timely paid, and all applicable filings, reports and returns shall be filed, as provided by applicable Law.  The paying Party shall be entitled to reimbursement from the non-paying Party in accordance with Section 9.2 or 9.3, as the case may be.  The paying Party shall present a statement to the non-paying Party setting forth the amount of reimbursement to which the paying Party is entitled under Section 9.2 or 9.3, as the case may be, together with such supporting evidence as is reasonably necessary to calculate the amount to be reimbursed.  The non-paying Party shall make such reimbursement promptly but in no event later than the later of (a) ten (10) days after the presentation of such statement and (b) two (2) Business Days before the due date of payment of such Transfer Taxes or Property Taxes relating to the Apportioned Obligations.  Any payment not made within such time shall bear interest at the rate per annum equal to the rate of interest announced by JP Morgan Chase Bank, N.A. from time to time as its base rate in New York City.

9.5.     Employment Taxes.    With respect to the preparation and filing of employment Tax returns, Seller and Purchaser will follow the Standard Procedure specified in Revenue Procedure 2004-53, 2004-2 C.B. 320, Sec. 4, whereby, among other things, (a) Seller will be responsible for and perform all employment Tax withholding, payment and reporting duties with respect to any wages and other compensation paid by Seller to the Transferred Employees in connection with the operation of the Business on or prior to the Closing Date, and (b) Purchaser will be responsible for and perform all employment Tax withholding, payment and reporting duties with respect to any wages and other compensation paid by Purchaser to the Transferred Employees in connection with the operation of the Business after the Closing Date.

9.6.     Responsibility for Tax Returns.    Seller shall be responsible for preparing and filing all Tax returns relating to the Business or the Purchased Assets for taxable periods closing on or before the Closing Date.  Purchaser shall be responsible for preparing and filing all Tax returns relating to the Business or the Purchased Assets for Straddle Periods.  Each such Tax return shall be prepared on a basis consistent with past practice, except as required by applicable Law.  The Party preparing any such Tax return shall provide a copy of such Tax return to the other Party at least ten (10) days before it is due, taking into consideration extensions of time to file, for the other Party's review and comment.

**10.     Employee Matters.**

10.1.     Employees and Offers of Employment.

(a) As of the Closing Date, Purchaser shall offer employment to all Eligible Employees, with compensation and benefits that are comparable in the aggregate to the compensation and benefits provided by Seller immediately prior to Closing.  For purposes of this Agreement, "Eligible Employees" means employees who are employed by Seller in connection with the Business, but excluding all such employees who are, as of the Closing Date, on a leave of absence.

(b) If Purchaser fails to offer employment to any Eligible Employee, Purchaser shall be liable for and shall reimburse the Seller for, and Seller shall pay to the Eligible Employee, severance in an amount equal to one week of severance at such Eligible Employee's regular rate of compensation for each year of service completed by such Eligible Employee.  If any employee of Seller who accepts an offer of employment from Purchaser pursuant to Section 10.1(a) (each, a "Transferred Employee") is subsequently terminated by Purchaser within the six (6) month period after the Closing Date, other than a termination for cause (as reasonably determined by Purchaser), then Purchaser shall pay severance to such Transferred Employee in an amount equal to one week of severance at such Transferred Employee's regular rate of compensation for each year of service completed by such Transferred Employee, including all years of service with Seller.

10.2.  Employee Plans.

(a) Following the Closing Date, (i) Purchaser shall use commercially reasonable efforts to ensure that no waiting periods, exclusions or limitations with respect to any pre-existing conditions, evidence of insurability or good health or actively-at-work exclusions are applicable to any Transferred Employee or their dependents or beneficiaries under any welfare benefit plans in which such employees may be eligible to participate; and (ii) Purchaser shall use commercially reasonable efforts to provide or cause to be provided that any costs or expenses incurred by employees of Seller (and their dependents or beneficiaries) up to and including the Closing Date shall be taken into account for purposes of satisfying applicable deductible, co-payment, coinsurance, maximum out-of-pocket provisions and like adjustments or limitations on coverage under any such welfare benefit plans.

(b) With respect to each employee benefit plan, policy and practice, including severance, vacation and paid time off plans, policies and practices, sponsored or maintained by Purchaser or its Affiliates, Purchaser shall use reasonable efforts to grant, or cause to be granted, to all Transferred Employees from and after the Closing Date credit for all service with Seller and its predecessors prior to the Closing Date for all purposes (including eligibility to participate, vesting credit, eligibility to commence benefits and severance).

10.3.  Reserved.

10.4.  Accrued Vacation. Within five (5) Business Days after the Closing Date, Seller shall pay to each Transferred Employee that was, as of immediately prior to the Closing, an hourly employee of the Business, all accrued vacation pay due to such Transferred Employee for calendar year 2016.

10.5.  Workers' Compensation. Seller shall be liable for all workers' compensation Claims arising out of injuries with an identifiable date of occurrence sustained by Seller's employees prior to the Closing Date.  Purchaser shall be liable for all workers' compensation Claims arising out of injuries with an identifiable date of occurrence, sustained by Transferred Employees on and after the dates (hereinafter, "Transferred Employees' Employment Date") Purchaser hires them, including injuries sustained by a Transferred

41

Employee on or after the Transferred Employees' Employment Date that are aggravations, exacerbations or re-injuries of medical conditions or diagnoses resulting from injuries that were sustained before the Transferred Employees' Employment Date.  Seller shall be liable for all workers' compensation Claims arising out of injuries or occupational diseases without an identifiable date of occurrence or exposure, originating from within Seller's facilities and which are alleged to have been sustained or contracted prior to the Closing Date, provided such Claims are filed with the appropriate workers' compensation authority within forty-five (45) days after the Transferred Employees' Employment Date.  Purchaser shall be liable for all workers' compensation Claims arising out of injuries or occupational diseases without an identifiable date of occurrence or exposure, which are alleged to have been sustained or contracted either before or after the Transferred Employees' Employment Date, provided that, in the case of any such injuries or diseases allegedly sustained before the Transferred Employees' Employment Date, such Claims are filed with the appropriate workers' compensation authority more than forty-five (45) days after the Transferred Employees' Employment Date.

