

**IT IS ORDERED as set forth below:**

**Date: July 8, 2016**

_____

**Paul W. Bonapfel**
**U.S. Bankruptcy Court Judge**

_____

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ROME DIVISION**

| | | |
|---|---|---|
| **In re:** | ) | **Chapter 11** |
| | ) | |
| **ASTROTURF, LLC,** | ) | **Case No. 16-41504-PWB** |
| | ) | |
| | ) | |
| **Debtor.** | ) | |
| | ) | |

**SECOND INTERIM ORDER (i) AUTHORIZING DEBTOR TO OBTAIN
POST-PETITION FINANCING FROM TEXTILE MANAGEMENT ASSOCIATES,
INC., AS LENDER, PURSUANT TO SECTION 364 OF THE BANKRUPTCY CODE,
(ii) GRANTING LIENS AND SUPER-PRIORITY CLAIMS, AND (iii) SCHEDULING
THE FINAL HEARING ON THE DEBTOR'S MOTION TO INCUR SUCH
FINANCING ON A PERMANENT BASIS AND APPROVING THE FORM AND
METHOD OF NOTICE THEREOF**

Upon the emergency motion, dated June 28, 2016 (the "Motion"), of Astroturf, LLC,

as a debtor and debtor in possession ("Debtor"):

(i)    for authorization and approval, pursuant to sections 105, 361, 362, and 364 of

title 11 of the United States Code (the "Bankruptcy Code") and Rules 2002, 4001, and 9014

of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for the Debtor to

obtain post-petition financing in an aggregate principal amount of $10,000,000 (the "DIP

Facility"), from Textile Management Associates, Inc., as lender thereunder (the "DIP Lender") to (A) fund among other things, ongoing working capital needs of the Debtor, with such amounts stipulated to be secured by the "Collateral" (as defined below), and (B) incur and pay fees and expenses (including, without limitation, reasonable attorneys' fees and expenses) owed to the DIP Lender under the DIP Facility and the other DIP Facility Documents (as defined below);

(ii)     requesting, pursuant to Section 364(c) of the Bankruptcy Code, that the financing under the DIP Facility:

(A)     have priority over any and all administrative expenses, including, without limitation, the kind specified in sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b), 726 of the Bankruptcy Code, except for the Carve-Out (as defined below) as provided for herein (the "Superpriority DIP Claim"); and

(B)     be secured by a first priority security interest in, and lien upon, all assets of the Debtor including without limitation assets constituting all personal property and other assets, whether now owned by or owing to, or hereafter acquired by or arising in favor of the Debtor (including under any trade names, styles or derivations thereof), and whether owned or consigned by or to, or leased from, the Debtor, and regardless of where located, including, without limitation:  (a) accounts, accounts receivable, payment intangibles, instruments, intercompany claims, and other rights to receive payments of the Debtor, (b) commercial lockboxes, government lockboxes and collection accounts, together with all funds received thereby or deposited therein, and any checks or instruments from time to time representing or evidencing the same, (c) cash and cash equivalents; (d) funds in any account of the

2

Debtor; (e) contract rights; (f) instruments, documents and chattel paper; (g) securities (whether or not marketable); (h) equipment, inventory and fixtures; (i) leaseholds and interests in leaseholds; (j) franchise rights; (k) patents, tradenames, trademarks, copyrights and all other intellectual property; (l) general intangibles; (m) capital stock; (n) investment property; (o) supporting obligations; (p) letter of credit rights; (q) except for avoidance actions under Chapter 5 of the Bankruptcy Code, all commercial tort claims and all other claims and causes of action; (r) except for the proceeds of avoidance actions under chapter 5 of the Bankruptcy Code, the proceeds of all claims or causes of action; (s) all information and data compiled or derived by the Debtor with respect to any of the foregoing; (t) all books and records of the Debtor evidencing or relating to or associated with any of the foregoing, and (u) to the extent not covered by the foregoing, all other assets or property of the Debtor, whether tangible, intangible, personal or mixed, and all proceeds and products of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, any and all proceeds of any insurance, indemnity, warranty or guaranty payable to the Debtor from time to time with respect to any of the foregoing, but specifically excluding any actions or proceeds of any actions under chapter 5 of the Bankruptcy Code, as provided for by section 364(c) of the Bankruptcy Code, subordinate to only the valid, perfected, and unavoidable pre-petition liens, if any, and to the Carve-Out provided for herein (the "DIP Facility Lien"); provided, however, that the DIP Superpriority Claim and the DIP Facility Lien shall attach to any of the Debtor's assets that are subject to a lien that is subsequently avoided pursuant to Chapter 5 of the Bankruptcy Code (collectively, the "Avoided Liens"),

including, without limitation, any Avoided Liens granted in connection with the Existing Facility (as defined in the DIP Facility Credit Agreement).  The personal property and assets described in this sub-paragraph (ii)(B) shall be referred to herein as the "Collateral".  For the avoidance of doubt, notwithstanding anything in this paragraph to the contrary, the provisions of Section 551 of the Bankruptcy Code or the exclusion of avoidance actions from the definition of Collateral, if and to the extent that any pre-petition security interest on any of such Collateral is avoided, in whole or in part, the DIP Lender shall hold a continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected post-petition security interest in and lien on the Collateral so avoided, which security interest and lien shall be senior in priority to all other liens, claims and interests except for any Prior Permitted Liens (as defined in the DIP Facility Credit Agreement) and the Carve-Out (and no lien or security interest preserved for the benefit of the estate under Section 551 of the Bankruptcy Code or otherwise shall be construed or deemed to be a Prior Permitted Lien).

(iii)    requesting, pursuant to Bankruptcy Rule 4001, that an interim hearing (the "First Interim Hearing") on the Motion be held for this Court to consider entry of an interim order authorizing the Debtor, on an interim basis, to obtain under the DIP Facility from the DIP Lender the principal amount of up to $4,200,000 pursuant to the terms of the DIP Facility Credit Agreement (as defined below);

(iv)    requesting authorization to use the cash collateral ("Cash Collateral") of Textile Management Associates, Inc. in its capacity as lender under that certain Amended and

Restated Loan Agreement dated as of January 1, 2014 (in such capacity, the "Pre-Petition Lender"); and

(v)     requesting, pursuant to Bankruptcy Rule 4001, that a final hearing be held for this Court to consider entry of an order approving the DIP Facility on a final basis (the "Final Order"), as set forth in the Motion and the DIP Facility Credit Agreement; and, pursuant to Bankruptcy Rules 4001(b) and 4001(c)(1), due and sufficient notice under the circumstances of the Motion, the First Interim Hearing and the second interim hearing (the "Second Interim Hearing") having been provided by the Debtor as set forth in paragraph "F" below, and the Second Interim Hearing having been held on July 6, 2016, and upon consideration of all the pleadings filed with this Court; and any objections to the relief requested in the Motion that have not been resolved are hereby overruled; and upon the record made by the Debtor at the First Interim Hearing and the Second Interim Hearing and the *Declaration of Sean M. Harding in Support of First Day Motions and Applications*, and after due deliberation and consideration and sufficient  cause appearing therefor; and the First Interim Hearing having been held on June 29, 2016, after which the Court entered the an order granting the Motion on an interim basis (Docket No. 33);

IT IS HEREBY FOUND:

A.     On June 28, 2016 (the "Petition Date"), the Debtor commenced in this Court a case under chapter 11 of the Bankruptcy Code (the "Chapter 11 Case"). The Debtor is continuing to operate its business and manage its property as a debtor in possession under sections 1107 and 1108 of the Bankruptcy Code.

B.      This Court has subject matter jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

C.      The Debtor's business requires the availability of credit to finance the ordinary costs of its operations.  Without such credit, the Debtor would not be able to operate its business and the Debtor's estate would be irreparably harmed.

D.      The Debtor is unable to obtain sufficient interim financing from sources other than the DIP Lender on terms more favorable than under the DIP Facility and any and all documents and instruments delivered pursuant thereto or in connection therewith (inclusive of the DIP Facility Credit Agreement (as defined below), the "DIP Facility Documents").  The Debtor has been unable to obtain sufficient interim unsecured credit solely under section 503(b)(1) of the Bankruptcy Code as an administrative expense.  New credit is unavailable to the Debtor without it granting (i) the Superpriority DIP Claims and (ii) the DIP Facility Lien as provided herein and in the DIP Facility Documents.

E.      The DIP Lender has indicated a willingness to consent and agree to provide financing to the Debtor subject to (i) the entry of this Order, (ii) the terms and conditions of the DIP Facility Credit Agreement, (iii) the terms and conditions of all "First-Day Orders" being, in form and substance, reasonably satisfactory to the DIP Lender, and (iv) findings by the Court that such financing is essential to the Debtor's estate, that the terms of such financing were negotiated in good faith and at arm's length, and that the DIP Lender's security interests, liens, encumbrances, claims, super-priority claims, and other protections granted pursuant to this Order and the DIP Facility Documents will not be affected by any subsequent reversal, modification, vacatur, or amendment of this Order or any other order, as

6

provided in section 364(e) of the Bankruptcy Code.  The Pre-Petition Lender has consented to the use of Cash Collateral pursuant to the terms of this Order.

F.    Notice of the Motion, First Interim Hearing and the Second Interim Hearing has been provided to the Office of the United States Trustee, counsel for the DIP Lender, the Debtor's twenty (20) largest unsecured creditors, the district director of the Internal Revenue Service, the Attorney General for the State of Georgia, the United States Attorney for the Northern District of Georgia, the First Bank of Dalton, all persons or entities known or reasonably believed to have asserted an interest in the Collateral, counsel to FieldTurf USA, Inc. and FieldTurf Tarkett, Inc., and the Debtor's insurance carriers.  Under the urgent circumstances, requisite notice of the Motion and the relief requested thereby has been provided in accordance with Bankruptcy Rule 4001, which notice is sufficient for all purposes under the Bankruptcy Code, including, without limitation, sections 102(1) and 364 of the Bankruptcy Code, and no other notice need be provided for entry of this Order.

G.    The Debtor has requested immediate entry of this Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2).  Absent entry of this Order, the Debtor's estate will be immediately and irreparably harmed.

H.    The ability of the Debtor to finance its operations and the availability to the Debtor of sufficient working capital through the incurrence of new indebtedness for borrowed money and other financial accommodations, including credit support, is in the best interests of the Debtor and its creditors and estate.  The interim financing authorized hereunder is vital to avoid immediate irreparable harm to the Debtor's estate and to allow the orderly continuation of the Debtor's business.

I.        Based upon the record presented by the Debtor to this Court:  (i) the terms of the DIP Facility are fair and reasonable, reflect the Debtor's exercise of prudent business judgment consistent with its fiduciary duty, and are supported by reasonably equivalent value and fair consideration; and (ii) the DIP Facility has been negotiated in good faith and at arm's length among the Debtor and the DIP Lender, and any credit extended, loans made, and other financial accommodations extended to the Debtor by the DIP Lender shall be deemed to have been extended, issued, or made, as the case may be, in "good faith" within the meaning of section 364(e) of the Bankruptcy Code.

IT IS HEREBY ORDERED, ADJUDGED AND DECREED:

1.        <u>Motion Granted</u>.  The Motion is granted as set forth in this Order.  All objections to the interim relief sought in the Motion to the extent not withdrawn or resolved are hereby overruled.

2.        <u>Authorization to Borrow and to Use Cash Collateral</u>.  Pursuant to that certain Senior Secured Debtor-in-Possession Loan Agreement (the "<u>DIP Facility Credit Agreement</u>") by and among the Debtor and the DIP Lender, in substantially the form annexed hereto as "Exhibit A," and provided that the Debtor is not in default under the terms of this Order, the Debtor is immediately authorized to borrow under the DIP Facility from the DIP Lender the principal amount of up to $4,200,000 under the terms of the DIP Facility Credit Agreement for the Debtor to continue to operate its business, in accordance with the DIP Facility Credit Agreement.  Upon execution and delivery of the DIP Facility Documents, the DIP Facility Documents shall constitute legal, valid, and binding obligations of the Debtor party thereto, enforceable against the Debtor in accordance with their terms.  Available financing and advances under the DIP Facility Credit Agreement until the Final Hearing (as defined below)

will be made only to fund the Debtor's ordinary working capital and general corporate needs and to pay other amounts required or allowed to be paid pursuant to the DIP Facility Credit Agreement and this Order; provided, however, that: (a) the Debtor shall not borrow in excess of an amount that it believes is necessary to meet its obligations that are expected to become due and payable during the period between the Petition Date and the Final Hearing; and (b) the Debtor shall not make any payments on account of its obligations to its affiliate suppliers prior to the date that such obligations become due and payable.  The use of Cash Collateral pursuant to an Approved Budget (as defined in the DIP Facility Credit Agreement) on an interim basis is authorized, subject to the terms and conditions set forth in this Order.

3. <u>Superpriority DIP Claims</u>.  For all of the amounts owing by the Debtor to the DIP Lender pursuant to or in connection with the DIP Facility Credit Agreement or any other DIP Facility Document including, without limitation, all principal, interest, fees, expenses, indemnification and reimbursement payments, costs and expenses (including all fees and expenses of counsel to the DIP Lender incurred pursuant to the DIP Facility Credit Agreement or any other DIP Facility Document), whether direct or indirect, absolute or contingent, liquidated or unliquidated, now existing or hereafter arising under the DIP Facility Credit Agreement or any other DIP Facility Document (the "<u>Obligations</u>") and any other indebtedness of the Debtor arising under the DIP Facility and the DIP Facility Documents, the DIP Lender is granted, pursuant to section 364(c)(l) of the Bankruptcy Code, the Superpriority DIP Claims as described in subparagraph (ii)(A) of the first paragraph of this Order (which claims shall be payable from and have recourse to, in addition to the Collateral, any unencumbered post-petition property of the Debtor), with the seniority, scope, and effect set forth in such subparagraph; provided, however, that the Commitment Fee owed under (and

as defined in) section 3(c) of the DIP Facility Credit Agreement shall be calculated based upon a commitment equal to $4,200,000 until entry of the Final Order, at which time the Commitment Fee shall be calculated based upon a commitment equal to $10,000,000.