**11.    Closing Conditions**.

11.1.    Conditions to Obligations of Purchaser and Seller.  The obligations of Purchaser and Seller to consummate the Closing are subject to the satisfaction of the following conditions:

(a) The Bankruptcy Court shall have entered the Approval Order in the Bankruptcy Case, authorizing the Transactions and approving this Agreement under Sections 105(a), 363 and 365 of the Bankruptcy Code, in form and substance reasonably acceptable to Seller and in the same form and substance as the proposed order attached hereto as Exhibit D, and as of the Closing Date the Approval Order shall be in full force and effect, shall not then be stayed, and shall not have been vacated or reversed.

(b) All terminations or expirations of waiting periods imposed (and any extension thereof) by any Governmental Authority necessary for consummation of the Transactions, if any, shall have occurred.

(c) No injunction, stay or similar Order issued by any Governmental Authority shall be in effect that restrains, enjoins, stays or prohibits the consummation of the Transactions.

(d) The Other Transactions shall have closed or shall close contemporaneously with the Closing.

11.2.    Conditions to Obligations of Purchaser and Parent.  The obligation of Purchaser and Parent to consummate the Closing is subject to the satisfaction (or waiver by Purchaser) of the following further conditions:

(a) Seller shall have performed in all material respects all of its obligations hereunder required to be performed by Seller on or prior to the Closing Date; and

(b) the representations and warranties of Seller contained in this Agreement shall be true and correct at and as of the Closing Date, as if made at and as of such date (or to the extent such representations and warranties speak as of an earlier date, they shall be true and correct as of such earlier date), with only such exceptions as would not in the aggregate reasonably be expected to have a Material Adverse Effect.

11.3.   Conditions to Obligations of Seller.   The obligation of Seller to consummate the Closing is subject to the satisfaction (or waiver by Seller) of the following further conditions:

(a) Purchaser shall have performed in all material respects all of its obligations hereunder required to be performed by it at or prior to the Closing Date;

(b) the representations and warranties of Purchaser and Parent contained in this Agreement shall be true and correct in all material respects at and as of the Closing Date, as if made at and as of such date (or to the extent such representations and warranties speak as of an earlier date, they shall be true and correct in all material respects as of such earlier date); and

(c) Seller shall have received all documents it may reasonably request relating to the existence of Purchaser and Parent and the authority of Purchaser and Parent for this Agreement, all in form and substance reasonably satisfactory to Seller.

**12.    Survival; Indemnification.**

12.1.   Survival.   The representations and warranties of Seller shall survive the Closing in accordance with the terms of the Indemnity Agreement; provided, however, that such representations and warranties shall not form the basis for any Claims against Seller.   The covenants and agreements of Seller that by their terms are to be performed at or before Closing, contained in this Agreement or in any certificate or other writing delivered in connection herewith, shall not survive the Closing.   The covenants and agreements of Seller contained herein that by their terms are to be performed after Closing shall survive the Closing for such terms.

12.2.   Indemnification.   Each of Purchaser and Seller agrees to indemnify the other with respect to any investment banking fees, financial advisory fees, brokerage fees, finders' fees, or other similar fees which are alleged to be due and payable with respect to the Transactions and which are asserted as a result of the actions of the indemnifying party.   There shall be no post-Closing indemnification of Purchaser by Seller with respect to any matter not set forth in this Section 12.2.

**13.    Termination.**

13.1.   Grounds for Termination.   This Agreement may be terminated at any time prior to the Closing:

(a) by mutual written agreement of Seller and Purchaser;

43

(b) by Seller or Purchaser, if the Closing shall not have been consummated on or before September 23, 2016 (the "End Date"), unless the Party seeking termination is in breach of its obligations hereunder;

(c) by Seller or Purchaser, if: (i) any condition set forth in Section 11.1 is not satisfied, and such condition is incapable of being satisfied by the End Date; or (ii) any of the Other Purchase Agreements shall have terminated;

(d) by Purchaser or Parent, if any condition set forth in Section 11.2 has not been satisfied, and such condition is incapable of being satisfied by the End Date;

(e) by Seller, if any condition set forth in Section 11.3 has not been satisfied, and such condition is incapable of being satisfied by the End Date;

(f) by Purchaser, in accordance with Section 5.2, within three (3) days after its receipt of the Customer Certification; or

(g) by Purchaser, if the Approval Order has not been entered by the Bankruptcy Court on or before forty-five (45) days after the Petition Date.

The Party desiring to terminate this Agreement pursuant to this Section 13.1 (other than pursuant to Section 13.1(a)) shall give notice of such termination to the other Party in accordance with Section 14.1.

13.2.  Effect of Termination.  If this Agreement is terminated as permitted by Section 13.1, such termination shall be without liability of any Party (or any stockholder, director, officer, employee, agent, consultant or representative of such Party) to the other Party to this Agreement except as expressly provided in Section 2.8(b).  The provisions of Sections 2.8, 6.1, 12.2, 13.2, 13.3, 13.4, 14.1, 14.4, 14.5, 14.6, 14.8, 14.9 and 14.10 shall survive any termination hereof pursuant to Section 13.1.

13.3.  Expenses.  Except as otherwise set forth expressly herein, all costs and expenses incurred in connection with this Agreement or the Transactions shall be paid by the Party incurring such cost or expense.