4.        DIP Facility Lien.    As security for the Obligations, pursuant to sections 364(c)(2) and (c)(3) of the Bankruptcy Code, the DIP Lender, is hereby granted (effective upon the date of this Order and without the necessity of the execution by the Debtor or the filing or recordation of mortgages, security agreements, financing statements, or otherwise) the DIP Facility Lien, all with the perfection, seniority, scope, and effect set forth in subparagraph (ii)(B) of the first paragraph of this Order.  Such security interests and liens shall be subject to the payment of the Carve-Out.

5.        Carve-Out.  The Superpriority DIP Claims and the DIP Facility Lien shall be subject to the payment of an amount equal to the sum of the following: (a) all fees required to be paid to the Clerk of the Court and to the U.S. Trustee under 28 U.S.C. § 1930(a) plus interest pursuant to 31 U.S.C. § 3717; (b) to the extent allowed by the Bankruptcy Court at any time, and solely to the extent provided for in any budget submitted by the Debtor pursuant to the DIP Facility Credit Agreement in form and substance satisfactory to the DIP Lender, all accrued and unpaid fees, disbursements, costs and expenses of professionals or professional firms retained by the Debtor and any official committee of creditors incurred at any time after the Petition Date and before or on the date and time of the delivery by the DIP Lender of a written notice delivered by the DIP Lender to the Debtor and its counsel, the U.S. Trustee, and lead counsel to any official committee, which notice may be delivered following the occurrence of an Event of Default (as defined in the DIP Facility Credit Agreement) ("Carve Out Trigger Notice"), whether allowed by the Bankruptcy Court prior to or after delivery of a

Carve Out Trigger Notice; and (c) to the extent allowed by the Bankruptcy Court at any time and in an amount not to exceed $100,000 in the aggregate, accrued and unpaid fees, disbursements, costs and expenses incurred by professionals or professional firms retained by the Debtor and any official committee of creditors at any time on or after the date and time of the delivery by the DIP Lender of a Carve Out Trigger Notice (collectively, the "Carve-Out"); *provided, however*, that the Carve-Out shall not include, apply to, or be available for any fees or expenses incurred by any party, including the Debtor, in connection with the initiation or prosecution of any claims, causes of action, adversary proceedings, or other litigation against the DIP Lender, including, without limitation, challenging the amount, validity, extent, perfection, priority, or enforceability of, or asserting any defense, counterclaim, or offset to the Obligations or the security interests and liens of the DIP Lender in respect thereof, or asserting any claims or causes of action, including, without limitation, any actions under chapter 5 of the Bankruptcy Code, against the DIP Lender.  The foregoing shall not be construed as consent to the allowance of any fees and expenses referred to above and shall not affect the right of the Debtor, the DIP Lender, any committee, the U.S. Trustee, or other parties in interest to object to the allowance and payment of such amounts.

6.    Payment of Administrative Claims.  So long as no Default or Event of Default shall have occurred, (i) the Debtor shall be permitted to pay administrative expenses allowed and payable under sections 330 and 331 of the Bankruptcy Code, as the same may become due and payable, and (ii) such payments shall not be applied to reduce the Carve-Out.

7.    Limitation on Additional Surcharges.  So long as the DIP Lender is providing post-petition financing, with the exception of the Carve-Out and except as otherwise permitted by the DIP Facility, unless consented to by the DIP Lender in writing, neither the

11

Collateral nor the DIP Lender shall be subject to surcharge, pursuant to section 506(c) of the Bankruptcy Code or otherwise, by the Debtor or any other party in interest, until all Obligations are indefeasibly paid in full in cash, and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Lender in this proceeding, including but not limited to funding of the Debtor's ongoing operation by the DIP Lender.  In no event shall the DIP Lender be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the Collateral.

8.    Restrictions on Use of Proceeds.  The Debtor may use the proceeds of the DIP Facility only for the purposes specifically set forth in the DIP Facility Credit Agreement. Notwithstanding anything set forth herein or in the DIP Facility Credit Agreement to the contrary, no proceeds of the DIP Facility or any proceeds of the Collateral may be used directly or indirectly by the Debtor, any committee, any trustee or other estate representative appointed in the Chapter 11 Case (or any successor case) or any other person or entity (or to pay any professional fees, disbursements, costs or expenses incurred in connection therewith): (i) to seek authorization to obtain Liens that are senior to, or on a parity with, the Liens in favor of the DIP Lender (except to the extent expressly set forth in the DIP Facility Credit Agreement) and Debtor has agreed that it will not seek such authorization; or (ii) to investigate (including by way of examinations or discovery proceedings), prepare, assert, join, commence, support or prosecute any action for any claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination or similar relief against, or adverse to the interests of the DIP Lender, solely in its capacity as DIP Lender, its controlling persons, affiliates or successors or assigns, and each of the respective officers, directors, employees, agents, attorneys, or

advisors of each of the foregoing, with respect to any transaction, occurrence, omission, action or other matter (including formal discovery proceedings in anticipation thereof), including, without limitation, (A) any claims or causes of action arising under chapter 5 of the Bankruptcy Code, (B) any so-called "lender liability" claims and causes of action, (C) any action with respect to the validity, enforceability, priority and extent of, or asserting any defense, counterclaim, or offset to, the Obligations, the Superpriority DIP Claims or the DIP Facility Documents, (D) any action seeking to invalidate, modify, set aside, avoid or subordinate, in whole or in part, the Obligations, (E) any action seeking to modify any of the rights, remedies, priorities, privileges, protections and benefits granted to the DIP Lender in this Order, the Final Order or under any of the DIP Facility Documents (including, without limitation, claims, proceedings or actions that might prevent, hinder or delay the DIP Lender's assertions, enforcements, realizations or remedies on or against the Collateral in accordance with the applicable DIP Facility Documents, this Order or the Final Order), or (F) objecting to, contesting, or interfering with, in any way, the DIP Lender's enforcement or realization upon any of the Collateral once an Event of Default has occurred.  Nothing herein waives the rights of any party to challenge the validity, extent, priority, or perfection of any claims or liens arising under the Pre-Petition Loan Agreement.

9.    Maturity Date.  The Obligations shall be due and payable, without notice or demand, on the earliest of (i) the date that is one (1) year after the Closing Date (as defined in the DIP Facility Credit Agreement), (ii) if the Final Order has not been entered, the date that is thirty (30) days after the Closing Date; (iii) the date of the acceleration of the loans made by the DIP Lender under the DIP Facility Credit Agreement and/or termination of the commitments pursuant to Section 9 of the DIP Facility Credit Agreement, and (iv) the closing

13

date of a sale of all or substantially all of the assets of the Debtor pursuant to section 363 of the Bankruptcy Code (the "Maturity Date").

      10.     Fees and Expenses of the DIP Lender. The Debtor shall promptly, pursuant to the procedures described below, reimburse the DIP Lender for its reasonable costs, fees (including reasonable attorneys' fees actually incurred), charges, and expenses incurred in connection with the Chapter 11 Case. None of such costs, fees, charges, and expenses shall be subject to Court approval, and no recipient of any such payment shall be required to file with respect thereto any interim or final fee application with the Court, provided that the Court shall have jurisdiction to determine any dispute concerning such invoices; provided, however, that any time that professionals retained by the DIP Lender seek payment of fees and expenses from the Debtor, each professional shall provide copies of its fee and expense statements to the U.S. Trustee and counsel for any official committee of unsecured creditors contemporaneously with the delivery of such fee and expense statements to the Debtor. Such invoices may be redacted to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of such invoices shall not constitute any waiver of the attorney-client privilege or of any benefits of the attorney work product doctrine. The U.S. Trustee or any official committee of unsecured creditors may object to the reasonableness of the fees, costs and expenses included in any professional fee invoice submitted hereunder; provided, however, that any such objection shall be forever waived and barred unless (i) it is filed with this Court and served on counsel for the party seeking reimbursement no later than fourteen (14) days after the objecting party's receipt of the applicable professional fee invoice; and (ii) it describes with particularity the items or

categories of fees, costs and expenses that are the subject of the objection and provides the specific basis for the objection to each such item or category of fees, costs and expenses; provided further, however, that the Debtor shall promptly pay all amounts that are not the subject of any objection.  Any hearing on an objection to payment of any fees, costs and expenses of the DIP Lender set forth in a professional fee invoice shall be limited to the reasonableness or necessity of the particular items of categories of the fees, costs and expenses which are the subject of such objection.

11.    Restrictions on the Debtor.    Other than the Carve-Out, no claim having a priority superior or pari passu with those granted by this Order to the DIP Lender shall be granted or permitted by any order of the Court heretofore or hereafter entered in the Chapter 11 Case, while any portion of the DIP Facility (or refinancing thereof) or the commitment thereunder remains outstanding. Except as expressly permitted by the DIP Facility Credit Agreement, the Debtor will not, at any time during the Chapter 11 Case, grant mortgages, security interests, or liens in the Collateral or any portion thereof to any other parties pursuant to section 364(d) of the Bankruptcy Code or otherwise.

12.    Additional Perfection Measures.    The DIP Lender shall not be required to file financing statements, mortgages, deeds of trust, notices of lien, or similar instruments in any jurisdiction or effect any other action to attach or perfect the security interests and liens granted under the DIP Facility Documents and this Order (including, without limitation, the execution of any control, lock-box, deposit account, or similar documents or agreements). Notwithstanding the foregoing, the DIP Lender may, in its sole discretion, file such financing statements, mortgages, deeds of trust, notices of lien, or similar instruments or otherwise confirm  perfection  of  such  liens,  security  interests,  and  mortgages  without  seeking

15

modification of the automatic stay under section 362 of the Bankruptcy Code and all such documents shall be deemed to have been filed or recorded at the time of and on the Petition Date.

13.    <u>Automatic Stay</u>.  Subject only to the provisions of the DIP Facility Credit Agreement, the automatic stay provisions of section 362 of the Bankruptcy Code are vacated and modified to the extent necessary to permit the DIP Lender to exercise, upon the occurrence and during the continuance of any Event of Default and after the giving of the five (5) business days' notice provided for in the DIP Facility Credit Agreement to the Debtor and the U.S. Trustee, all rights and remedies provided for in the DIP Facility Documents; <u>provided</u>, <u>however</u>, that notwithstanding anything in the DIP Facility Credit Agreement to the contrary, the DIP Lender shall provide counsel for any official committee of unsecured creditors with a copy of any notice of an Event of Default delivered to the Debtor. Notwithstanding the occurrence of an Event of Default or the Maturity Date or anything to the contrary contained herein, all of the rights, remedies, benefits, and protections provided to the DIP Lender under the DIP Facility Documents and this Order shall survive the Maturity Date. If it becomes necessary for the DIP Lender, at any time, to exercise any of its rights and remedies hereunder or under applicable law to effect repayment of the Obligations or to receive any amounts or remittances due in connection therewith, including, without limitation, foreclosing upon and selling all or a portion of the Collateral, the DIP Lender may, without further order of this Court, exercise such rights and remedies as to all or part of such Collateral as the DIP Lender may elect in its sole discretion, subject to the DIP Lender having given five (5) business days' notice provided for in the DIP Facility Credit Agreement to the Debtor and the U.S. Trustee of its intention to exercise such rights and remedies.

14.    <u>Binding Effect</u>.  The provisions of this Order shall be binding upon and inure to the benefit of the DIP Lender, the Debtor, and their respective successors and assigns. To the extent permitted by applicable law, this Order shall bind any trustee hereafter appointed for the estate of any of the Debtor, whether in this Chapter 11 Case or in the event of the conversion of this Chapter 11 Case to a liquidation under chapter 7 of the Bankruptcy Code. Such binding effect is an integral part of this Order.

15.    <u>Survival</u>.  The provisions of this Order and any actions taken pursuant hereto shall survive the entry of any order (i) confirming any plan of reorganization in the Chapter 11 Case (and, to the extent not satisfied in full in cash, the Obligations shall not be discharged by the entry of any such order, or pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtor having hereby waived such discharge); (ii) converting the Chapter 11 Case to a chapter 7 case; or (iii) dismissing the Chapter 11 Case, and the terms and provisions of this Order as well as the Superpriority DIP Claims and the DIP Facility Lien granted pursuant to this Order and the DIP Facility Documents shall continue in full force and effect notwithstanding the entry of any such order, and such claims and liens shall maintain their priority as provided by this Order and the DIP Facility Documents to the maximum extent permitted by law until all of the Obligations are indefeasibly paid in full in cash and discharged.

16.    <u>Dismissal of Case</u>.  Unless all Obligations shall theretofore have been paid in full in cash, it shall constitute an Event of Default if the Debtor seeks, or if there is entered, an order dismissing the Chapter 11 Case.  If an order dismissing the Chapter 11 Case under section 1112 of the Bankruptcy Code or otherwise is at any time entered, such order shall provide (in accordance with sections 105 and 349 of the Bankruptcy Code) that the super-

priority claims, liens and security interests, replacement security interests, and other
protections granted to the DIP Lender pursuant to this Order and the DIP Facility Documents
shall continue in full force and effect and shall maintain their priorities as provided in this
Order until all Obligations in respect thereof shall have been paid and satisfied in full (and
that such super-priority claims, liens, and other protections, shall, notwithstanding such
dismissal, remain binding on all parties in interest).

17.    <u>After Acquired Property</u>.  Except as otherwise provided in this Order, pursuant
to section 552(a) of the Bankruptcy Code, all property acquired by the Debtor after the
Petition Date, including, without limitation, all Collateral pledged to the DIP Lender, pursuant
to the DIP Facility Documents and this Order, is not and shall not be subject to any lien of any
person or entity arising prior to the Petition Date, except to the extent that such property
constitutes proceeds of property of the Debtor that is subject to a valid, enforceable, perfected,
and unavoidable liens as of the Petition Date.

18.    <u>Access to the Debtor</u>.  Without limiting the rights of access and information
afforded the DIP Lender under the DIP Facility Documents, the Debtor shall permit
representatives, agents, and/or employees of the DIP Lender to have reasonable access to
their premises and records during normal business hours (without unreasonable interference
with the proper operation of the Debtor's business) and shall cooperate, consult with, and
provide to such representatives, agents, and/or employees all such non-privileged information
as they may reasonably request.