13.4.  Exclusive Remedies.  Effective as of Closing, Purchaser waives irrevocably any rights and Claims Purchaser may have against Seller, whether in Law or in equity, relating to (a) any breach of a representation, warranty, covenant or agreement contained herein and occurring on or prior to the Closing, or (b) the Purchased Assets, the Assumed Liabilities or the Business, provided, however, that notwithstanding any provision in this Agreement to the contrary, nothing contained herein shall constitute a waiver of Purchaser's right, which is expressly reserved, to initiate such action against the Seller post-Closing as Purchaser may deem necessary to enforce the provisions of the Approval Order (including Purchaser's right to receive possession of the Purchased Assets).  Purchaser and Seller acknowledge and agree that if this Agreement is terminated pursuant to Section 13.1, the provisions of Section 13.2 set forth the sole and exclusive remedies of the Parties.  For the avoidance of doubt, nothing in this Section 13.4 is intended to limit or modify any undertaking by, or obligation of, any Affiliate of Seller pursuant to the Indemnity Agreement.

44

14.    **Miscellaneous**.

14.1.    Notices.    All notices, requests and other communications to any Party hereunder shall be in writing (including facsimile transmission) and shall be given,

if to Purchaser, to:

APT Acquisition Construction Corp.
109 Conica Lane
P.O. Box 160
Harmony, Pennsylvania  16037
Attention:  Robert J. Carey
Facsimile:  (724) 452-1703

with a copy to (which shall not constitute notice):

Thompson Hine LLP
335 Madison Avenue 12th Floor
New York, New York 10017
Attention:  Garrett D. Evers
Facsimile:  (212) 344-6101

if to Parent, to:

APT Acquisition Corp.
109 Conica Lane
P.O. Box 160
Harmony, Pennsylvania  16037
Attention:  Robert J. Carey
Facsimile:  (724) 452-1703

with a copy to (which shall not constitute notice):

Thompson Hine LLP
335 Madison Avenue 12th Floor
New York, New York 10017
Attention:  Garrett D. Evers
Facsimile:  (212) 344-6101

if to Seller, to:

AstroTurf, LLC
1906 S. Hamilton St.
Dalton, Georgia 30720
Attn: Bryan Peeples
Fax:  (706) 370-4731

45

with copies to (which shall not constitute notice):

      AstroTurf, LLC
      c/o FTI Consulting, Inc.
      1201 West Peachtree Street NW
      Suite 500
      Atlanta, Georgia  30309
      Attn: Sean Harding
      Fax:  404-460-6230

      King & Spalding LLP
      1180 Peachtree Street
      Atlanta, Georgia  30309
      Attention: Paul Ferdinands
      Fax: 404-572-5131

All such notices, requests and other communications shall be deemed received on the date of receipt by the recipient thereof if received prior to 5:00 p.m. in the place of receipt and such day is a Business Day in the place of receipt.  Otherwise, any such notice, request or communication shall be deemed not to have been received until the next succeeding Business Day in the place of receipt.

      14.2.   Waivers.  No failure or delay by any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  The rights and remedies herein provided shall be cumulative.

      14.3.   Successors and Assigns.   The provisions of this Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and assigns but shall not be assignable by either Party hereto without the prior written consent of the other Party hereto; provided, however, that Purchaser may, without the consent of Seller, (a) assign this Agreement in its entirety, or any or all of its rights hereunder, to any Affiliate of Purchaser, or (b) assign any or all of its rights hereunder as collateral security to any lender to Purchaser or Parent or any of their respective Affiliates, who shall be permitted to exercise any or all of the rights and remedies of Purchaser hereunder and to transfer and assign such rights to any purchaser of the loan made by such lender.  Any purported assignment or delegation in violation of this Section 14.3 shall be null and void.

      14.4.   Governing Law.  This Agreement shall be governed by and construed in accordance with the internal Laws of the State of Georgia and any applicable provisions of the Bankruptcy Code, without regard to the principles of conflicts of Law that would provide for application of another Law.

      14.5.   Jurisdiction.

      (a) Prior to the closing of the Bankruptcy Case, the Parties hereto agree that any suit, action or proceeding seeking to enforce any provision of, or based on any

46

matter arising out of or in connection with, this Agreement or the Transactions shall be brought exclusively in the Bankruptcy Court, and each of the Parties hereby irrevocably consents to the jurisdiction of the Bankruptcy Court (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by Law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in the Bankruptcy Court or that any such suit, action or proceeding which is brought in the Bankruptcy Court has been brought in an inconvenient forum. Process in any such suit, action or proceeding may be served on any Party anywhere in the world, whether within or without the jurisdiction of the Bankruptcy Court. Without limiting the foregoing, each Party agrees that service of process on such Party as provided in Section 14.1 shall be deemed effective service of process on such Party.

(b) After the closing of the Bankruptcy Case, except as otherwise expressly provided in this Agreement, the Parties hereto agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the Transactions may be brought in any court having subject matter jurisdiction over such suit, action or proceeding, and that any cause of action arising out of this Agreement shall be deemed to have arisen from a transaction of business in the State of Georgia, and each of the Parties hereby irrevocably consents to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by Law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in any such court or that any such suit, action or proceeding which is brought in any such court has been brought in an inconvenient forum. Process in any such suit, action or proceeding may be served on any Party anywhere in the world, whether within or without the jurisdiction of any such court. Without limiting the foregoing, each Party agrees that service of process on such Party as provided in Section 14.1 shall be deemed effective service of process on such Party.

14.6.    Waiver of Jury Trial. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS.

14.7.    No Third Party Beneficiaries. No provision of this Agreement is intended to confer upon any Person other than the Parties hereto any rights or remedies hereunder; provided, however, each Transferred Employee shall be a third party beneficiary of (A) the agreement by Purchaser set forth in the last sentence of Section 10.1(b) and (B) the agreement by Seller set forth in Section 10.4, and shall be entitled to enforce the provisions thereof.