19.    <u>Authorization to Act</u>.  The Debtor is authorized to do and perform all acts, to
make, execute and deliver all instruments and documents (including, without limitation, the
execution of security agreements and financing statements), and to pay fees, which may be

reasonably required or necessary for the Debtor's performance under the DIP Facility and this Order, including, without limitation:

(i)     the execution of the DIP Facility Documents;

(ii)    the modification or amendment of the DIP Facility Credit Agreement or any other DIP Facility Documents without further order of this Court, in each case, in such form as the Debtor and the DIP Lender may agree (except for any modification or amendment to shorten the maturity of the extensions of credit thereunder, or increase the rate of interest payable thereunder); provided, however, that notice of any such modification or amendment shall be provided to the U.S. Trustee and any official committee of unsecured creditors, which will have five (5) business days from the date of such notice within which to object in writing; provided further, however, that if such objection is timely provided, then such modification or amendment shall be permitted only pursuant to an order of the Court; and

(iii)   reasonable costs and expenses as may be due from time to time, including, without limitation, reasonable attorneys' and other professional fees and disbursements as provided in the DIP Facility Documents.

20.     Insurance Policies.  Upon entry of this Order, the DIP Lender shall be, and shall be deemed to be, without any further action or notice, named as additional insureds and loss payees on each insurance policy maintained by the Debtor or under which the Debtor is a named insured, which in any way relates to the Collateral.

21.     Subsequent Reversal.  If any or all of the provisions of this Order or the DIP Facility Documents are hereafter modified, vacated, amended, or stayed by subsequent order of this Court or any other court without the consent of the DIP Lender:  (i) such modification,

vacatur, amendment, or stay shall not affect the validity of any obligation to the DIP Lender that is or was incurred prior to the effective date of such modification, vacatur, amendment, or stay (the "Effective Date"), or the validity and enforceability of any security interest, lien, or priority authorized or created by this Order and the DIP Facility Documents; and (ii) the Obligations pursuant to this Order and the DIP Facility Documents arising prior to the Effective Date shall be governed in all respects by the original provisions of this Order and the DIP Facility Documents, and the validity of any such credit extended or security interest granted pursuant to this Order and the DIP Facility Documents is protected by section 364(e) of the Bankruptcy Code.

22.    Findings of Fact and Conclusions of Law.  This Order constitutes findings of fact and conclusions of law and shall take effect and be fully enforceable nunc pro tune to the Petition Date immediately upon the entry thereof.

23.    Effect of Order.  To the extent any provision of this Order conflicts with any provision of the Motion, any prepetition agreement or any document executed in connection with the DIP Facility, the provisions of this Order shall control.  Notwithstanding Bankruptcy Rules 4001(a)(3) and 6004(h) or any other Bankruptcy Rule or any Federal Rule of Civil Procedure, this Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Order.  The requirements set forth in Bankruptcy Rule 6003(b) have been satisfied.  The requirements of Bankruptcy Rule 6004(a) are waived.

24.    Final Hearing.  The Final Hearing shall take place on **July 26, 2016 at 1:30 p.m. in Courtroom 1401, United States Courthouse, 75 Ted Turner Drive, SW, Atlanta, GA 30303**, and parties shall have until **July 19, 2016 at 5:00 p.m.** to file an objection if

necessary and serve such objection on counsel for the Debtor, counsel for the DIP Lender, counsel for any official committee of unsecured creditors and the U.S. Trustee.  On or before the date that is four days after the entry of this Order, the Debtor shall serve, by United States mail, first-class postage prepaid, notice of the entry of this Order and of the Final Hearing (the "Final Hearing Notice"), together with copies of this Interim Order, on: (a) the parties having been given notice of the Interim Hearing; (b) any party which has filed prior to such date a request for notices with this Court; and (c) counsel for any official committee of unsecured creditors, if appointed by such date.  In the event this Court modifies any of the provisions of this Order or other documents following the Final Hearing, such modifications shall not affect the rights and priorities of the DIP Lender pursuant to this Order with respect to the Collateral and any portion of the DIP Facility that arises, or is incurred, or is advanced prior to such modifications (or otherwise arising prior to such modifications), and this Order shall remain in full force and effect except as specifically modified pursuant to the Final Hearing.

END OF DOCUMENT

Prepared and presented by:

KING & SPALDING LLP

/s/ Paul K. Ferdinands
Paul K. Ferdinands
Georgia Bar No. 258623
pferdinands@kslaw.com
Mark. M. Maloney
Georgia Bar No. 468104
mmaloney@kslaw.com
Jeffrey R. Dutson
Georgia Bar No. 637106
jdutson@kslaw.com
Karyn D. Heavenrich
Georgia Bar No. 334083
kheavenrich@kslaw.com
1180 Peachtree Street
Atlanta, Georgia 30309-3521
Telephone:      (404) 572-4600
Facsimile:      (404) 572-5131

PROPOSED COUNSEL FOR THE
DEBTOR-IN-POSSESSION

**SENIOR SECURED DEBTOR-IN-POSSESSION LOAN AGREEMENT**

This SENIOR SECURED DEBTOR-IN-POSSESSION LOAN AGREEMENT (this "Agreement") is dated as of June 30, 2016 and is by and among AstroTurf, LLC, a Michigan limited liability company, a debtor and debtor-in-possession under the Bankruptcy Code (as defined below) (the "Borrower"), and Textile Management Associates, Inc., a Georgia corporation, as lender hereunder (the "DIP Lender").

### W I T N E S S E T H:

WHEREAS, Borrower is indebted to DIP Lender under an existing credit facility as provided under that certain Amended and Restated Loan Agreement dated as of January 1, 2014 (as amended, the "Existing Facility");

WHEREAS, the Borrower filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Georgia, Rome Division (the "Bankruptcy Court") on June 28, 2016 (the "Petition Date");

WHEREAS, the Borrower is continuing in the possession of its assets and in the management of its business as a debtor-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code;

WHEREAS, the Borrower has requested the DIP Lender to provide a revolving credit facility (the "DIP Facility") to the Borrower in an aggregate principal amount of $10,000,000 for the purposes described herein;

WHEREAS, to provide security for the repayment of the loans made available pursuant hereto and payment of the other obligations of the Borrower hereunder, the Borrower has agreed to provide the DIP Lender with Liens on the Collateral (as defined below); and

WHEREAS, the DIP Lender is willing to make the requested DIP Facility available on the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the premises and the mutual covenants herein contained, the Borrower and the DIP Lender agree as follows:

1.    **Definitions**.  The terms listed below shall be defined as follows:

"$" "USD" and "dollars" denotes the lawful currency of the United States of America.

"Approved Budget" shall have the meaning set forth in Section 8(a) hereof.

"Availability Period" shall mean the period from the Closing Date to, but excluding, the Maturity Date.

"Bankruptcy Code" shall mean Title 11 of the United States Code entitled "Bankruptcy," as now and hereafter in effect, or any successor statute.

"Bankruptcy Court" shall have the meaning set forth in the recitals.

"Borrowing Request" shall mean a Borrowing Request in the form attached hereto as Exhibit A, or such other form acceptable to the DIP Lender.

"Budget" shall mean the Initial Approved Budget and each subsequent Approved Budget.

"Business Day" shall mean any day that is not a Saturday, Sunday or other day on which commercial banks in New York, New York are authorized or required by Law to remain closed.

"Carve-Out" shall mean an amount equal to the sum of the following: (a) all fees required to be paid to the Clerk of the Court and to the U.S. Trustee under 28 U.S.C. § 1930(a) plus interest pursuant to 31 U.S.C. § 3717; (b) to the extent allowed by the Bankruptcy Court at any time, and solely to the extent provided for in the Budget, all accrued and unpaid fees, disbursements, costs and expenses of professionals or professional firms retained by the Borrower and any official committee of creditors incurred at any time after the Petition Date and before or on the date and time of the delivery by the DIP Lender of a Carve Out Trigger Notice, whether allowed by the Bankruptcy Court prior to or after delivery of a Carve Out Trigger Notice; and (c) to the extent allowed by the Bankruptcy Court at any time, accrued and unpaid fees, disbursements, costs and expenses incurred by professionals or professional firms retained by the Borrower and any official committee of creditors at any time on or after the date and time of the delivery by the DIP Lender of a Carve Out Trigger Notice, not to exceed $100,000 in the aggregate; provided, however, that nothing in this Agreement shall be construed to impair the right of any party to object to any fees, expenses, reimbursement or compensation sought by any such professionals or any other person or entity.

"Carve Out Trigger Notice" shall mean a written notice delivered by the DIP Lender to the Borrower and its counsel, the U.S. Trustee, and lead counsel to any official committee, which notice may be delivered following the occurrence of an Event of Default.

"Chapter 11 Case" shall mean the case filed under Chapter 11 of the Bankruptcy Code by the Borrower in its capacity as a debtor and debtor-in-possession in the Bankruptcy Court.

"Change in Control" shall mean any of the following: (a) any person or group of persons (within the meaning of the Securities Exchange Act of 1934) shall have acquired beneficial ownership (within the meaning of Rule 13d-3 promulgated by the Securities and Exchange Commission under the Securities Exchange Act of 1934) of 50% or more of the issued and outstanding shares of capital stock of the Borrower having the right to vote for the election of directors of the Borrower under ordinary circumstances, other than stockholders of the Borrower on the Closing Date or their Affiliates; (b) during any period of twelve consecutive calendar months, individuals who at the beginning of such period constituted the board of directors of the Borrower (together with any new directors whose election by the board of directors of the

Borrower or whose nomination for election by the Stockholders of the Borrower was approved by a vote of at least two-thirds of the directors then still in office who either were directors at the beginning of such period or whose election or nomination for election was previously so approved) cease for any reason other than death or disability to constitute a majority of the directors then in office; or (c) a sale of all or substantially all of the assets of the Borrower.

"Closing Date" shall mean June 30, 2016.

"Code" shall mean the Internal Revenue Code of 1986, as amended.

"Collateral" shall mean all personal property and other assets, whether now owned by or owing to, or hereafter acquired by or arising in favor of the Borrower (including under any trade names, styles or derivations thereof), and whether owned or consigned by or to, or leased from, the Borrower, and regardless of where located, including, without limitation:  (a) accounts, accounts receivable, payment intangibles, instruments, intercompany claims, and other rights to receive payments of the Borrower (including, without limitation, the accounts), (b) commercial lockboxes, government lockboxes and collection accounts, together with all funds received thereby or deposited therein, and any checks or instruments from time to time representing or evidencing the same, (c) cash and cash equivalents; (d) funds in any account of the Borrower; (e) contract rights; (f) instruments, documents and chattel paper; (g) securities (whether or not marketable); (h) equipment, inventory and fixtures; (i) leaseholds and interests in leaseholds; (j) franchise rights; (k) patents, tradenames, trademarks, copyrights and all other intellectual property; (l) general intangibles; (m) capital stock; (n) investment property; (o) supporting obligations; (p) letter of credit rights; (q) except for avoidance actions under Chapter 5 of the Bankruptcy Code, all commercial tort claims and all other claims and causes of action; (r) except for the proceeds of avoidance actions under chapter 5 of the Bankruptcy Code, the proceeds of all claims or causes of action; (s) all information and data compiled or derived by the Borrower with respect to any of the foregoing; (t) all books and records of the Borrower evidencing or relating to or associated with any of the foregoing, and (u) to the extent not covered by the foregoing, all other assets or property of the Borrower, whether tangible, intangible, personal or mixed, and all proceeds and products of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, any and all proceeds of any insurance, indemnity, warranty or guaranty payable to the Borrower from time to time with respect to any of the foregoing.

"Commitment" shall have the meaning set forth in Section 2(a) hereof.

"Commitment Fee" shall have the meaning set forth in Section 3(c) hereof.

"Default" shall mean any condition or event that, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

"Default Rate" shall mean, for any Loan, a fixed rate per annum equal to 7%.

"Designated Officer" shall mean Sean Harding, the Borrower's Chief Restructuring Officer, or any successor thereto.

3

"DIP Facility" shall have the meaning set forth in the recitals.

"DIP Financing Orders" shall mean the Interim Order and the Final Order, as may be applicable.

"DIP Loan Documents" shall mean this Agreement, the DIP Financing Orders, and any other documents, instruments, or agreements delivered as security or collateral for, or a guaranty of, the Loans, or in connection with, or as support for, any of the foregoing, whether by the Borrower or a Third Party, and any updates or renewals thereof.

"Event of Default" shall have the meaning set forth in Section 9 hereof.

"Excluded Taxes" shall mean (i) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, imposed by the United States of America or the jurisdiction where the DIP Lender's applicable lending office is located, (ii) U.S. Federal withholding Taxes imposed on amounts payable hereunder pursuant to the Law in effect as of the date of this Agreement, and (iii) U.S. Federal withholding Taxes imposed under FATCA.

"FATCA" shall mean Sections 1471 through 1474 of the Code as of the date of this Agreement (or any amended or successor version of such sections that are substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, and any agreement entered into pursuant to Section 1471(b)(1) of the Code.

"Final Order" shall mean a final, non-appealable order of the Bankruptcy Court approving the DIP Facility, in form and substance satisfactory to the DIP Lender in its sole discretion.

"Indemnified Taxes" shall mean (i) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of the Borrower under this Agreement or any other DIP Loan Document, and (ii) without duplication of any Taxes covered in subclause (i) of this definition, Other Taxes.

"Initial Approved Budget" shall mean the Budget attached hereto as Exhibit B.

"Interim Order" shall mean an interim order of the Bankruptcy Court approving the DIP Facility and entered in the Chapter 11 Case, in form and substance satisfactory to the DIP Lender in its sole discretion.

"Law" shall mean any international, foreign, Federal, state or local statute, treaty, rule, guideline, regulation, ordinance, code, or administrative or judicial precedent or authority, including the interpretation or administration thereof by any governmental authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any governmental authority, in each case whether or not having the force of law.

"Lien" shall mean, with respect to any asset, any mortgage, pledge, hypothecation, assignment, deposit arrangement, lien (statutory or other) or other security interest or preferential

arrangement of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, and the filing of any financing statement under the UCC or comparable Laws of any jurisdiction).

"Loans" shall have the meaning set forth in Section 2(a) hereof.

"Main Office" shall mean the main office of the DIP Lender, currently located at 1906 South Hamilton Street, Dalton, GA 30720, or such other location as the DIP Lender may designate as its main office.