14.8.    Entire Agreement; Amendments; Counterparts. This Agreement (including the Schedules and Exhibits hereto), the Confidentiality Agreement and, solely with respect to Purchaser's remedies with respect to any inaccuracy in, or breach of, the representations and warranties of Seller, the Indemnity Agreement, set forth the entire agreement among the Parties with respect to the subject matter hereof and may be amended only by a writing executed by Purchaser, Parent and Seller. This Agreement may be executed in

47

counterparts, each of which when taken together shall constitute an original. This Agreement shall become effective when each Party hereto shall have received a counterpart hereof signed by the other Party hereto.

14.9.    Headings, Interpretation. The headings contained in this Agreement are for convenience of reference only and shall not affect the meaning or interpretation of this Agreement. Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation." In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of authorship of any provisions of this Agreement.

14.10.    Disclosure Schedules. The Parties acknowledge and agree that (i) the Schedules to this Agreement may include certain items and information solely for informational purposes for the convenience of Purchaser, and (ii) the disclosure by Seller of any matter in the Schedules shall not be deemed to constitute an acknowledgment by Seller that the matter is required to be disclosed by the terms of this Agreement or that the matter is material. Any information disclosed in a Schedule which may be applicable to another section of this Agreement shall be deemed to be made with respect to such other section of this Agreement so long as such information sets forth the exception to the other section in reasonable detail and the relevance of such information is readily apparent. Seller shall have the right (but not the obligation) to supplement or amend the Schedules hereto with respect to any matter hereafter arising (such supplement or amendment, the "Schedule Supplement"); provided, however, that Seller shall not supplement or amend the Schedules at any time less than three (3) Business Days prior to the Closing. Prior to the Closing, any disclosure in the Schedule Supplement shall not cure, or be deemed to have cured, any inaccuracy in or breach of any representation or warranty contained in this Agreement, including for purposes of the termination rights contained in this Agreement or of determining whether or not the conditions set forth in Section 11.2 have been satisfied; provided, however, that if Purchaser does not elect to terminate this Agreement, then to the extent such disclosure actually cures any inaccuracy in or breach of any representation or warranty contained in this Agreement, Purchaser shall be deemed to have irrevocably waived, effective as of the Closing, its right to indemnification under the Indemnity Agreement with respect to such inaccuracy in or breach of such representation or warranty.

14.11.    Name Change. Promptly following the Closing Date, Seller shall make all filings that are reasonably required in order to amend Seller's articles of organization, any foreign qualification registrations and any assumed name or d/b/a filings to terminate Seller's use of the name "AstroTurf, LLC" or any other name that is derivative or similar to such name. Seller shall cooperate with Purchaser in good faith with respect to the timing, form and content of such filings, and take all other actions that are reasonably required to effect such name change in the State of Michigan and in each other jurisdiction where Seller is registered to do business.

*[Signature pages follow]*

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

APT ACQUISITION CONSTRUCTION CORP.

By: _____

Name:    Andreas M. Schulze Ising

Title:    President and Chief Executive Officer


By: _____

Name:    Robert J. Carey

Title:    Chief Financial Officer


APT ACQUISITION CORP.

By: _____

Name:    Andreas M. Schulze Ising

Title:    President


By: _____

Name:    Robert J. Carey

Title:    Secretary

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

APT ACQUISITION CONSTRUCTION CORP.

By: _____
Name:    Andreas M. Schulze Ising
Title:    President and Chief Executive Officer

By: _____
Name:    Robert J. Carey
Title:    Chief Financial Officer

APT ACQUISITION CORP.

By: _____
Name:    Andreas M. Schulze Ising
Title:    President

By: _____
Name:    Robert J. Carey
Title:    Secretary

ASTROTURF, LLC

By: _____

Name:    Sean Harding
Title:    Chief Restructuring Officer

**EXHIBIT A**
**(Base Working Capital)**

**Astroturf, LLC**
**As of 4/30/16**

| | Balance Sheet Items 4/30/16 | Base Working Capital 4/30/16 | Notes |
|---|---|---|---|
| **Current Assets** | | | |
| A/R (net of allowance for doubtful accounts) | 17,515,839 | 17,306,097 | Removed A/R - Other |
| Inventory | 465,323 | 465,323 | |
| Notes Receivable | 1,536,312 | - | Long-Term Customer Receivables |
| Prepaid Expenses | 1,275,898 | 1,275,898 | |
| WIP (Cost in Excess of Billings) | 6,742,367 | 6,742,367 | |
| **Total Current Assets** | **27,535,739** | **25,789,685** | |
| **Current Liabilities** | | | |
| A/P Trade (includes amounts due to Seller's Affiliates)[1] | 6,418,672 | 6,418,672 | |
| A/P Related Party | 4,764,458 | - | Non-recurring, Long-term |
| Accrued Expenses[1] | 679,688 | 529,855 | Not assuming medical expenses or sales taxes |
| Billings in Excess of Cost[1] | 1,519,363 | 1,519,363 | |
| **Total Current Liabilities** | **13,382,161** | **8,467,890** | |
| **Net Working Capital** | **14,153,579** | **17,321,795** | |

---

[1] As of 4/30/16 (prepetition)

<u>**EXHIBIT B**</u>

<u>**BILL OF SALE, ASSIGNMENT AND ASSUMPTION AGREEMENT**</u>

THIS BILL OF SALE, ASSIGNMENT AND ASSUMPTION AGREEMENT (this "<u>Agreement</u>") is entered into between ASTROTURF, LLC ("<u>Seller</u>") and APT ACQUISITION CONSTRUCTION CORP., a Georgia corporation ("<u>Purchaser</u>"), this _____ day of _____, 2016 (the "<u>Effective Date</u>").