"Material Adverse Effect" shall mean, with respect to any event, act, condition or occurrence of whatever nature (including any adverse determination in any litigation, arbitration, or governmental investigation or proceeding), whether singularly or in conjunction with any other event or events, act or acts, condition or conditions, occurrence or occurrences, whether or not related, resulting in a material adverse change in, or a material adverse effect on, (i) the business, results of operations, financial condition, assets, liabilities or prospects of the Borrower taken as a whole (other than the commencement of the Chapter 11 Case and the continuation of the Chapter 11 Case), (ii) the ability of the Borrower to perform any of its obligations under the DIP Loan Documents, (iii) the rights and remedies of the DIP Lender under any of the DIP Loan Documents, (iv) the legality, validity or enforceability of any of the DIP Loan Documents and the DIP Financing Orders, (v) the value of the Collateral, or (vi) the validity, perfection or priority of the Liens granted pursuant to the DIP Loan Documents or the DIP Financing Orders.

"Maturity Date" shall mean the earliest of (i) the date that is one year after the Closing Date, (ii) if the Final Order has not been entered, the date that is thirty (30) days after the Closing Date, and (iii) the date of the acceleration of the Loans and/or the termination of the Commitment pursuant to Section 9.

"Obligations" shall mean all amounts owing by the Borrower to the DIP Lender pursuant to or in connection with this Agreement or any other DIP Loan Document including, without limitation, all principal, interest, fees, expenses, indemnification and reimbursement payments, costs and expenses (including all fees and expenses of counsel to the DIP Lender incurred pursuant to this Agreement or any other DIP Loan Document), whether direct or indirect, absolute or contingent, liquidated or unliquidated, now existing or hereafter arising hereunder or thereunder.

"Other Taxes" shall mean, collectively, all present or future stamp, court, or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement, or registration of, from the receipt of security interests in, or otherwise with respect to this Agreement or any other DIP Loan Document.

"Permitted Variance" shall mean (i) any favorable variance, or (ii) an unfavorable variance of not more than 20% with respect to any disbursement line item.

"Prior Permitted Liens" shall have the meaning set forth in Section 11(a) hereof.

"Requirements of Law" shall mean, as to the Borrower, the articles of organization and operating agreement of the Borrower, and each federal, state, local and foreign law, treaty, rule or regulation or determination of an arbitrator or a court or other governmental authority, in each case applicable to or binding upon the Borrower or any of its property or to which the Borrower or any of its property is subject.

"Superpriority DIP Claims" shall mean all of the claims of the DIP Lender on account of the Obligations, which claims shall be entitled to the benefits of Section 364(c)(1) of the Bankruptcy Code, having a superpriority over any and all administrative expenses of the kind that are specified in Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1114 or any other provisions of the Bankruptcy Code.

"Tax" or "Taxes" shall mean all present or future taxes, levies, imposts, duties, deductions, withholding (including backup withholding), assessments, fees, value added tax or any other goods, services, use or sales tax, or other charges imposed by any governmental authority, including, without limitation, any interest, additions to tax, or penalties applicable thereto.

"Testing Period" shall have the meaning set forth in Section 8(i) hereof.

"Third Party" shall mean any party liable with respect to, or otherwise granting support for, this Agreement, whether by guaranty, subordination, grant of security or otherwise.

"UCC" shall mean the Uniform Commercial Code as in effect from time to time in the State of Georgia; provided that if by reason of mandatory provisions of Law, the perfection, the effect of perfection or non-perfection or the priority of the security interests of the DIP Lender in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than Georgia, "UCC" means the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such perfection, effect of perfection or non-perfection or priority.

"Variance Report" shall have the meaning set forth in Section 8(a) hereof.

Unless otherwise defined herein or the context otherwise requires, any uncapitalized terms used herein which are defined in the UCC, have the respective meanings provided in the UCC including, without limitation: (i) as-extracted collateral; (ii) certificated security; (iii) chattel paper; (iv) documents; (v) electronic chattel paper; (vi) financial assets; (vii) goods, (viii) instruments; (ix) inventory; (x) investment property; (xi) payment intangibles; (xii) proceeds; (xiii) securities account; (xiv) securities intermediary; (xv) security; (xvi) security certificate; (xvii) security entitlements; and (xviii) uncertificated security.

## 2. Borrowings, Conversions, Renewals and Payments.

(a)     Subject to the terms and conditions set forth herein (including the conditions to borrowing set forth in Sections 4 and 5 hereof), the DIP Lender agrees to make revolving loans ("Loans") to the Borrower, from time to time during the Availability Period, in an aggregate

principal amount outstanding not to exceed $10,000,000 (the "Commitment").    During the Availability Period, the Borrower shall be entitled to borrow, repay in whole or in part and reborrow the Loans in accordance with the terms and conditions of this Agreement; provided, however, that the Borrower may not borrow any amounts hereunder should there exist an Event of Default.

(b)    The Borrower shall give the DIP Lender irrevocable notice of each borrowing by delivering a Borrowing Request by 5:00 p.m. New York, New York time not less than one (1) Business Day prior to the date of each requested borrowing of a Loan; provided, however, that (i) no Loan shall be in an amount less than $25,000, and (ii) Borrower shall not be permitted to request Loans (and DIP Lender shall not be required to fund Loans) in excess of the Borrower's cash needs for the two (2) calendar weeks immediately following the date of the Borrowing Request (as set forth in an Approved Budget).

(c)    The Borrower hereby unconditionally promises to pay to the order of the DIP Lender at its Main Office the principal amount of all outstanding Loans on the Maturity Date (whether by acceleration or otherwise), plus all accrued interest, fees and other Obligations then outstanding without further application to or order of the Bankruptcy Court.

(d)    The Borrower shall have the right to make prepayments of principal at any time or from time to time, provided that:  (i) the Borrower shall give the DIP Lender irrevocable notice of each prepayment by 12:00 noon New York, New York time on the date of prepayment of a Loan; and (ii) all prepayments of Loans shall be in a minimum amount equal to the lesser of $25,000 or the unpaid principal amount of the Loans.

(e)    The DIP Lender shall maintain a loan account (the "Loan Account") on its books to record: all Loans, all payments made by the Borrower, and all other debits and credits as provided in this Agreement with respect to the Loans or any other of the Obligations.  All entries in the Loan Account shall be made in accordance with the DIP Lender's customary accounting practices as in effect from time to time.  The balance in the Loan Account, as recorded on the DIP Lender's most recent printout or other written statement, shall, absent manifest error, be rebuttable evidence of the amounts due and owing to the DIP Lender by the Borrower; provided that any failure to so record or any error in so recording shall not limit or otherwise affect the Borrower's duty to pay the Obligations.

3.    **Interest and Fees.**

(a)    The Borrower promises to pay interest on the unpaid balance of the principal amount of each Loan at a fixed rate equal to 4.00% per annum.  After the occurrence of an Event of Default, all outstanding principal shall bear interest from and including the date of such Event of Default until paid in full at a rate per annum equal to the Default Rate, such interest to be payable on demand. Interest shall be due and payable on the Maturity Date and shall be calculated on the basis of a year of 360 days for the actual number of days elapsed.

(b)    All payments hereunder shall be made in lawful money of the United States and in immediately available funds.  Any extension of time for the payment of the principal of this Agreement resulting from the due date falling on a non-Business Day shall be included in the

computation of interest. The date, amount, and the interest rate with respect to each Loan evidenced hereby and all payments of principal thereof shall be recorded by the DIP Lender on its books and, at the discretion of the DIP Lender prior to any transfer of this Agreement at any other time, may be endorsed by the DIP Lender on a schedule. Any such endorsement shall be conclusive absent manifest error. The Borrower waives presentment, notice of dishonor, protest and any other notice or formality with respect to this Agreement.

(c)    The Borrower agrees to pay to the DIP Lender a commitment fee (the "Commitment Fee") in an amount equal to 1% of the Commitment, which shall be fully-earned and payable upon the Closing Date.

4.    **Conditions To Effectiveness**.   The obligation of the DIP Lender to make Loans shall not become effective until the date on which each of the following conditions is satisfied (or waived in the sole and absolute discretion of the DIP Lender):

(a)    The DIP Lender (or its counsel) shall have received the following:

(i)    a counterpart of this Agreement signed by the Borrower;

(ii)    copies of duly executed resolutions, in form and substance satisfactory to the DIP Lender in its sole discretion, of the Manager and Members of the Borrower authorizing the execution, delivery and performance of the DIP Loan Documents to which it is a party;

(iii)    a duly executed Borrowing Request with respect to any Loan made on the Closing Date; and

(iv)    the Initial Approved Budget, in form and substance satisfactory to the DIP Lender, executed by the Borrower.

(b)    All legal matters incident to this Agreement and the borrowings hereunder shall be satisfactory to the DIP Lender.

(c)    All motions and other documents to be filed with and submitted to the Bankruptcy Court related to the DIP Facility and the approval thereof shall be in form and substance satisfactory to the DIP Lender in its sole discretion.

(d)    The Bankruptcy Court shall have entered the Interim Order in form and substance satisfactory to the DIP Lender in its sole discretion.

(e)    The DIP Lender shall have a valid and perfected Lien on and security interest in the Collateral on the basis and with the priority set forth in the Interim Order, and such Lien of the DIP Lender shall be senior to all other Liens except as otherwise provided in any DIP Financing Order and Section 11 of this Agreement.

8

(f)    All orders entered with respect to Borrower's "first day" motions shall be in a form and substance that does not alter, impair or impinge the DIP Lender's rights under the Interim Order, as determined in DIP Lender's reasonable discretion.

**5.    Conditions to All Credit Extensions.** The obligation of the DIP Lender to make a Loan on the occasion of any borrowing is subject to the satisfaction of each of the conditions set forth in <u>Section 4</u> on the date of such Loan (other than those conditions expressly required to be satisfied on the Closing Date) and the following additional conditions:

(a)    The Borrower shall have delivered to the DIP Lender an appropriate Borrowing Request, duly executed and completed, by the time specified in, and otherwise as permitted by, this Agreement.

(b)    The representations and warranties made by the Borrower herein shall be true and correct in all respects at and as if made as of such date (in each case immediately prior to, and after giving effect to, the funding of any Loans) except to the extent they expressly relate to an earlier date, in which case such representations and warranties shall be true and correct in all respects on and as of such earlier date.

(c)    No Default or Event of Default shall exist or be continuing either prior to or after giving effect to the making of such Loan.

(d)    The making of such Loan (and the use of the proceeds therefrom) shall not violate any Law and shall not be enjoined, temporarily, preliminarily or permanently.

(e)    No Material Adverse Effect shall have occurred.

(f)    The making of such Loan complies with the Budget, in all respects, or has otherwise been approved in writing by the DIP Lender.

(g)    The DIP Financing Order shall have been entered approving the DIP Facility, in form and substance satisfactory to the DIP Lender in its sole discretion, which DIP Financing Order shall be in full force and effect and shall not have been reversed, vacated or stayed, and shall not have been amended, supplemented or otherwise modified without the prior written consent of the DIP Lender.

(h)    There shall not exist any Law, ruling, judgment, order, injunction or other restraint that, in the reasonable judgment of the DIP Lender, prohibits, restricts or imposes a materially adverse condition on the Borrower, the DIP Facility or the exercise by the DIP Lender of its rights as a secured party with respect to the Collateral.

(i)    Any borrowing hereunder shall be limited to the amount that is required to fund disbursements permitted under the Budget after giving effect to any cash otherwise available for use by the Borrower.

The delivery of each Borrowing Request shall constitute a representation and warranty by the Borrower of the correctness of the matters specified in subsections (b) through (i) above.

6.    **Indemnified Taxes.**  The Borrower agrees that all payments made pursuant to or on account of this Agreement or any other DIP Loan Document shall be made by the Borrower free and clear and without deduction or withholding for any Tax, except as required by applicable Law.  If any applicable Law requires the deduction of or withholding of any Tax from any such payment, then the Borrower shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant governmental authority in accordance with applicable Law and, if such Tax is an Indemnified Tax, then the sum payable by the Borrower pursuant to or on account of this Agreement or any other DIP Loan Document shall be increased as necessary so that after such deduction or withholding has been made (including any such deduction or withholding that may be applicable to additional sums payable under this Section) the DIP Lender shall receive an amount equal to the amount it would have received had no such deduction or withholding been made.  The Borrower shall provide to the DIP Lender evidence of such payment made to the relevant governmental authority within thirty (30) days thereof and shall also provide to the DIP Lender any official tax receipt or other documentation issued by the appropriate governmental authorities with respect to the payment of Indemnified Taxes.  The Borrower hereby agrees that they shall indemnify and reimburse the DIP Lender, on demand, for any loss, liability, or expense incurred by the DIP Lender as a result of any failure by the Borrower to pay Indemnified Taxes as and when due, whether or not such Indemnified Taxes were correctly or legally imposed by the relevant governmental authority.  The Borrower shall timely pay to the relevant governmental authority or, at the option of the DIP Lender, reimburse it for Other Taxes.

7.    **Representations.**  The Borrower represents and warrants that:

(a)    Upon entry of the Interim Order, the DIP Loan Documents constitute the legal, valid and binding obligations of the Borrower, enforceable against the Borrower in accordance with their terms.

(b)    The execution, delivery and performance by the Borrower of the DIP Loan Documents and all other documents contemplated hereby or thereby, and the use of the proceeds of any of the Loans, do not and will not: (i) conflict with or constitute a breach of, or default under, or require any consent under, or result in the creation of any Lien, charge or encumbrance upon the property or assets of the Borrower pursuant to any other agreement or instrument (other than any pledge of or security interest granted in any Collateral pursuant to any DIP Loan Document) to which the Borrower is a party or is bound or by which its properties may be bound or affected; or (ii) violate any provision of any Law, order, writ, judgment, injunction, decree, determination or award presently in effect having applicability to the Borrower.

(c)    Upon entry of the Interim Order, no consent, approval or authorization of, or registration, declaration or filing with, any governmental authority or other person or entity is required as a condition to or in connection with the due and valid execution, delivery and performance by the Borrower of any DIP Loan Document.

(d)    Except for the Chapter 11 Case and as set forth on Schedule 7(d), there are no actions, suits, investigations or proceedings pending or threatened at law, in equity, in arbitration or by or before any other authority involving or affecting: (i) the Borrower that, if adversely determined, are likely to have a Material Adverse Effect; (ii) any material part of the assets or

properties of the Borrower or any part of the Collateral under any DIP Loan Document; or (iii) any of the transactions contemplated in the DIP Loan Documents. Except as set forth on Schedule 7(d), there are currently no material judgments entered against the Borrower and the Borrower is not in default with respect to any judgment, writ, injunction, order, decree or consent of any court or other judicial authority, which default is likely to have or has had a Material Adverse Effect.