WHEREAS, pursuant to that certain Asset Purchase Agreement dated as of June 27, 2016 (the "<u>Asset Purchase Agreement</u>") by and among Seller, Purchaser, and APT Acquisition Corp., a Georgia corporation, Seller agreed to sell to Purchaser and Purchaser agreed to purchase from Seller, for the consideration and upon the terms and conditions set forth in the Asset Purchase Agreement, all of Seller's right, title and interest in and to the Purchased Assets, as the same are described in the Asset Purchase Agreement, free and clear of all Liens (other than Permitted Liens and Assumed Liabilities) pursuant to Sections 105, 363 and 365 of the Bankruptcy Code;

WHEREAS, pursuant to the Asset Purchase Agreement, Seller has agreed to assign and transfer certain rights and agreements to Purchaser, and Purchaser has agreed to assume the Assumed Liabilities as partial consideration for the Purchased Assets; and

WHEREAS, capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Asset Purchase Agreement.

NOW, THEREFORE, pursuant to the Asset Purchase Agreement and in consideration of the promises contained therein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, it is hereby agreed that:

1.      <u>Transfer of Purchased Assets</u>.   Upon the terms and conditions of the Asset Purchase Agreement, Seller does hereby assign, transfer, convey, grant, sell, bargain, set over, alien, remise, release, deliver and confirm unto Purchaser, and Purchaser hereby accepts from Seller, all of the Seller's assets, properties, rights, titles and interests in and to the Purchased Assets in accordance with the terms of the Asset Purchase Agreement.

2.      <u>Assumption and Assignment</u>.   As of the Effective Date, Seller has assumed pursuant to Section 365 of the Bankruptcy Code the Assumed Contracts and hereby assigns, grants, conveys, sells, transfers and sets over (collectively, the "<u>Assignment</u>") to Purchaser all of Seller's right, title, benefit, privileges and interest in and to, and all of Seller's burdens, obligations and liabilities in connection with, each of the Assumed Contracts and the Assumed Liabilities.  Effective as of the Effective Date, Purchaser hereby accepts the Assignment and assumes and agrees to pay, perform and discharge, as and when due, all of Seller's duties and obligations under the Assumed Contracts to the extent relating to the performance thereunder following the Closing, and to pay, perform and discharge, as and when due, all of the Assumed Liabilities.

     3.    <u>Conflict with Asset Purchase Agreement</u>.   The terms of the Asset Purchase Agreement, including, but not limited to, the representations, warranties, covenants, and agreements relating to the Assumed Contracts and Assumed Liabilities, are incorporated herein by reference.  Such terms shall not be superseded by the terms of this Agreement, but shall continue in full force and effect to the extent provided for in the Asset Purchase Agreement.  To the extent any terms and provisions of this Agreement are in any way inconsistent with or in conflict with any term, condition or provision of the Asset Purchase Agreement, the Asset Purchase Agreement shall govern and control.

     4.    <u>Governing Law; Counterparts</u>.  This Agreement and all documents, instruments and agreements executed and delivered pursuant to the terms and provisions hereof shall be governed by and construed in accordance with the Bankruptcy Code, and to the extent not inconsistent with the Bankruptcy Code, the laws of the State of Georgia without regard to conflicts of laws principles that would require the application of any other law.  This Agreement may be executed in counterparts, each of which shall be deemed an original but all of which together will constitute one and the same agreement.  Delivery of an executed signature page of this Agreement by electronic transmission shall be effective as delivery of a manually executed counterpart hereof.

     5.    <u>Further Assurances</u>.  If at any time after the delivery of this instrument any further action is necessary to carry out the purposes of this Agreement, Seller will take such further actions (including the execution and delivery of such further instruments and documents) as Purchaser may reasonably request.

     6.    <u>Successors and Assigns</u>.  This Agreement shall be binding upon the Seller and its respective successors and assigns, effective immediately upon its delivery to Purchaser.  This Agreement shall be binding upon Purchaser and its successors and assigns, effectively immediately upon delivery of this Agreement to Seller.

*[Signature pages follow.]*

IN WITNESS WHEREOF, Seller and Purchaser have caused this Agreement to be executed and delivered as of the date first above written.

**<u>SELLER</u>:**

ASTROTURF, LLC,
a Michigan limited liability company

By:_____
    Name:
    Title:

[*Additional signature page follows.*]

*Signature Page to Bill of Sale, Assignment and Assumption Agreement*

**PURCHASER:**

APT ACQUISITION CONSTRUCTION
CORP.,
a Georgia corporation

By: _____
     Name:
     Title:

# **EXHIBIT C**

# **NON-COMPETITION AND NON-SOLICITATION AGREEMENT**

## NON-COMPETITION AND NON-SOLICITATION AGREEMENT

THIS NON-COMPETITION AND NON-SOLICITATION AGREEMENT (this "Agreement"), is made and entered into effective as of _____, 2016, by and among APT Acquisition Manufacturing and Distribution Corp., a Georgia corporation ("APT Manufacturing"), APT Acquisition Construction Corp., a Georgia corporation ("APT Construction"), and APT Acquisition Corp., a Georgia corporation ("APT Acquisition" and together with APT Manufacturing and APT Construction, each a "Purchaser" and collectively the "Purchasers"), Textile Management Associates, Inc., a Georgia corporation ("TMA"), AstroTurf, LLC, a Michigan limited liability company ("AstroTurf"), Synthetic Turf Resources, LLC, a Georgia limited liability company ("STR"), Crystal Products Co., Inc., a Georgia corporation ("Crystal"), and UTGH Equipment, LLC, a Georgia limited liability company ("UTGH" and together with TMA, AstroTurf, STR, and Crystal, each a "Restricted Party" and collectively the "Restricted Parties").