(e)     The Borrower is in compliance with all Requirements of Law, except to the extent that the failure to comply therewith would not, in the aggregate, be reasonably expected to have a Material Adverse Effect.

(f)     This Agreement, taken together with the Interim Order and/or the Final Order is effective to create in favor of the DIP Lender legal, valid, enforceable and continuing Liens on, and security interests in, the Collateral pledged hereunder or thereunder, in each case subject to no Liens other than with respect to Liens permitted under the DIP Financing Orders. Pursuant to the terms of the Interim Order and/or Final Order, no filing or other action will be necessary to perfect or protect such Liens. Pursuant to and to the extent provided in the Interim Order and the Final Order, the Obligations of the Borrower under this Agreement will constitute allowed administrative expense claims in the Chapter 11 Case under Section 364(c) of the Bankruptcy Code, having priority over all administrative expense claims and unsecured claims against the Borrower now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expense claims of the kind specified in Sections 503(b) and 507(b) of the Bankruptcy Code and all super-priority administrative expense claims granted to any other Person.

(g)     The Borrower is in compliance with the terms and conditions of the DIP Financing Orders. Each of the Interim Order (to the extent necessary, with respect to the period prior to the entry of the Final Order) or the Final Order (from after the date the Final Order is entered) is in full force and effect and has not been vacated, reversed or rescinded or, without the prior written consent of the DIP Lender, in its sole discretion, amended or modified and no appeal of such order has been timely filed or, if timely filed, no stay pending such appeal is currently effective.

(h)     A true and complete copy of the Initial Approved Budget, as agreed to with the DIP Lender as of the Closing Date, is attached as Exhibit B hereto.

Each borrowing request by the Borrower under this Agreement shall constitute a representation and warranty that the statements above are true and correct both on the date of such request and on the date of the borrowing. Each borrowing request shall also constitute a representation that no Default or Event of Default under this Agreement has occurred and is continuing or would result from such borrowing.

**8**.     **Covenants**.     The Borrower agrees that so long as the DIP Lender has any Commitment hereunder or any Obligation or other amount payable hereunder or under any DIP Loan Document (in each case other than contingent indemnification obligations) remains unpaid:

(a)     The Borrower shall provide to the DIP Lender: (i) monthly unaudited financial statements of the Borrower within thirty (30) days of month-end, certified by the Designated Officer; (ii) every four weeks (or more frequently with the DIP Lender's consent) after the Closing Date, an updated 13-week cash flow forecast, in each case, in form and substance satisfactory to the DIP

11

Lender in its sole discretion (each such forecast approved by the DIP Lender, an "Approved Budget") for the subsequent 13 week period consistent with the form of the Initial Approved Budget; and (iii) beginning on the second Wednesday following the Closing Date and on each Wednesday following, a variance report (the "Variance Report") setting forth actual cash receipts and disbursements of the Borrower for the prior week and setting forth all the variances, on a line-item and aggregate basis, from the amount set forth for such week as compared to the Initial Approved Budget or the most recently Approved Budget delivered prior to such Variance Report (as applicable) on a weekly and cumulative basis, and each such Variance Report shall include explanations for all material variances and shall be certified by the Designated Officer.  No portion of any Loan shall be used, directly or indirectly: (A) to finance or make any payment not permitted hereunder, (B) to pay any fees or similar amounts payable to any person or entity who has proposed or may propose to purchase interests in Borrower or who otherwise has proposed or may propose to invest in Borrower (including so-called "topping fees," "exit fees," and similar amounts), (C) to make any distribution under a plan of reorganization in the Chapter 11 Case or (D) to finance in any way any action, suit, arbitration, proceeding, application, motion or other litigation of any type adverse to the interests of the DIP Lender or its rights and remedies under this Agreement, the other DIP Loan Documents, the Interim Order or the Final Order.  The Borrower will promptly provide written notice to the DIP Lender of any Material Adverse Effect, any Default or any Event of Default.

(b)    The Borrower will provide to the DIP Lender such other reports and information as may be reasonably requested by the DIP Lender.  In addition, the Borrower's accountants, financial advisors, consultants and parties providing management services to the Borrower shall cooperate, consult with and provide to the DIP Lender all such information as may be reasonably requested with respect to the businesses, results of operations, and financial condition of the Borrower.

(c)    The Borrower will execute any and all further documents, financing statements, agreements and instruments, and take all such further actions (including the filing and recording of financing statements and other documents), which may be required under any applicable Law, or which the DIP Lender may reasonably request, to effectuate the transactions contemplated by this Agreement and the other DIP Loan Documents or to grant, preserve, protect or perfect the Liens created or intended to be created by this Agreement, the DIP Financing Orders or other DIP Loan Documents or the validity or priority of any such Lien.  To the extent DIP Lender reasonably requests further documents, financing statements and instruments (beyond the existence and continuing effectiveness of the DIP Financing Orders), Borrower agrees to provide evidence reasonably satisfactory to the DIP Lender as to the perfection and priority of the Liens created or intended to be created by this Agreement, the DIP Financing Orders and the other DIP Loan Documents.  If any material assets are acquired by the Borrower after the Closing Date, the Borrower will notify the DIP Lender thereof and, if requested by the DIP Lender, the Borrower will cause such assets to be subjected to a Lien securing the Obligations and will take such actions as shall be necessary or reasonably requested by the DIP Lender to grant and perfect such Lien.

(d)    Except for and to the extent permitted under the DIP Financing Orders, the Borrower will not, directly or indirectly, incur, create, assume, suffer to exist or permit any administrative expense claim or Lien which is pari passu with or senior to the claims or Liens, as the case may be,

12

of the DIP Lender against the Borrower hereunder, under the other DIP Loan Documents or under the DIP Financing Orders, or apply to the Bankruptcy Court for authority to do so.

(e)       The Borrower will not, directly or indirectly (i) seek, support, consent to or suffer to exist any modification, stay, vacation or amendment of the Interim Order or the Final Order except for any modifications and amendments agreed to in writing by the DIP Lender, (ii) apply to the Bankruptcy Court for authority to take any action prohibited by this Agreement (except to the extent such application and the taking of such action is conditioned upon receiving the written consent of the DIP Lender) or (iii) seek authorization for, or permit the existence of, any claims entitled to a superpriority under Section 364(c)(1) of the Bankruptcy Code that is senior or pari passu with the Superpriority DIP Claims.

(f)       The Borrower shall not make or commit to make payments to critical vendors in respect of prepetition amounts in excess of the amount included in the Budget, without first obtaining the prior written consent of the DIP Lender.

(g)       Except as otherwise provided herein or approved by the DIP Lender, the Borrower will not directly or indirectly (i) use any cash or the proceeds of any Loans in a manner or for a purpose other than those consistent with this Agreement, the DIP Financing Orders and the Budget, (ii) permit a disbursement that would cause any Budget variance that would not otherwise constitute a Permitted Variance without the prior written consent of the DIP Lender or (iii) make any payment (as adequate protection or otherwise), or application for authority to pay, on account of any claim or debt arising prior to the Petition Date other than payments authorized by the Bankruptcy Court and in compliance with the Budget.

(h)       No Collateral or proceeds of Loans may be used directly or indirectly by the Borrower, any committee, any trustee or other estate representative appointed in the Chapter 11 Case (or any successor case) or any other person or entity (or to pay any professional fees, disbursements, costs or expenses incurred in connection therewith):

(i)       to seek authorization to obtain Liens that are senior to, or on a parity with, the Liens in favor of the DIP Lender (except to the extent expressly set forth in this Agreement) and Borrower further covenants that it will not seek such authorization; or

(ii)       to investigate (including by way of examinations or discovery proceedings), prepare, assert, join, commence, support or prosecute any action for any claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination or similar relief against, or adverse to the interests of the DIP Lender, solely in its capacity as DIP Lender, its controlling persons, affiliates or successors or assigns, and each of the respective officers, directors, employees, agents, attorneys, or advisors of each of the foregoing, with respect to any transaction, occurrence, omission, action or other matter (including formal discovery proceedings in anticipation thereof), including, without limitation, (A) any claims or causes of action arising under chapter 5 of the Bankruptcy Code, (B) any so-called "lender liability" claims and causes of action, (C) any action with respect to the validity, enforceability, priority and extent of, or asserting any defense, counterclaim, or offset to, the Obligations, the

13

Superpriority DIP Claims or the DIP Loan Documents, (D) any action seeking to invalidate, modify, set aside, avoid or subordinate, in whole or in part, the Obligations, (E) any action seeking to modify any of the rights, remedies, priorities, privileges, protections and benefits granted to the DIP Lender in the DIP Financing Orders or under any of the DIP Loan Documents (including, without limitation, claims, proceedings or actions that might prevent, hinder or delay the DIP Lender's assertions, enforcements, realizations or remedies on or against the Collateral in accordance with the applicable DIP Loan Documents and the Interim and/or Final Orders), or (F) objecting to, contesting, or interfering with, in any way, the DIP Lender's enforcement or realization upon any of the Collateral once an Event of Default has occurred.

(i)      The Borrower shall remain in compliance with the Initial Approved Budget and any subsequent Approved Budget for each Testing Period.  To comply with the Initial Approved Budget or any subsequent Approved Budget, the Borrower shall not exceed any disbursement line item set forth in the Initial Approved Budget or any subsequently Approved Budget, as applicable, for any Testing Period by more than the Permitted Variance.  The Permitted Variance with respect to each Testing Period shall be determined and reported to the DIP Lender not later than the Wednesday immediately following each such Testing Period.  Budget compliance shall be tested each week after the Closing Date and shall be tested on a cumulative basis from the Closing Date (each, a "Testing Period").

(j)      Except as otherwise provided herein or approved in writing by the DIP Lender, the Borrower will not directly or indirectly use any cash or the proceeds of the DIP Facility in a manner or for a purpose other than those consistent with an Approved Budget and the DIP Financing Orders.

(k)      The Borrower shall not create, incur, assume or permit to exist any indebtedness except (without duplication) to the extent not prohibited by the Bankruptcy Code or any order of the Bankruptcy Court (i) the Loans and the other Obligations and (ii) existing indebtedness under the Existing Facility.

(l)      The Borrower shall not, directly or indirectly, by operation of law or otherwise, (i) form any subsidiary or (ii) merge with, consolidate with, acquire all or substantially all of the assets or equity interests of, or otherwise combine with or acquire, any other entity.

(m)      The Borrower shall not amend its articles of organization or operating agreement in a manner that would adversely affect the DIP Lender or the Borrower's duty or ability to repay the Obligations.  The Borrower shall not engage in any business other than the business currently engaged by it and businesses reasonably related thereto.

(o)      The Borrower shall not sell, transfer, convey, assign or otherwise dispose of any of its properties or other assets or any of its accounts to any person, other than, to the extent not prohibited by the Bankruptcy Code or any order of the Bankruptcy Court, the sale of inventory in the ordinary course of business.

(p)      The Borrower shall not (i) change its name as it appears in official filings in the state of Michigan, (ii) change the type of entity that it is, (iii) change its organizational identification

14

number, or (iv) change its state of organization or organize in any additional jurisdictions.  The Borrower shall not change its fiscal year.

(q)    The Borrower will not maintain any bank or deposit account (other than a payroll account) without prior written notice to the DIP Lender.  If requested by DIP Lender, the DIP Lender, the Borrower and the bank or other financial institution at which the account is to be opened shall enter into a pledge, collateral assignment and control agreement, in form and substance satisfactory to the DIP Lender, sufficient to give the DIP Lender "control" over such account.

(r)    The Borrower will (i) keep and maintain all property material to the conduct of its business in good working order and condition, ordinary wear and tear excepted, (ii) comply with such provisions of all leases to which it is a party or under which it occupies property except where the failure will not have a Material Adverse Effect, and (iii) maintain with financially sound and reputable insurance companies insurance in such amounts (with no greater risk retention) and against such risks as are satisfactory to the DIP Lender in its sole discretion. The Borrower will furnish to the DIP Lender, promptly upon request or in the event of any change or amendment to the insurances, information in reasonable detail as to the insurance so maintained. Promptly upon the request of the DIP Lender, the Borrower shall deliver to the DIP Lender, in form and substance satisfactory to the DIP Lender, certificates and related endorsements to all such policies of insurance naming the DIP Lender as a loss payee or an additional insured, as appropriate.

**9**.    **Events of Default.**    Notwithstanding the provisions of Section 362 of the Bankruptcy Code and without application or motion to the Bankruptcy Court or any notice to the Borrower, the occurrence of any one or more of the following events (regardless of the reason therefor) shall constitute an "Event of Default" hereunder:

(a)    The Borrower shall fail to pay (i) the principal of any Loan as and when due and payable, or (ii) interest on any Loan, or any other amount payable under this Agreement, as and when due and payable.

(b)    Any representation or warranty made or deemed made by the Borrower in this Agreement or by the Borrower or any Third Party in any DIP Loan Document to which it is a party, or in any certificate, document, opinion or financial or other statement furnished under or in connection with a DIP Loan Document, shall prove to have been incorrect in any material respect on or after the date hereof.

(c)    The Borrower shall fail to perform or observe any term, covenant or agreement contained in any DIP Loan Document on its part to be performed or observed.

(d)    Any Lien or security interest purported to be created by any DIP Loan Document or DIP Financing Order shall cease to be, or shall be asserted by the Borrower not to be, a valid, perfected, first-priority (except as otherwise expressly provided in such DIP Loan Document or any DIP Financing Order) security interest in the assets or properties covered thereby.