## Background

A.     The Purchasers have agreed to acquire certain assets, tangible and intangible, of TMA, AstroTurf, STR, Crystal and UTGH used in the Covered Business (as defined below), pursuant to an Asset Purchase Agreement, dated as of June [___], 2016, between TMA and APT Acquisition (the "TMA Purchase Agreement"); an Asset Purchase Agreement, dated as of June [___], 2016, between AstroTurf and APT Construction (the "AstroTurf Purchase Agreement"); an Asset Purchase Agreement, dated as of June [___], 2016, between STR and APT Manufacturing (the "STR Purchase Agreement"); an Asset Purchase Agreement, dated as of June [___], 2016, between Crystal and APT Manufacturing (the "Crystal Purchase Agreement"); and an Asset Purchase Agreement, dated as of June [___], 2016, between UTGH and APT Acquisition (the "UTGH Purchase Agreement" and together with the TMA Purchase Agreement, the AstroTurf Purchase Agreement, the STR Purchase Agreement and the Crystal Purchase Agreement, each a "Purchase Agreement" and collectively the "Purchase Agreements").

B.     As an inducement for each party to enter into the respective Purchase Agreements, the Restricted Parties and the Purchasers have agreed to enter into this Agreement and acknowledge that the restrictive covenants contained in this Agreement are reasonably necessary to protect the legitimate business interests and goodwill associated with the Covered Business.

## Agreement

NOW, THEREFORE, in consideration of the Purchasers entering into the Purchase Agreements and other good and valuable consideration and the covenants contained herein, the receipt and legal sufficiency of which are hereby acknowledged, the parties do hereby agree as follows:

1.     Agreement Not to Compete; Confidentiality.

1

(a)    For a period of five (5) years immediately following the date hereof (the "Non-Compete Period"), each of the Restricted Parties covenants and agrees not to compete, and to cause their respective Affiliates not to compete, with the Purchasers or any of their respective Affiliates, successors or assigns (together with each of their respective subsidiaries, each a "Protected Entity" and collectively, the "Protected Entities") by engaging, directly or indirectly, in the Covered Business within the Covered Area (as defined below).

(b)    For purposes of this Agreement:

(i)    The term "Confidential Information" means any and all of the following information of the Covered Business as of immediately prior to the Closing:

(A)    all information that is a trade secret under applicable trade secret law;

(B)    all information concerning product specifications, data, know-how, formulae, compositions, processes, designs, sketches, photographs, graphs, drawings, samples, inventions and ideas, past, current and planned research and development, current and planned manufacturing or distribution methods and processes, customer lists, current and anticipated customer requirements, price lists, market studies, business plans, computer hardware, software and computer software and database technologies, systems, structures and architectures;

(C)    all information concerning the business and affairs of the Covered Business (which includes historical and current financial statements, financial projections and budgets, tax returns and accountants' materials, historical, current and projected sales, capital spending budgets and plans, business plans, strategic plans, marketing and advertising plans, publications, client and customer lists and files, contracts, the names and backgrounds of key personnel and personnel training techniques and materials, however documented); and

(D)    all notes, analyses, compilations, studies, summaries and other material prepared by any Restricted Party to the extent containing or based, in whole or in part, upon any information included in the foregoing.

Notwithstanding the foregoing, Confidential Information shall not include any information which: (1) is or becomes generally available to or known by the public, other than as a result of a breach of this Agreement by any Restricted Party; (2) becomes available to any Restricted Party on a non-confidential basis from a source not known by the Restricted Party to be under a duty of confidentiality to any Protected Entity; or (3) was independently developed by any Restricted

2

Party without the use of any Confidential Information and without breaching this Agreement, as evidenced by written records in the Restricted Party's possession.

(ii)    The term "Covered Area" means worldwide.

(iii)    The term "Covered Business" means the business of manufacturing, marketing, selling and installing artificial turf products for athletic fields and for landscape applications; provided, however, that the term "Covered Business" shall not include:

(A)    the manufacture, marketing, sale and installation of (1) floor mats for boats in the marine business and (2) walk-out mats for buildings;

(B)    the rolling, wrapping and shipping of products to big box retailers;

(C)    the manufacture, marketing, sale and installation of artificial grass carpet products (light weight polypropylenes cut pile constructions of fibrillated slit film tapes of various deniers, widths, and colors, coated with EVA Marine, Action Back, and Unitary SBR secondary backings) for residential porch and patio applications, special events market applications (for example, artificial grass carpet products for hospitality and sponsorship tents at golf tournaments), marine applications (for example, replacement carpets and rugs for marine and cruise vessels), recreational vehicle industry applications (for example, rugs and mats for various outdoor miscellaneous utility uses) and tradeshow and convention applications, in each case, to the extent such products have a pile height that is three quarters of an inch or less, or such greater pile height as may be consented to in writing by APT Acquisition;

(D)    any business of providing supplies and production services (such as yarn (for residential and commercial carpet only), coating, primary and secondary backing, chemicals and colorization services related to carpet and turf manufacturing) to the Purchasers or any other Person that is engaged in the manufacture, marketing, sale and installation of artificial turf products for athletic fields and for landscape applications in the United States of America, provided, however, for so long as any Purchaser is providing to Tigersports Americas Inc. (dba TenCate Turf Systems), or any of its Affiliates engaged in the manufacture, marketing, sale and installation of artificial turf products for athletic fields and for landscape

3

applications in the United States of America, the services contemplated under the Toll Manufacturing Agreement, dated as of December 5, 2013, between Synthetic Turf Resources, LLC and TigerSports Americas Inc., whether pursuant to such Toll Manufacturing Agreement or any other agreement or arrangement, and during the twelve month period following the cessation of such services, the Restricted Parties shall not be permitted to supply any such supplies or services to Tigersports Americas Inc. except as may be consented to in writing by APT Acquisition;