(e)    Any of the following shall occur in the Chapter 11 Case:

(i)      filing of a plan of reorganization or liquidation under Chapter 11 of the Bankruptcy Code by the Borrower that does not propose to indefeasibly repay the Obligations in full in cash, unless otherwise consented to by the DIP Lender;

(ii)     the Borrower shall file a pleading seeking to vacate or modify any of the DIP Financing Orders without the prior written consent of the DIP Lender;

(iii)    entry of an order without the prior consent of the DIP Lender amending, supplementing or otherwise modifying any DIP Financing Order;

(iv)    reversal, vacation or stay of the effectiveness of any DIP Financing Order;

(v)     any violation of the terms of any DIP Financing Order;

(vi)    dismissal of the Chapter 11 Case or conversion of the Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code;

(vii)   appointment of a Chapter 11 trustee in the Chapter 11 Case;

(viii)  the Borrower seeks to sell any of its assets outside the ordinary course of business;

(ix)    appointment of a responsible officer or examiner with enlarged powers relating to the operation of the business of the Borrower without the prior written consent of the DIP Lender;

(x)     granting of relief from the automatic stay in the Chapter 11 Case to permit foreclosure or enforcement on, or any right or remedy with respect to, assets of the Borrower;

(xi)    the Borrower's filing of (or supporting another party in the filing of) a motion seeking entry of, or the entry of an order, granting any superpriority claim or Lien (except as contemplated herein) which is senior to or pari passu with the DIP Lender's claims and Liens under the DIP Facility;

(xii)   payment of or granting adequate protection with respect to prepetition debt, other than as expressly provided herein or in the DIP Financing Orders;

(xiii)  the Borrower's loss of its exclusive right, pursuant to Section 1121 of the Bankruptcy Code, to file a plan of reorganization (or any modification of such right);

(xiv)   unless otherwise provided in the Interim Order or the Final Order, or upon the written permission of the DIP Lender, the Borrower seeks or if there is entered, an order under Section 365 of the Bankruptcy Code rejecting a material lease that is part of (or whose premises contain any of ) the Collateral; or

(xv)    cessation of the Liens of the DIP Lender to be valid, perfected and enforceable in all respects in accordance with the DIP Financing Orders.

(f)     The Borrower shall use cash collateral or Loan proceeds for any item other than those set forth in, and in accordance with, the Budget and as approved by the Bankruptcy Court or prepays any pre-petition debt.

(g)     A Change in Control shall occur.

(h)     The Borrower is enjoined, restrained or in any way prevented by court order from continuing to conduct all or any material part of its business affairs, for more than ten (10) days.

(i)     Any material provision of any DIP Loan Document shall for any reason cease to be valid and binding on, or enforceable against, the Borrower in accordance with the terms thereof without the express prior written agreement, consent or approval of the DIP Lender.

THEN, the DIP Lender may, without limitation of its cumulative rights and remedies under applicable law and the Bankruptcy Code, (a) notwithstanding the provisions of Section 362 of the Bankruptcy Code, without any application, motion or notice to or order from the Bankruptcy Court, suspend the DIP Facility with respect to additional Loans, whereupon any additional Loans shall be made or incurred in the DIP Lender's sole discretion so long as an Event of Default is continuing and (b) deliver written notice to the Borrower of the existence of an Event of Default whereupon if Borrower does not seek, within five (5) Business Days of the receipt of such written notice, a determination by the Bankruptcy Court that an Event of Default has not occurred or is no longer continuing, and obtain within fourteen (14) Business Days of the receipt of such written notice an order by the Bankruptcy Court re-imposing the automatic stay, the automatic stay provisions of Section 362 of the Bankruptcy Code shall be deemed vacated and modified to the extent necessary to permit the DIP Lender to exercise all rights and remedies provided for in the DIP Loan Documents, and to take, subject to the provisions of the DIP Financing Orders, any or all of the following actions without further order of or application to the Bankruptcy Court (as applicable):

(a)     declare the Commitment terminated whereupon the Commitment shall be immediately terminated;

(b)     declare the unpaid principal of and any accrued interest in respect of all Loans and any and all other indebtedness or Obligations of any and every kind owing by the Borrower to the DIP Lender hereunder to be due whereupon the same shall be immediately due and payable without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower;

(c)     enforce any and all rights against the Collateral in the possession of the DIP Lender, including, without limitation, disposition of the Collateral solely for application towards the Obligations; and/or

(d)     take any other actions or exercise any other rights or remedies permitted under the DIP Financing Orders, the DIP Loan Documents or applicable Law to effectuate the repayment of the Obligations.

The Borrower shall cooperate fully with the DIP Lender in its exercise of rights and remedies, whether against the Collateral or otherwise. The Borrower hereby waives any right to seek relief under the Bankruptcy Code, including under Section 105 thereof, to the extent such relief would restrict or impair the rights and remedies of the DIP Lender set forth in the DIP Financing Orders and in the DIP Loan Documents. The Borrower further waives (y) all rights to notice and a hearing prior to the DIP Lender's taking possession or control of, or to the DIP Lender's replevy, attachment or levy upon, the Collateral or any bond or security that might be required by any court prior to allowing the DIP Lender to exercise any of its remedies and (z) the benefit of all valuation, appraisal, marshaling and exception laws.

In case any one or more of the covenants and/or agreements set forth in this Agreement or any other DIP Loan Document shall have been breached by the Borrower, then the DIP Lender may proceed to protect and enforce the DIP Lender's rights either by suit in equity and/or by action at law, including an action for damages as a result of any such breach and/or an action for specific performance of any such covenant or agreement contained in this Agreement or such other DIP Loan Document. Without limitation of the foregoing, the Borrower agrees that failure to comply with any of the covenants contained herein will cause irreparable harm and that specific performance shall be available in the event of any breach thereof. The DIP Lender acting pursuant to this paragraph shall be indemnified by the Borrower against all liability, loss or damage, together with all reasonable costs and expenses related thereto (including reasonable legal and accounting fees and expenses).

In the absence of a specific determination by the DIP Lender with respect thereto when an Event of Default has occurred and is continuing, payments by the Borrower and proceeds of Collateral shall be applied to amounts then due and payable in the following order (1) to fees and DIP Lender's expenses reimbursable hereunder; (2) to interest on the Loans; (3) to principal payments on the Loans; and (4) to all other Obligations. No provisions in this Section 9 shall limit in any way the DIP Lender's cumulative rights and remedies under applicable law and the Bankruptcy Code, including without limitation its rights of setoff and recoupment and the right at its sole option and discretion to obtain confirmation from the Bankruptcy Court on an emergency or expedited basis that the automatic stay is no longer in effect as to DIP Lender and/ or the Collateral.

## 10. Certain Bankruptcy Matters.

(a)    Except to the extent provided otherwise in a DIP Financing Order, the Borrower hereby agrees that the Obligations shall (i) constitute Superpriority DIP Claims with priority over all administrative expense claims and unsecured claims against the Borrower now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, all administrative expense claims of the kind specified in Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1114 or any other provisions of the Bankruptcy Code and all super-priority administrative expense claims granted to any other Person the establishment of which super-priority shall have been approved and authorized by the Bankruptcy Court, subject only to the Carve-Out and (ii) be secured pursuant to Sections 364(c)(2) and (c)(3) of the Bankruptcy Code and, to the extent provided in any of the DIP Financing Orders, shall not be subject to any claims against the Collateral pursuant to Section 506(c) of the Bankruptcy Code, subject only to the Carve-Out.

(b)     In the event of a conflict between, or inconsistency among, the Interim Order or the Final Order, on the one hand, and any other DIP Loan Document, on the other hand, the Interim Order or the Final Order, as the case may be, shall control.

(c)     Notwithstanding anything to the contrary contained herein or elsewhere:

(i)     The DIP Lender shall not be required to prepare, file, register or publish any financing statements, mortgages, hypothecs, account control agreements, notices of Lien or similar instruments in any jurisdiction or filing or registration office, or to take possession of any Collateral or to take any other action in order to validate, render enforceable or perfect the Liens on the Collateral granted by or pursuant to this Agreement, the DIP Financing Orders or any other DIP Loan Document. If the DIP Lender shall, in its sole discretion, from time to time elect to prepare, file, register or publish any such financing statements, mortgages, hypothecs, account control agreements, notices of Lien or similar instruments, take possession of any Collateral, or take any other action to validate, render enforceable or perfect all or any portion of the DIP Lender's Liens on the Collateral, (A) all such documents and actions shall be deemed to have been filed, registered, published or recorded or taken at the time and on the date that the Interim Order is entered, and (B) shall not negate or impair the validity or effectiveness of this Section or of the perfection of any other Liens in favor of the DIP Lender on the Collateral.

(ii)     Except as otherwise agreed to by the DIP Lender, the Liens, lien priorities, Superpriority DIP Claims and other rights and remedies granted to the DIP Lender pursuant to this Agreement, the DIP Financing Orders or the other DIP Loan Documents (specifically including, but not limited to, the existence, perfection, enforceability and priority of the Liens provided for herein and therein, and the Superpriority DIP Claims provided herein and therein) shall not be modified, altered or impaired in any manner by any other financing or extension of credit or incurrence of debt by the Borrower (pursuant to Section 364 of the Bankruptcy Code or otherwise), or by dismissal or conversion of the Chapter 11 Case, or by any other act or omission whatsoever.

(d)     Without limiting the generality of the foregoing, notwithstanding any such financing, extension, incurrence, dismissal, conversion, act or omission:

(i)     except to the extent provided in any of the DIP Financing Orders and subject to the DIP Financing Orders, no costs or expenses of administration which have been or may be incurred in the Chapter 11 Case or any conversion of the same or in any other proceedings related thereto, and no priority claims, are or will be prior to or on a parity with any claim of the DIP Lender against the Borrower in respect of any Obligations;

(ii)     other than as provided in the DIP Financing Orders or the DIP Loan Documents, the DIP Lender's Liens on the Collateral shall constitute valid, enforceable and perfected first priority Liens, and shall be prior to all other Liens, now existing or hereafter arising, in favor of any other creditor or other Person; and

19

(iii)    the DIP Lender's Liens on the Collateral shall continue to be valid, enforceable and perfected without the need for the DIP Lender to prepare, file, register or publish any financing statements, mortgages, hypothecs, account control agreements, notices of Lien or similar instruments or to otherwise perfect the DIP Lender's Liens under applicable non-bankruptcy Law.

(e)    In connection with any sale of all or any portion of the Collateral, including pursuant to Sections 9-610 or 9-620 of the UCC, at any sale thereof conducted under the provisions of the Bankruptcy Code, including Section 363 of the Bankruptcy Code or as part of restructuring plan subject to confirmation under Section 1129(b)(2)(A)(iii) of the Bankruptcy Code, or at any sale or foreclosure conducted by the DIP Lender, in accordance with applicable Law, the Borrower hereby gives the DIP Lender the power and right, without assent by the Borrower, to "credit bid" the full amount of all Obligations in order to purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral.   In connection with the foregoing, the DIP Lender shall have the right to assign its right to purchase all or any portion of the Borrower's assets in connection with any such "credit bid" to a newly-formed acquisition vehicle or affiliate.

## 11.    Grant of Security.

(a)    To secure the Obligations, effective immediately upon entry of the Interim Order, pursuant to Sections 361, 362, 364(c)(2) and 364(c)(3) of the Bankruptcy Code, the DIP Lender is hereby granted continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected post-petition (x) first-priority security interests in and liens on all Collateral that is not otherwise subject to a valid, properly perfected and unavoidable security interest or lien as of the Petition Date (collectively, the "Prior Permitted Liens"), subject only to the Carve-Out, and (y) junior security interests in and liens on all Collateral subject to a Prior Permitted Lien, subject only to the Carve-Out.  Nothing herein shall be deemed to grant the DIP Lender a security interest in or a lien on any avoidance actions under Chapter 5 of the Bankruptcy Code; provided, however, that the DIP Superpriority Claim and the DIP Liens shall attach to any of the Debtor's assets that are subject to a Lien that is subsequently avoided pursuant to Chapter 5 of the Bankruptcy Code (collectively, the "Avoided Liens"), including, without limitation, any Avoided Liens granted in connection with the Existing Facility.  For the avoidance of doubt, notwithstanding the foregoing sentence, the provisions of Section 551 of the Bankruptcy Code or the exclusion of avoidance actions from the definition of Collateral, if and to the extent that any pre-petition security interest on any of such Collateral is avoided, in whole or in part, the DIP Lender shall hold a continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected post-petition security interest in and lien on the Collateral so avoided, which security interest and lien shall be senior in priority to all other liens, claims and interests except for any Prior Permitted Liens and the Carve-Out (and no lien or security interest preserved for the benefit of the estate under Section 551 of the Bankruptcy Code or otherwise shall be construed or deemed to be a Prior Permitted Lien).

(b)    The priority of the DIP Lenders' Liens on the Collateral described in Section 11(a) shall be set forth in the Interim Order and the Final Order.

(c)    All Obligations shall constitute administrative expenses of the Borrower in the Chapter 11 Case, with administrative priority and senior secured status under Sections 364(c) of

20

the Bankruptcy Code.  Subject to the Carve-Out, such administrative claim shall have priority over all other costs and expenses of the kinds specified in, or ordered pursuant to, Sections 105, 326, 330, 331, 503(b), 506(c) (to the extent and as provided in the Orders), 507(a), 507(b), 726 or any other provision of the Bankruptcy Code and shall at all times be senior to the rights of the Borrower, the Borrower's estates, and any successor trustee or estate representative in the Chapter 11 Case or any subsequent proceeding or case under the Bankruptcy Code.  The Liens and security interests granted to the DIP Lender on the Collateral, and the priorities accorded to the Obligations shall have the priority and senior secured status afforded by Sections 364(c) of the Bankruptcy Code (all as more fully set forth in the Interim Order and Final Order) senior to all claims and interests other than the Carve-Out.

(d)     The DIP Lender's Liens on the Collateral and its administrative claim under Sections 364(c)(1) of the Bankruptcy Code granted in respect of the Obligations shall also have priority over any claims arising under Section 506(c) of the Bankruptcy Code, subject only to the Carve-Out.

(e)     To the extent permitted by applicable Law, the Borrower hereby irrevocably authorizes DIP Lender and its affiliates, counsel and other representatives, at any time and from time to time, to file in the name of the Borrower or otherwise and without separate authorization or authentication of the Borrower appearing thereon, such UCC financing statements or continuation statements as the DIP Lender may reasonably deem necessary or reasonably appropriate to further perfect or maintain the perfection of the Liens of the DIP Lender under this Agreement, and such financing statements and amendments may describe the Collateral covered thereby "all of the debtor's personal property and assets" or words to similar effect, whether now owned or hereafter acquired, notwithstanding that such description may be broader in scope than the Collateral described in this Agreement.  The Borrower hereby also authorizes DIP Lender and its affiliates, counsel and other representatives, at any time and from time to time, to execute and file any and all agreements, instruments, documents and papers as the DIP Lender may reasonably request to evidence the Liens of the DIP Lender in any patent, trademark, copyright or other intellectual property, including without limitation the goodwill or accounts and general intangibles of the Borrower relating thereto or represented thereby.  The Borrower agrees that, except to the extent that any filing office requires otherwise, a carbon, photographic, photostatic or other reproduction of this Agreement or of a financing statement is sufficient as a financing statement.  The Borrower shall pay the costs of, or incidental to, any recording or filing of any financing or continuation statements or other assignment documents concerning the Collateral.