(E)    the marketing, selling or installing of artificial turf products for landscape applications by (i) Putting Greens Direct of Nevada, LLC, a Nevada limited liability company pursuant to that certain Supply Agreement, dated as of May 1, 2016, by and between UTGH Equipment, LLC  and Putting Greens Direct of Nevada, LLC; (ii) Synscapes of Arizona, LLC, a Delaware limited liability company pursuant to that certain Dealership Agreement, dated as of December 31, 2003, by and between UTGH Equipment, LLC (as successor in interest to Synthetic Lawns International, Inc.) and Synscapes of Arizona, LLC (as successor in interest to UT Group Holdings, Inc.); and (iii) SYNScapes of Southern CA, LLC, a California limited liability company d/b/a SYNLawn of San Diego, pursuant to a Supply Agreement, dated as of January 1, 2016, by and between UTGH Equipment, LLC and SYNScapes of Southern CA, LLC d/b/a SYNLawn of San Diego;

(F)    the retail sale (but not manufacturing or the installation) by Dalton Carpet Mart, Inc., a Georgia corporation, of promotional sports and landscape turf products; and

(G)    any business acquired by a Restricted Party or its Affiliates after the date of this Agreement provided that (1) less than ten percent (10%) of the gross sales of such acquired business and (2) less than $10 million of the gross sales of such business are generated by the Covered Business during the Non-Compete Period.

(iv)    The phrase "engage, directly or indirectly" with respect to any Person means, directly or indirectly, whether on such Person's own or through an agent, employee or otherwise, or in association with any other Person, (i) engaging in, (ii) having an economic or other interest in, directly or indirectly, as owner, partner, participant of a joint venture, trustee, proprietor, stockholder, member, manager, director, officer, employee, independent contractor, capital investor, lender (including providing funding in any form,

4

whether by gift or otherwise), landlord, consultant, advisor or similar capacity, or by lending his or its name or reputation to be used in connection with, or otherwise participating in or making available his or its skill, knowledge or experience to be used in connection with, or (iii) participating in the management or control of a business (or division, group, or other portion of a business) or enterprise engaged in the Covered Business in the Covered Area.

(v)    The term "Affiliate" means, with respect to any Person, any other Person which directly or indirectly controls, is controlled by, or is under common control with, such first specified Person. The term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of any Person, whether through the ownership of voting securities, by contract or otherwise, and the terms "controlled" and "controlling" have meanings correlative thereto.

(vi)    The term "Person" means an individual, corporation, partnership, limited partnership, limited liability company, syndicate, person (including a "person" as defined in Section 13(d)(3) of the Exchange Act), trust, association or any other entity, including a governmental authority.

(c)    <u>Confidentiality</u>. The Restricted Parties covenant and agree not to, and to cause their Affiliates not to, at any time during the Non-Compete Period, directly or indirectly use, reproduce or disclose, for the benefit of any Restricted Parties, any of their Affiliates, or any other Person, any of the Confidential Information. Notwithstanding the foregoing, the Restricted Parties and/or their Affiliates may disclose Confidential Information to the extent required by applicable law, rule or regulation provided that the Restricted Parties, if not prohibited by applicable law, rule or regulation, shall, or shall cause their Affiliates to, first provide the Purchasers with prompt written notice of such request so that the Protected Entities, as applicable, may seek an appropriate protective order or other appropriate remedy and, if such protective order or remedy is not obtained, the Restricted Parties or their Affiliates may disclose only that portion of the Confidential Information which any such Person is legally required to disclose, and the Restricted Parties shall exercise, and shall cause their Affiliates to exercise, commercially reasonable efforts to obtain assurance that confidential treatment will be accorded to the Confidential Information so disclosed.

2.    <u>Non-Solicitation</u>. For a period of two (2) years immediately following the date hereof (the "Non-Solicit Period"), each of the Restricted Parties covenants and agrees not to, and to cause its Affiliates not to, directly or indirectly, induce, encourage or otherwise solicit for hire, or hire, or assist any other Person, firm or entity in hiring, and to cause their respective Affiliates not to induce, encourage or otherwise solicit for hire, or hire, or assist any other Person, firm or entity in hiring, any employees of the Protected Entities whose principal roles are management or sales in the Covered Business (the "Covered Employees") except for Covered Employees whose employment relationship with the Protected Entities is terminated or is not renewed; provided, however, that each of the Restricted Parties and its respective Affiliates shall not hire or engage any Covered Employee described in the foregoing exception for a period of thirty (30) days after such termination; provided, further, however, that the foregoing restrictions shall not apply to making a general offer of employment to the public that is not targeted or focused on Covered Employees of any of the Protected Entities, and hiring employees pursuant to such

5

process, or hiring any Person that is not an officer of any of the Protected Entities who, without having been solicited, seeks employment from the Restricted Party or any Affiliate thereof.

3.      Permitted Activities.  Nothing contained herein shall prohibit or restrict any of the Restricted Parties or their Affiliates from (i) providing any services, selling any products or leasing any properties, personal or real, to any of the Protected Entities, (ii) leasing any real property to Persons engaged in a Covered Business provided that such leasing arrangement is at a market rental rate and with market rental terms, (iii) providing loans on market-standard terms (including, without limitation, servicing such loans and managing the collateral pledged to support such loans) to Persons engaged in a Covered Business in the ordinary course of the business of First Bank of Dalton, or (iv) holding or make investments in securities of any corporation, limited partnership or other entity that is listed on a national or regional securities exchange or admitted to trading privileges thereon, traded on the Nasdaq National Market System, or have been registered under Section 12 of the Securities Exchange Act of 1934, provided, however, the Restricted Parties' aggregate equity interest in any entity that conducts operations or holds an interest in the Covered Business does not exceed 5% of the outstanding shares or interests in such corporation, partnership or other entity.