(f)     The Borrower will promptly deliver each instrument and any other document, and take any other action, that may be reasonably requested by the DIP Lender in order to perfect the DIP Lender's Liens on the Collateral, all at the sole cost and expense of the Borrower.

**12.     Expenses.**  The Borrower agrees to reimburse the DIP Lender on demand for all costs, expenses and charges (including, without limitation, reasonable attorney's fees and charges) in connection with the preparation or modification of the DIP Loan Documents, performance or enforcement of the DIP Loan Documents, or the defense or prosecution of any rights of the DIP Lender pursuant to any DIP Loan Documents.

**13.    Jurisdiction.**    To the maximum extent not prohibited by applicable Law, the Borrower hereby irrevocably: (i) submits to the jurisdiction of any Georgia state or United States federal court sitting in Rome, Georgia over any action or proceeding arising out of this Agreement; (ii) agrees that all claims in respect of such action or proceeding may be held and determined in such Georgia state or federal court; (iii) agrees that any action or proceeding brought against the DIP Lender may be brought only in a Georgia state or United States federal court sitting in Rome, Georgia; (iv) consents to the service of process in any such action or proceeding in either of said courts by mailing thereof by the DIP Lender by registered or certified mail, postage prepaid, to the Borrower at its address specified on the signature page hereof, or at the Borrower's most recent mailing address as set forth in the records of the DIP Lender; and (v) waives any defense on the basis of an inconvenient forum. Notwithstanding any other provision of this Section 13, the Bankruptcy Court shall have exclusive jurisdiction over any action or dispute involving, relating to or arising out of this Agreement or the other DIP Loan Documents. The Borrower agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in any other jurisdiction by suit or proceeding in such state and hereby waives any defense on the basis of an inconvenient forum. Nothing herein shall affect the right of the DIP Lender to serve legal process in any other manner permitted by Law or affect the right of the DIP Lender to bring any action or proceeding against the Borrower or its property in the courts of any other jurisdiction.

**14.    Waiver of Jury Trial.**

EACH PARTY HERETO IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF THIS AGREEMENT OR ANY OTHER DIP LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER DIP LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION**.**

**15.    Miscellaneous.**

(a)    The provisions of this Agreement are intended to be severable. If for any reason any provisions of this Agreement shall be held invalid or unenforceable in whole or in part in any jurisdiction, such provision shall, as to such jurisdiction, be ineffective to the extent of such invalidity or unenforceability without in any manner affecting the validity or enforceability thereof in any other jurisdiction or the remaining provisions thereof in any jurisdiction.

(b)    No amendment, modification, supplement or waiver of any provision of this Agreement nor consent to departure by the Borrower therefrom shall be effective unless the same

22

shall be in writing and signed by the Borrower and the DIP Lender, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

(c)     No failure on the part of the DIP Lender to exercise, and no delay in exercising, any right hereunder shall operate as a waiver thereof or preclude any other or further exercise thereof or the exercise of any other right.  The remedies herein provided are cumulative and not exclusive of any remedies provided by Law.

(d)     This Agreement shall be binding on the Borrower and its respective successors and assigns and shall inure to the benefit of the DIP Lender and its successors and assigns, except that the Borrower may not delegate any of its obligations hereunder without the prior written consent of the DIP Lender.  With the consent of the Borrower, not to be unreasonably withheld, the DIP Lender may assign all or a portion of its rights and obligations under this Agreement; provided that such consent shall not be required (i) at any time that an Event of Default has occurred and is continuing, (ii) in connection with any assignment to an affiliate of the DIP Lender, or (iii) in connection with any merger or consolidation.

(e)     Anything herein to the contrary notwithstanding, the obligations of the Borrower under this Agreement shall be subject to the limitation that payments of interest shall not be required to the extent that receipt thereof would be contrary to provisions of Law applicable to the DIP Lender limiting rates of interest which may be charged or collected by the DIP Lender.

(f)     Unless otherwise agreed in writing, notices shall be given to the DIP Lender and the Borrower at its addresses set forth in the signature page of this Agreement, or such other address communicated in writing by either such party to the other.  Notices to the DIP Lender shall be effective upon receipt.

(g)     Sections 6, 12, 13, 14, 16, 17, 18 and 19 hereof shall survive the repayment of the Loans.

(h)     Each reference herein to the DIP Lender shall be deemed to include its successors, endorsees, and assigns, in whose favor the provisions hereof shall inure.  Each reference herein to the Borrower shall be deemed to include the respective heirs, executors, administrators, legal representatives, successors and assigns of the Borrower, all of whom shall be bound by the provisions hereof.

(i)     The DIP Lender's rights and remedies under this Agreement shall be cumulative and nonexclusive of any other rights and remedies that the DIP Lender may have under any other agreement, including the other DIP Loan Documents, by operation of law or otherwise.  Recourse to the Collateral shall not be required.

(j)     Except as otherwise provided in this Agreement or any of the other DIP Loan Documents by specific reference to the applicable provisions of this Agreement, if any provision contained in this Agreement conflicts with any provision in any of the other DIP Loan Documents, the provision contained in this Agreement shall govern and control.

23

(k)    The Section titles contained in this Agreement are and shall be without substantive meaning or content of any kind whatsoever and are not a part of the agreement between the parties hereto.

(l)    This Agreement may be executed in any number of separate counterparts, each of which shall collectively and separately constitute one agreement.

(m)    This Agreement shall remain in full force and effect and shall continue to be effective or to be reinstated, as the case may be, if at any time payment and performance of the Obligations, or any part thereof, is, pursuant to applicable law, rescinded or reduced in amount, or must otherwise be restored or returned by any obligee of the Obligations, whether as a "voidable preference," "fraudulent conveyance," or otherwise, all as though such payment or performance had not been made.  In the event that any payment, or any part thereof, is rescinded, reduced, restored or returned, the Obligations shall be reinstated and deemed reduced only by such amount paid and not so rescinded, reduced, restored or returned.

(o)    Each of the parties represents to each other party hereto that it has discussed this Agreement with its counsel.

(p)    The parties hereto have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provisions of this Agreement.

(q)    This Agreement, the other DIP Loan Documents, and all Liens created hereby or pursuant hereto to any other DIP Loan Document shall be binding upon the Borrower, and any trustee or successor in interest of the Borrower in the Chapter 11 Case or any subsequent case commenced under chapter 7 of the Bankruptcy Code, and shall not be subject to Section 365 of the Bankruptcy Code.  This Agreement and the other DIP Loan Documents shall be binding upon, and inure to the benefit of, the successors of DIP Lender and its assigns, transferees and endorsees.  The Liens created by this Agreement and the other DIP Loan Documents shall be and remain valid and perfected in the event of the substantive consolidation or conversion of the Chapter 11 Case or any other bankruptcy case of Borrower to a case under chapter 7 of the Bankruptcy Code or in the event of dismissal of the Chapter 11 Case or the release of any Collateral from the jurisdiction of the Bankruptcy Court for any reason, without the necessity that the DIP Lender file financing statements or otherwise perfect its security interests or Liens under applicable law.

(r)    The Borrower hereby agrees that (i) this Agreement is separate and distinct from the Existing Facility and (ii) the obligations of the Borrower under the Existing Facility are in full force and effect.  Borrower further agrees that by entering into this Agreement, the DIP Lender does not waive any "Default" or "Event of Default" under the Existing Facility.

**16.    Governing Law.**  This Agreement shall be governed by and construed in accordance with federal Law applicable to the DIP Lender and, to the extent not preempted by federal Law, the Law of the State of Georgia, without regard to its conflicts of laws principles.

**17.    Indemnification.**    The Borrower shall indemnify and hold harmless each of the DIP Lender and its Affiliates, and each their respective officers, directors, employees, attorneys, agents and representatives (each, an "Indemnified Person"), from and against any and all suits, actions, proceedings, claims, damages, losses, liabilities and expenses (including reasonable attorneys' fees and disbursements and other costs of investigation or defense, including those incurred upon any appeal) that may be instituted or asserted against or incurred by any such Indemnified Person as the result of credit having been extended, suspended or terminated under this Agreement and the other DIP Loan Documents and the administration of such credit, and in connection with or arising out of the transactions contemplated hereunder and thereunder and any actions or failures to act in connection therewith (collectively, "Indemnified Liabilities"); provided, that the Borrower shall not be liable for any indemnification to an Indemnified Person to the extent that any such suit, action, proceeding, claim, damage, loss, liability or expense results from that Indemnified Person's gross negligence or willful misconduct.  NO INDEMNIFIED PERSON SHALL BE RESPONSIBLE OR LIABLE TO ANY OTHER PARTY TO ANY DIP LOAN DOCUMENT, ANY SUCCESSOR, ASSIGNEE OR THIRD PARTY BENEFICIARY OF SUCH PERSON OR ANY OTHER PERSON ASSERTING CLAIMS DERIVATIVELY THROUGH SUCH PARTY, FOR INDIRECT, PUNITIVE, EXEMPLARY OR CONSEQUENTIAL DAMAGES WHICH MAY BE ALLEGED AS A RESULT OF CREDIT HAVING BEEN EXTENDED, SUSPENDED OR TERMINATED UNDER ANY DIP LOAN DOCUMENT OR AS A RESULT OF ANY OTHER TRANSACTION CONTEMPLATED HEREUNDER OR THEREUNDER.

**18.    Release.**  The Borrower hereby acknowledges that effective upon entry of the Final Order, it shall not have any defense, counterclaim, offset, recoupment, cross-complaint, claim or demand of any kind or nature whatsoever that can be asserted to reduce or eliminate all of any part of the Borrower's liability to repay the DIP Lender as provided in this Agreement or to seek affirmative relief or damages of any kind or nature from the DIP Lender.  The Borrower hereby acknowledges further that effective upon entry of the Final Order, the Borrower, in its own right and on behalf of its bankruptcy estate, and on behalf of all its successors and assigns, (collectively, the "Releasing Parties"), hereby fully, finally and forever releases and discharges the DIP Lender and all the DIP Lender's past and present officers, directors, servants, agents, attorneys, assigns, heirs, parents, subsidiaries, and each Person acting for or on behalf of any of them (collectively, the "Released Parties") of and from any and all past, present and future actions, causes of actions, demands, suits, claims, liabilities, Liens, lawsuits, adverse consequences, amounts paid in settlement, costs, damages, debts, deficiencies, diminution in value, disbursements, expenses, losses and other obligations of any kind or nature whatsoever, whether in law, equity or otherwise (including, without limitation, those arising under Section 541 through 550 of the Bankruptcy Code and interest or other carrying costs, penalties, legal, accounting and other professional fees and expenses, and incidental, consequential and punitive damages payable to third parties), whether known or unknown, fixed or contingent, direct, indirect, or derivative, asserted or unasserted, foreseen or unforeseen, suspected or unsuspected, now existing, heretofore existing or which may heretofore accrue to the Releasing Parties against any of the Released Parties, whether held in a

personal or representative capacity, and which are based on any act, fact, event or omission or other matter, cause or thing occurring at or from any time prior to and including the date hereof in any way, arising out of, connected with or relating to DIP Lender's providing the DIP Facility under this Agreement, the Interim Order, the Final Order and the transactions contemplated hereby, and all other agreements, certificates, instruments and other documents and statements (whether written or oral) related to any of the foregoing.

      **19.**    **Waiver of any Priming Rights.**  Upon the Closing Date, and on behalf of itself and its estate, and for so long as any Obligation shall be outstanding, the Borrower hereby irrevocably waives any right, pursuant to Sections 364(c) or 364(d) of the Bankruptcy Code or otherwise, to grant any Lien of equal or greater priority than the Lien securing the Obligations, or to approve a claim of equal or greater priority than the Obligations.

**The remainder of this page is intentionally blank.**

IN WITNESS WHEREOF, this Agreement has been executed by the parties hereto as of the date first written above.

**BORROWER:**

AstroTurf, LLC

By: _____

Name: SEAN M. HARDING

Title: CHIEF RESTRUCTURING OFFICER

**Address for notices to the Borrower:**

AstroTurf, LLC
2680 Abutment Road
Dalton, Georgia 30721
Attn: Sean M. Harding

With a copy to:

King & Spalding LLP
1180 Peachtree Street NE
Atlanta, Georgia 30309
Attn: Paul K. Ferdinands and
Mark M. Maloney

*Signature Page to Senior Secured Debtor-in-Possession Loan Agreement*

**DIP LENDER:**

Textile Management Associates, Inc.

By: _Tommy Boggs_

Name: Tommy Boggs

Title: CEO

**Address for notices to DIP Lender:**

Textile Management Associates, Inc.
1906 South Hamilton Street
Dalton, GA 30720
Attn: Tommy Boggs

With a copy to:

Miller & Martin PLLC
Suite 1200 Volunteer Bldg.
832 Georgia Avenue
Chattanooga, TN 37402
Attn: Jonathan F. Kent

*Signature Page to Senior Secured Debtor-in-Possession Loan Agreement*

<u>Exhibit A</u>

Form of Borrowing Request

[*Date*]

Textile Management Associates, Inc.
1906 South Hamilton Street
Dalton, GA 30720
Attn: [_____]

Ladies and Gentlemen:

Reference is made to that certain SENIOR SECURED DEBTOR-IN-POSSESSION LOAN AGREEMENT, dated as of [_____], 2016 (the "<u>Loan Agreement</u>"), by and among AstroTurf, LLC, a Michigan limited liability company, a debtor and debtor-in-possession under the Bankruptcy Code (as defined below) (the "<u>Borrower</u>"), and Textile Management Associates, Inc., a Georgia corporation, as lender (the "<u>DIP Lender</u>").  Terms defined in the Loan Agreement are used herein with the same meanings.  This notice constitutes a Borrowing Request, and the Borrower, hereby requests a Loan under the Loan Agreement, and in that connection the Borrower specifies the following information with respect to the Loan requested hereby:

(A)    Aggregate principal amount of Loan[1]: _____

(B)    Date of Loan  (which is a Business Day): _____

(C)    Location and number of the applicable Borrower's account to which proceeds of the Loan are to be disbursed: _____

(D)    Purpose    of    the    Loan    and    use    of    proceeds    therefrom: _____

---

[1]  Not less than $25,000

The Borrower hereby represents and warrants that the conditions specified in paragraphs (b) through (i) of <u>Section 5</u> of the Loan Agreement are satisfied as of the date hereof.