4.      Special Remedies and Enforcement.  Each of the Restricted Parties recognize and agree that a breach of any of the covenants set forth in this Agreement would cause irreparable harm to the Protected Entities, that the remedies at law in the event of such breach would be inadequate, and that, accordingly, in the event of such breach, the Protected Entities shall be entitled to obtain a restraining order or injunction or both (or other specific performance or equitable relief) against each of the Restricted Parties without any requirement that the Protected Entities post any bond or security (and neither the Restricted Parties nor any of their Affiliates shall contest any such relief by asserting the defense that a remedy at law would be adequate or that specific performance or injunctive relief in respect of such breach or violation should not be available on any other grounds (provided, that the foregoing shall not be deemed to preclude a party from contesting that the alleged breach or violation giving rise to such relief has occurred)), which is in addition to any other rights and remedies which are available to the Protected Entities.  Each of the Restricted Parties further acknowledge and agree, on behalf of themselves and their respective Affiliates, that: (a) the covenants and agreements in this Agreement, including the scope of the covenants and agreements as to time, geography and activity, are reasonable and necessary to protect and preserve the Protected Entities' and their respective Affiliates' legitimate business interests and are not broader than necessary to protect the Protected Entities' and their respective Affiliates' interests; (b) the Protected Entities have been materially induced by the Restricted Parties to enter into the Purchase Agreements by the covenants set forth in this Agreement, and the Protected Entities would not have taken such action if the Restricted Parties had not covenanted as provided in this Agreement. Notwithstanding the foregoing, prior to seeking any judicial relief relative to a breach or violation of this Agreement, the Protected Entities shall provide ten (10) days' prior written notice to the Restricted Parties of such breach or violation in accordance with the notice provisions contained in the Purchase Agreements and the Restricted Parties shall be allowed to cure such breach or violation within such ten (10) day period, to the extent such violation or breach can be cured.

6

5.      <u>Severability</u>. The parties hereto intend that all of the covenants contained herein shall be deemed to be separate covenants as to each state, territory, jurisdiction and country and that if in any judicial proceeding, a court shall refuse to enforce all of the separate covenants included herein because, taken together, they cover too extensive a geographic area or because they cover too long a period of time or because they cover too broad a range of activities, the parties hereto intend that those such covenants shall be reduced in scope only to the extent required by law, and that all remaining covenants hereof not so affected shall remain in effect and be fully enforceable.

6.      <u>Amendment; Counterparts; Waiver</u>. Any provision of this Agreement may be amended or waived by the parties hereto only by an instrument in writing signed by, or on behalf of, each of them (in the case of an amendment) or the party waiving its rights (in the case of a waiver).  This Agreement may be executed in two or more counterparts (including facsimile or .pdf versions), each of which shall for all purposes be deemed to be an original and all of which shall constitute the same instrument.  No delay or failure on the part of the Protected Entities in the exercise of any right or remedy shall operate as a waiver thereof; no waiver of any of the provisions of this Agreement shall be deemed to or shall constitute a waiver of any other provision hereof (whether or not similar); and no waiver of any provision of this Agreement with respect to a particular event or set of facts shall be deemed a waiver of such provision with respect to any other event or set of facts.

7.      <u>Governing Law; Judicial Proceedings</u>.  This Agreement shall be governed by and construed in accordance with the laws of the State of Georgia, without regard to or application of its conflicts of law principles.  Each of the parties hereto hereby irrevocably submit themselves to the jurisdiction of the federal courts of the United States of America or the courts of the State of Georgia in each case located in the city of Atlanta and County of Fulton for the purposes of any suit, action or other proceeding arising out of this Agreement and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such suit, action or other proceeding may be heard and determined in any such Georgia State court or, to the extent permitted by law, in such federal court.  Each of the parties agrees that a final judgment shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Each of the parties irrevocably and unconditionally waives, to the fullest extent it or he may legally and effectively do so, any objection (whether as a matter of state or federal law) that it or he may now or hereafter have to the laying of venue of any action, suit or other proceeding arising out of or relating to this Agreement in any federal courts of the United States of America or any courts of the State of Georgia in each case located in the city of Atlanta and County of Fulton.  Each of the parties irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action in any such court.  No party to this Agreement or any permitted assignee, successor, heir or personal representative of a party shall seek a jury trial in any suit, action or proceeding based upon or arising out of this Agreement or any of the other agreements or the dealings or the relationship between the parties.  No party will seek to consolidate any such action, in which a jury trial has been waived, with any other action in which a jury trial cannot or has not been waived.  The provisions of this Section have been fully discussed by the parties hereto, and these provisions shall be subject to no exceptions.  No party hereto has in any way agreed with or represented to

7

any other party hereto that the provisions of this Section will not be fully enforced in all instances.

8.    <u>Successors and Assigns</u>.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns, but shall not be assignable by any party hereto without the prior written consent of the other parties hereto. Notwithstanding the foregoing, this Agreement may be assigned by one or more of the Purchasers to any entity affiliated with the assigning Purchaser.

**[Signature Pages to Follow]**

8

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first written above.

**<u>PURCHASERS</u>:**

APT Acquisition Manufacturing and Distribution Corp.

By:_____
Name: _____
Title: _____

APT Acquisition Construction Corp.

By:_____
Name: _____
Title: _____

APT Acquisition Corp.

By:_____
Name: _____
Title: _____

Signature Page to Non-Competition and Non-Solicitation Agreement

**RESTRICTED PARTIES:**

Textile Management Associates, Inc.

By:_____
Name: _____
Title: _____

AstroTurf, LLC

By:_____
Name: _____
Title: _____

Synthetic Turf Resources, LLC

By:_____
Name: _____
Title: _____

Crystal Products Co., Inc.

By:_____
Name: _____
Title: _____

UTGH Equipment, LLC

By:_____
Name: _____
Title: _____

Signature Page to Non-Competition and Non-Solicitation Agreement