Very truly yours,

**AstroTurf, LLC**

By: _____
    Name:
    Title:

<u>Exhibit B</u>

Initial Approved Budget

See Attached.

**AstroTurf, LLC**
**Weekly Cash Flow Forecast**

| | Projected BK Filing 1 | Projected 2 | Projected 3 | Projected 4 | Projected 5 | Projected 6 | Projected 7 | Projected 8 | Projected 9 | Projected 10 | Projected 11 | Projected 12 | Projected 13 | 13-wk |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Week Ending: | 7/1/16 | 7/8/16 | 7/15/16 | 7/22/16 | 7/29/16 | 8/5/16 | 8/12/16 | 8/19/16 | 8/26/16 | 9/2/16 | 9/9/16 | 9/16/16 | 9/23/16 | Total |
| **Receipts** | $ 1,188,985 | $ 1,830,484 | $ 1,875,842 | $ 1,917,673 | $ 1,956,250 | $ 1,991,826 | $ 2,037,108 | $ 3,278,867 | $ 2,117,379 | $ 2,152,895 | $ 2,090,046 | $ 2,032,084 | $ 1,978,632 | $ 26,448,069 |
| | | | | | | | | | | | | | | |
| **Operating Disbursements** | | | | | | | | | | | | | | |
| Materials - Synthetic Turf | $ 848,131 | $ 899,844 | $ 899,844 | $ 899,844 | $ 1,156,943 | $ 959,626 | $ 959,626 | $ 959,626 | $ 1,233,805 | $ 503,609 | $ 503,609 | $ 503,609 | $ 503,609 | $ 10,831,726 |
| Materials - Other | 506,283 | 537,153 | 537,153 | 537,153 | 690,625 | 572,839 | 572,839 | 572,839 | 736,508 | 300,624 | 300,624 | 300,624 | 300,624 | 6,465,890 |
| Freight & Postage | 35,372 | 37,529 | 37,529 | 37,529 | 48,252 | 40,022 | 40,022 | 40,022 | 51,457 | 21,004 | 21,004 | 21,004 | 21,004 | 451,751 |
| Sub-Contractor Payments | 594,307 | 1,230,544 | 1,230,544 | 630,544 | 810,700 | 672,435 | 672,435 | 672,435 | 864,559 | 352,892 | 352,892 | 352,892 | 352,892 | 8,790,071 |
| Employee & Benefits | 41,231 | 35,231 | 515,731 | 42,731 | 41,231 | 71,795 | 64,211 | 410,335 | 65,585 | 36,335 | 74,827 | 481,522 | 36,368 | 1,917,133 |
| Marketing | 8,000 | - | 8,000 | | 8,000 | | 8,000 | | 8,000 | | 8,000 | | 8,000 | 56,000 |
| Building Rent | - | | | 48,200 | | | | 48,200 | | | | 48,200 | | 144,600 |
| Utilities | 151 | 109 | 439 | 201 | 209 | 339 | 251 | 309 | 439 | 401 | 409 | 439 | 401 | 4,098 |
| G&A/Other | 64,100 | 64,100 | 235,700 | 98,600 | 64,100 | 58,505 | 62,989 | 270,095 | 62,560 | 61,560 | 100,632 | 61,989 | 275,095 | 1,480,025 |
| Interest/Fees | 42,350 | 350 | 58,350 | 2,000 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 48,875 | 154,725 |
| 503(b)(9) | - | | | | | | | | | | | | 3,600,000 | 3,600,000 |
| **Total Operating Disbursements** | $ 2,139,925 | $ 2,804,861 | $ 3,523,291 | $ 2,296,803 | $ 2,820,409 | $ 2,375,912 | $ 2,380,724 | $ 2,974,212 | $ 3,023,263 | $ 1,276,775 | $ 1,362,347 | $ 1,722,429 | $ 5,195,068 | $ 33,896,019 |
| | | | | | | | | | | | | | | |
| **Cash Flow before Bankruptcy Expenses** | $ (950,940) | $ (974,377) | $(1,647,448) | $ (379,130) | $ (864,160) | $ (384,086) | $ (343,616) | $ 304,655 | $ (905,885) | $ 876,120 | $ 727,698 | $ 309,656 | $(3,216,437) | $ (7,447,950) |
| | | | | | | | | | | | | | | |
| **Bankruptcy Expenses** | | | | | | | | | | | | | | |
| Utility Deposit | - | 1,000 | | | | | | | | | | | | 1,000 |
| United States Trustee Fee | - | | | | | | | | | | | | 30,000 | 30,000 |
| Debtors' Professional Fees | 135,000 | 135,000 | 135,000 | 135,000 | 135,000 | 135,000 | 135,000 | 85,000 | 85,000 | 85,000 | 85,000 | 85,000 | 85,000 | 1,405,000 |
| UCC Professional Fees | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 130,000 |
| **Total Bankruptcy Expenses** | $ 145,000 | $ 146,000 | $ 145,000 | $ 145,000 | $ 145,000 | $ 145,000 | $ 145,000 | $ 95,000 | $ 95,000 | $ 95,000 | $ 95,000 | $ 95,000 | $ 125,000 | $ 1,566,000 |
| | | | | | | | | | | | | | | |
| **Net Cash Flow** | $(1,095,940) | $(1,120,377) | $(1,792,448) | $ (524,130) | $(1,009,160) | $ (529,086) | $ (438,616) | $ 209,655 | $(1,000,885) | $ 781,120 | $ 632,698 | $ 214,656 | $(3,341,437) | $ (9,013,950) |
| | | | | | | | | | | | | | | |
| **Cash** | | | | | | | | | | | | | | |
| Beginning Cash Balance | $ - | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ - |
| Net Cash Flow | (1,095,940) | (1,120,377) | (1,792,448) | (524,130) | (1,009,160) | (529,086) | (438,616) | 209,655 | (1,000,885) | 781,120 | 632,698 | 214,656 | (3,341,437) | (9,013,950) |
| Draw/(Repayment) | 1,195,940 | 1,120,377 | 1,792,448 | 524,130 | 1,009,160 | 529,086 | 438,616 | (209,655) | 1,000,885 | (781,120) | (632,698) | (214,656) | 3,341,437 | 9,113,950 |
| **Ending Cash Balance before Draw** | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 |
| | | | | | | | | | | | | | | |
| **DIP Facility** | | | | | | | | | | | | | | |
| Beginning DIP Facility Balance | $ - | $ 1,195,940 | $ 2,316,317 | $ 4,108,765 | $ 4,632,895 | $ 5,642,055 | $ 6,171,141 | $ 6,609,757 | $ 6,400,102 | $ 7,400,987 | $ 6,619,867 | $ 5,987,169 | $ 5,772,513 | $ - |
| Draw/(Repayment) | 1,195,940 | 1,120,377 | 1,792,448 | 524,130 | 1,009,160 | 529,086 | 438,616 | (209,655) | 1,000,885 | (781,120) | (632,698) | (214,656) | 3,341,437 | 9,113,950 |
| **Ending DIP Facility Balance** | $ 1,195,940 | $ 2,316,317 | $ 4,108,765 | $ 4,632,895 | $ 5,642,055 | $ 6,171,141 | $ 6,609,757 | $ 6,400,102 | $ 7,400,987 | $ 6,619,867 | $ 5,987,169 | $ 5,772,513 | $ 9,113,950 | $ 9,113,950 |

## **Schedule 7(d)**

The civil lawsuit captioned FieldTurf USA, Inc., et al. vs. AstroTurf, LLC, case no.: 2:10-cv-12492-SJM-MJH, pending in the United States District Court for the Eastern District of Michigan, together with all appeals and related proceedings.

## AstroTurf, LLC — Weekly Cash Flow Forecast

| Week Ending: | Actual BK Filing 1 7/1/16 | Projected 2 7/8/16 | Projected 3 7/15/16 | Projected 4 7/22/16 | Projected 5 7/29/16 | Projected 6 8/5/16 | Projected 7 8/12/16 | Projected 8 8/19/16 | Projected 9 8/26/16 | Projected 10 9/2/16 | Projected 11 9/9/16 | Projected 12 9/16/16 | Projected 13 9/23/16 | 13-wk Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Receipts** | $ 281,086 | $ 1,230,484 | $ 1,522,509 | $ 1,891,821 | $ 2,145,896 | $ 2,175,549 | $ 2,215,368 | $ 3,452,089 | $ 2,285,955 | $ 2,317,186 | $ 2,250,385 | $ 2,188,780 | $ 2,018,479 | $ 25,975,588 |
| **Operating Disbursements** | | | | | | | | | | | | | | |
| Materials - Synthetic Turf | $ 848,131 | $ 899,844 | $ 899,844 | $ 899,844 | $ 1,156,943 | $ 959,626 | $ 959,626 | $ 959,626 | $ 1,233,805 | $ 503,609 | $ 503,609 | $ 503,609 | $ 503,609 | $ 10,831,726 |
| Materials - Other | 506,283 | 537,153 | 537,153 | 537,153 | 690,625 | 572,839 | 572,839 | 572,839 | 736,508 | 300,624 | 300,624 | 300,624 | 300,624 | 6,465,890 |
| Freight & Postage | 35,372 | 37,529 | 37,529 | 37,529 | 48,252 | 40,022 | 40,022 | 40,022 | 51,457 | 21,004 | 21,004 | 21,004 | 21,004 | 451,751 |
| Sub-Contractor Payments | 594,307 | 1,381,655 | 1,381,655 | 630,544 | 810,700 | 672,435 | 672,435 | 672,435 | 864,559 | 864,559 | 352,892 | 352,892 | 352,892 | 9,092,293 |
| Employee & Benefits | 41,231 | 35,231 | 515,731 | 42,731 | 41,231 | 71,795 | 64,211 | 410,335 | 65,585 | 36,335 | 74,827 | 481,522 | 36,368 | 1,917,133 |
| Marketing | 8,000 | - | - | - | 8,000 | - | - | - | 8,000 | - | 8,000 | - | 8,000 | 56,000 |
| Building Rent | | | | 48,200 | | | | 48,200 | | | | | 48,200 | 144,600 |
| Utilities | 151 | 109 | 439 | 201 | 209 | 339 | 251 | 309 | 439 | 401 | 409 | 439 | 401 | 4,098 |
| G&A/Other | 64,100 | 64,100 | 235,700 | 98,600 | 64,100 | 58,505 | 62,989 | 270,095 | 62,560 | 61,560 | 100,632 | 61,989 | 275,095 | 1,480,025 |
| Interest/Fees | 10,350 | 32,350 | 350 | 60,000 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 62,334 | 168,184 |
| 503(b)(9) | | | | | | | | | | | | | 3,600,000 | 3,600,000 |
| **Total Operating Disbursements** | $ 2,107,925 | $ 2,987,972 | $ 3,616,401 | $ 2,354,803 | $ 2,820,409 | $ 2,375,912 | $ 2,380,724 | $ 2,974,212 | $ 3,023,263 | $ 1,276,775 | $ 1,362,347 | $ 1,722,429 | $ 5,208,527 | $ 34,211,700 |
| **Cash Flow before Bankruptcy Expenses** | $(1,826,839) | $(1,757,488) | $(2,093,892) | $ (462,982) | $ (674,514) | $ (200,363) | $ (165,356) | $ 477,877 | $ (737,309) | $ 1,040,411 | $ 888,038 | $ 466,351 | $(3,190,048) | $ (8,236,113) |
| **Bankruptcy Expenses** | | | | | | | | | | | | | | |
| Utility Deposit | | 1,000 | | | | | | | | | | | | 1,000 |
| United States Trustee Fee | | | | | | | | | | | | | 30,000 | 30,000 |
| Debtors' Professional Fees | 135,000 | 135,000 | 135,000 | 135,000 | 135,000 | 135,000 | 85,000 | 85,000 | 85,000 | 85,000 | 85,000 | 85,000 | 85,000 | 1,405,000 |
| UCC Professional Fees | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 130,000 |
| **Total Bankruptcy Expenses** | $ 145,000 | $ 146,000 | $ 145,000 | $ 145,000 | $ 145,000 | $ 145,000 | $ 95,000 | $ 95,000 | $ 95,000 | $ 95,000 | $ 95,000 | $ 95,000 | $ 125,000 | $ 1,566,000 |
| **Net Cash Flow** | $(1,971,839) | $(1,903,488) | $(2,238,892) | $ (607,982) | $ (819,514) | $ (345,363) | $ (260,356) | $ 382,877 | $ (832,309) | $ 945,411 | $ 793,038 | $ 371,351 | $(3,315,048) | $ (9,802,113) |
| **Cash** | | | | | | | | | | | | | | |
| Beginning Cash Balance | $ - | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ - |
| Net Cash Flow | (1,971,839) | (1,903,488) | (2,238,892) | (607,982) | (819,514) | (345,363) | (260,356) | 382,877 | (832,309) | 945,411 | 793,038 | 371,351 | (3,315,048) | (9,802,113) |
| Draw/(Repayment) | 2,071,839 | 1,903,488 | 2,238,892 | 607,982 | 819,514 | 345,363 | 260,356 | (382,877) | 832,309 | (945,411) | (793,038) | (371,351) | 3,315,048 | 9,902,113 |
| **Ending Cash Balance before Draw** | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 |
| **DIP Facility** | | | | | | | | | | | | | | |
| Beginning DIP Facility Balance | $ - | $ 2,071,839 | $ 3,975,327 | $ 6,214,219 | $ 6,822,201 | $ 7,641,715 | $ 7,987,078 | $ 8,247,434 | $ 7,864,557 | $ 8,696,866 | $ 7,751,455 | $ 6,958,416 | $ 6,587,065 | $ - |
| Draw/(Repayment) | 2,071,839 | 1,903,488 | 2,238,892 | 607,982 | 819,514 | 345,363 | 260,356 | (382,877) | 832,309 | (945,411) | (793,038) | (371,351) | 3,315,048 | 9,902,113 |
| **Ending DIP Facility Balance** | $ 2,071,839 | $ 3,975,327 | $ 6,214,219 | $ 6,822,201 | $ 7,641,715 | $ 7,987,078 | $ 8,247,434 | $ 7,864,557 | $ 8,696,866 | $ 7,751,455 | $ 6,958,416 | $ 6,587,065 | $ 9,902,113 | $ 9,902,113 |