**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT GEORGIA**
**ROME DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ASTROTURF, LLC, | ) | Case No. 16-41504-PWB |
| | ) | |
|       Debtor. | ) | |
| | ) | |

**OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF ASTROTURF, LLC'S OBJECTION TO SCHEDULING A FINAL HEARING ON AUGUST 4, 2016 ON DEBTOR'S PROPOSED SALE OF ASSETS, PROPOSED ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND LEASES**

COMES NOW, the Official Committee of Unsecured Creditors of AstroTurf, LLC (the "Committee") and objects to the expedited objection deadline and hearing on *Debtor's Motion for Entry of an Order Pursuant to 11 U.S.C. §§ 105, 363, and 365: (I) Authorizing the Sale of the Debtor's Property Free and Clear of Liens, Claims and Encumbrances; (II) Authorizing the Assumption and Assignment of Contracts and Leases; and (III) Granting Related Relief* (the "Motion") (Doc. No. 15) whereby a final hearing on the Motion is held on August 4, 2016, showing the Court as follows:[1]

**INTRODUCTION**

1. On June 28, 2016 (the "Petition Date"), AstroTurf, LLC ("Debtor") filed a voluntary petition with the Court under chapter 11 of the Bankruptcy Code. Also on the Petition Date, Debtor filed the Motion seeking to sell substantially all of its assets on an expedited basis through a private sale that is not subject to higher or better bids.

2. Specifically, Debtor proposes to sell its assets, together with the assets of four of its affiliates, Textile Management Associates, Inc. ("TMA"), Synthetic Turf Resources, Inc.

---

[1] This is objection is solely to the scheduling of an August 4, 2016 final hearing on Debtor's Motion and the related August 1, 2016 sale objection deadline. The Committee reserves the right to file objections to the proposed sale.

("STR"), Crystal Products, Inc. ("Crystal"), and UTGH Equipment, LLC ("UTGH", together with TMA, STR and Crystal, the "Other Sellers") to the Purchaser for the aggregate purchase price of $92.5 million. Of that amount, only $16,096,000 is proposed to be allocated to the assets to be sold by Debtor. The remaining $76,404,000 will benefit insiders and affiliates of the Debtor.[2]

3. Debtor and the Other Sellers are owned by the Peeples family[3]. The Peeples family has the following relationship with Debtor and the Other Sellers:

- The Peeples family controls Debtor's lender, who is allegedly owed over $37 million;

- The Peeples family licenses the intellectual property used by Debtor in the AstroTurf business, which license requires Debtor to purchase product exclusively from STR (an affiliate of the Debtor);

- The Peeples family is allegedly owed over $9.3 million, $3.2 million of which is on account of its 503(b)(9) claim;

- The Peeples family, as Debtor's landlord and lender is purportedly owed over $4.7 million in pre-petition debt;

- The Peeples family is Debtor's DIP lender; and

- The Peeples family is Debtor's manager and cash manager.

4. Thus, Debtor's insiders and affiliates, who negotiated the aggregate purchase, will receive not only $76 million on account of the sale of the assets of the non-debtors, but may also

---

[2] A chart detailing the relationship between Debtor, the Other Sellers and the Peeples family is attached hereto as Exhibit A.

[3] TMA owns 98% of the outstanding equity interests in the Debtor. William Bryan Peeples and George Thomas Peeples own the remaining outstanding equity interests in the Debtor. The Peeples, their family and/or wholly-owned entities own all of the interests in TMA, STR, Crystal and UTGH. (*See* Exhibit A.)

2

receive all of the net proceeds of the sale on account of TMA's allegedly secured claim and the DIP loan.  Hence, the sale as it is currently designed benefits no one other than the Peeples family and other insiders of the Debtor, leaving the unsecured creditors with little to no prospect of recovery and may result in the administrative insolvency of the Debtor's estate after the sale.

5.       Debtor proposes to conduct a private sale that is not subject to higher or better bids, with no marketing or other market test.  Even more troubling is that Debtor did not determine or negotiate the aggregate purchase price or the allocation of the aggregate purchase price to Debtor's assets.  In fact, the allocation was determined by the Purchaser, not the Debtor the Other Sellers.

6.       In determining whether the sale is fair and in the best interests of the creditors, the Committee needs to (i) conduct a financial analysis to determine whether the aggregate purchase price of $92.5 million is appropriate; (ii) conduct an analysis of the allocation of the aggregate purchase price as between Debtor and the Other Sellers; and (iii) conduct an analysis of the allocation of the aggregate purchase price to Debtor's assets.  In short, given that the sale of the Debtor's assets is part of the sale of the Turf Business, the Committee cannot determine whether the aggregate purchase price and the allocation to Debtor are fair without engaging in an extensive analysis of the financials of the Debtor and each of the Other Sellers, how they are related, and the assets and liabilities of each business.

7.       The Debtor contends that an expedited sale process is necessary based on the unfounded assertion that Debtor's business is deteriorating.  While Debtor and the Purchaser have been working on the sale since 2013 and in earnest since the summer of 2015, Debtor proposes to hold a sale hearing on August 4, 2016, less than 37 days after the Petition Date and 26 days from the date of appointment of the Committee.  Simply stated, there is an insufficient

time and information available to determine whether the proposed transaction is fair, whether the purchase price is reflective of the value of Debtor's assets, whether the allocation of the total purchase price of $92.5 million to Debtor's assets is fair, or whether the sale is proposed in good faith.

8. The Committee submits that the sale process should be extended no less than thirty (30) days from the current proposed sale hearing, to be heard no earlier than the week of September 5, 2016. This additional time will allow the Committee and other interested parties to conduct due diligence regarding the proposed sale, evaluate the aggregate purchase price and the allocation of the aggregate purchase price as between Debtor and its affiliates.

9. For the reasons set forth herein, the Court should postpone the sale hearing for a meaningful process to unfold. A proposed order setting forth the Committee's proposed discovery, objection, and hearing schedule is attached hereto.

## FACTUAL BACKGROUND

**A.    The Chapter 11 Case**

10. On June 28, 2016 (the "Petition Date"), Debtor filed a voluntary petition with the Court under chapter 11 of the Bankruptcy Code.

11. On June 8, 2016, the Committee was appointed. On June 9, 2016, the Committee selected Morris, Manning & Martin, LLP as its counsel and, on June 11, 2016, the Committee engaged GlassRatner Advisory and Capital Group, LLC ("GlassRatner") as its financial advisor.

**B.    The Proposed Sale**

12. The proposed sale is the culmination of discussions between Debtor and the purchaser that began in October 2013. Specifically, in October 2013, Sportfield Deutschland Holding GmBH ("Sportfield") contacted TMA and initiated discussions regarding the possibility of combining the Turf Business with Sportfield's artificial turf business. (Doc. No. 15, ¶ 8.) The

4

parties continued to engage in discussions in 2014. In April 2015, Equistone Partners Europe acquired Sportfield and discussions regarding a potential sale of the Turf Business intensified and progressed. (*Id.*)

13. In the summer of 2015, the parties reached a preliminary agreement on the purchase price and other material terms. (*Id.*, ¶ 9.) On December 17, 2015, Sportfield, Debtor and the Other Sellers entered into a non-binding letter of intent setting forth the proposed terms of the sale. (*Id.*, ¶ 10.) Thereafter, Sportfield "conducted extensive due diligence regarding the Turf Business" and retained KPMG to perform a "quality of earnings review". After Sportfield completed its due diligence, the parties agreed to a cash purchase price for the Turf Acquisition of $92.5 million. (*Id.*) The Purchaser, not the Debtor, determined the allocation of the aggregate purchase price as between Debtor and the Other Sellers (*Id.*, ¶ 17.)

14. On June 27, 2016, Debtor entered into the APA with Purchaser for the sale of substantially all of Debtor's assets. The APA dictates that the sale to Purchaser will be pursuant to a private sale that will not be exposed to better and higher bids (*See* APA, § 7.4(a).)

15. Also on June 27, 2016, the Other Sellers entered into agreements with Purchaser. Pursuant to which the Turf Business assets - which include Debtor's assets – will be sold for a total of $92.5 million.

16. On the Petition Date, Debtor filed its Motion, seeking to sell substantially all of its assets to Purchaser.

17. Pursuant to Debtor's Notice of Proposed Sale (Doc. No. 35), Debtors seek to hold the sale hearing on August 4, 2016, with objections due on August 1, 2016.

## ARGUMENT

18. The Court cannot approve the sale unless the sale process maximizes the value of Debtor's assets, which is the purpose of any sale of a debtor's assets. *In re Integrated Res., Inc.*, 135 B.R. 746, 750 (Bankr. S.D.N.Y.) *aff'd*, 147 B.R. 650 (S.D.N.Y. 1992) ("When a debtor desires to sell an asset, its main responsibility, and the primary concern of the bankruptcy court, is the maximization of the value of the asset sold."); *In re Bakalis*, 220 B.R. 525, 532 (Bankr. E.D.N.Y. 1998) (holding that "[a]lthough a trustee's business judgment enjoys great judicial deference, this discretion is not without limit. A duty is imposed upon the trustee to maximize the value obtained from a sale….") (internal quotation omitted).

19. In determining whether to approve a sale under section 363, courts consider, among other things, (a) whether the proposed sale is in the debtor's sound business judgment, (b) the terms of the offer including any contingencies, (c) the time it will take to consummate the sale in determining whether to approve a sale, (d) whether the price is fair, (e) whether the negotiations occurred at arm's length and (f) the exposure to the market. *See In re Gulf States Steel*, 285 B.R. 497, 514 (Bankr. N.D. Ala. 2002); *In re Cloverleaf Enter.*, 2010 Bankr. LEXIS 1301 (Bankr. D. Md. Apr. 2, 2010) (denying approval of proposed sale; finding that the debtor fell short in carrying out its duty to act as a fiduciary for creditors and interest holders).

20. Although Section 363 sales are beneficial because they may occur on an expedited basis, "[t]he need for expedition . . . is not a justification for abandoning proper standards." *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 450 (1968). As a general matter, Section 363 sales held on an expedited basis, such as the timetable proposed by Debtor, are disfavored. "At a minimum, if section 363(b)(1) is the means for effecting the debtor's disposition, the creditors should have the luxury of enough

time for their representative to assess fully the proposed transactions." *In re Bombay Co.*, No. 07-44084, 2007 WL 2826071, *4 (Bankr. N.D. Tex. Sept. 26, 2007); *see also In re Humboldt Creamery, LLC*, No. 09-11078, 2009 Bankr. Lexis 2470, *5 (Bankr. N.D. Cal. Aug. 14, 2009) (in expedited section 363 sales, "the judge is reduced to a figurehead without any meaningful discretion and might as well leave his or her stamp with the debtor's counsel and go on vacation or shift attention to consumer cases where the law may still mean something."); *In re Gulf Coast Oil Corp.*, 404 B.R. 407, 420-21 (Bankr. S.D. Tex. 2009) (discussing section 363 sales, stating that "[t]he lack of transparency, the pace of the process, and the inconsistent treatment by the courts . . . leave the bankruptcy courts and parties in interest vulnerable to unfair dealing, abuse, and sweetheart deals") (internal citations omitted). The truncated process proposed by Debtor is inadequate for the Committee and other interested parties to conduct a meaningful review of the proposed sale.

21. In order to determine whether the proposed price for Debtor's assets is fair and whether the sale is in the best interests of the estate, the Committee needs to obtain and analyze extensive financial information from Debtor and the Other Sellers, including, without limitation, financial statements, balance sheets, cash flow statements, tax returns, customer lists, due diligence materials provided to the Purchaser, customer contracts, receivables detail, quantified estimates of the working capital adjustment in the APAs, accounts payable, and information regarding the relationship and inter-company agreements and expense-sharing arrangements between and among Debtor and the Other Sellers.

22. Due to the relationship of the Debtor and the Other Sellers and the fact that the proposed sale is part of the sale of the overall Turf Business, the Committee's financial advisor needs to ensure that the overall price for the assets of the Debtor and Other Sellers is fair and

then to ensure that the portion of the aggregate purchase price allocated to Debtor is reasonable considering the financial position of each of the companies. (Declaration of Ian Ratner ("Ratner Decl."), ¶ 8, attached hereto as Exhibit B.)

23. GlassRatner's procedures with regard to the valuation and allocation of the value will include the following:

   a. Studying historical financial and projected trends of each entity, examining account balances, questioning unusual items, non-operating items, adequacy of future funding, contingencies, key performance measures and more. Assessment further includes comparing many of these same trends and other indicators to unaffiliated companies competing in the same industry for purposes of understanding relative performance and reasonableness of projections, both of which are relevant to aggregate and relative value determinations for Debtor and each of the Other Sellers;

   b. Gain a full understanding of the business of the Debtor and each of the Other Sellers;

   c. Gain a full understanding of the various transactions and agreements between the Debtor and the Other Sellers that are being included in the overall transaction.

   d. Gain a full understanding and review any cost sharing or overhead allocations between the Debtor and the various related parties included in the transaction. Such analysis will focus on logic for such allocations, amounts allocated relative to corresponding costs incurred and reasonable mark ups, impacts on profitability of respective entities relative to corporate roles, business risks, and asset class

    risks, as well as external research to help benchmark such charges – e.g., margins, royalty rates, etc.;

e. Market research will also be performed with an eye toward market vibrancy, size, market shares, and common business practices relative to the subject entities;

f. Perform detailed financial analysis of the historical financial statements for each business or business line being included in the overall transaction;

g. Prepare various comparative and relative financial analysis of the various businesses to determine the profitability, asset mix and overall relative performance of each business on a stand-alone basis and on a consolidated basis. This type of comparison will be critical in analyzing the proposed allocation of the transaction price;

h. Analyze the interdependency of the Debtor and the Other Sellers to determine if and how any intangibles should be allocated to the group of companies. Understand where various intangible rights reside – for example customer relationships, customer lists, customer contracts, various work force skills, exclusivity rights under licenses, business know-how, etc.;

i. Review any prior reports or analysis performed by the Purchaser, Debtor, the Other Sellers, or KPMG related to the allocation of the overall transaction price to the various businesses being acquired;

j. Consider if any goodwill or intangible value has been or should be allocated to any of the businesses or business lines being acquired;

k. Review and analyze any projections relied on by the Purchaser;

      l.  Perform market research on comparable transactions and comparable guideline companies to ensure that the overall price and valuation metrics are reasonable when compared to other transactions and the market. Also consider cost of capital inputs within the context of valuation measurement; and

      m.  Review the five Asset Purchase Agreements associated with the transaction.

(*Id.*, ¶ 9.)

24.    The Committee financial advisor needs a minimum of 45 days to investigate and determine whether the purchase price is fair, whether the allocation to Debtor of the aggregate purchase price is fair and reasonable, and whether the sale is in the best interests of the estate. This time is particularly necessary given that GlassRatner needs to examine not only Debtor's books, records, assets and liabilities, but also those of the Other Sellers, as the purchase price proposed to be paid to Debtor is based on an allocation of the aggregate purchase price as between the five affiliated sellers. (*Id.*, ¶ 10.)

25.    The Committee also anticipates that, in addition to written discovery, it will need to take the deposition of representatives of the Debtor, the Other Sellers, and Debtor's financial advisor. The Committee may also need to depose the Purchaser and/or its financial advisor for purposes of examining the allocation of the purchase price, as the purchase price allocation was determined by the Purchaser (in consultation with its advisor, KPMG).

26.    Debtor's proposed schedule whereby objections to the proposed sale are due August 1, 2016. Thus, a hearing will be held on the sale on August 4, 2016, is wholly unreasonable and does not provide the Committee, its counsel and financial advisor sufficient time to obtain and analyze documents from Debtor, the Other Sellers, and/or Purchaser and conduct necessary depositions.

27. Here, while the Debtor, Other Sellers and Purchaser have been working on the sale transaction since 2013 and in earnest since 2015, and Purchaser's determination of the aggregate purchase price and purchase price allocation was based on its "extensive due diligence regarding the Turf Business", Debtor proposes to hold a sale hearing less than thirty (30) days after the Committee's appointment. It is wholly unreasonable to expect the Committee and other parties in interest to diligence a private sale that has been in negotiations for more than a year on this truncated schedule.

28. The sale as currently proposed is designed for the sole purpose of benefiting Debtor's insiders and equity, without full disclosure of the facts and circumstances surrounding the negotiations and transactions which led to the proposed sale or the circumstances under which the purchase price was determined and allocated. There is not a substantial business justification for the expedited timetable for the sale and, accordingly, the sale hearing and related deadlines should be extended.

29. In the alternative, should the Committee's financial advisor determine that the aggregate purchase price of $92.5 million is within the range of reasonableness, the Court should approve the sale of Debtor's assets, ordering that the aggregate purchase price of $92,500,000 be held in escrow pending the Court's determination of the proper allocation of the purchase price to Debtor's assets.

**RESERVATION OF RIGHTS**

30. The Committee reserves the right to propound objections to the proposed sale, up to and including a hearing on the Motion. Nothing contained herein shall be deemed as a waiver of any right of the Committee to object to the sale of substantially all of the Debtor's assets pursuant to 11 U.S.C. § 363 or otherwise.

## **CONCLUSION**

WHEREFORE, the Committee respectfully requests that the Court extend the sale hearing to a date no sooner than September 6, 2016 and extend the deadline for filing objections to the proposed sale of Debtor's assets to a date no sooner than three (3) business days before the hearing on Debtor's proposed sale, and requests that the Court grant the Committee such other relief as is just and proper.

This 15th day of July, 2016.

Respectfully submitted,

**MORRIS, MANNING & MARTIN, LLP**

By: /s/ Lisa Wolgast

3343 Peachtree Road, N.E.  
Suite 1600  
Atlanta, Georgia 30326  
(404) 233-7000

Frank W. DeBorde  
Georgia Bar No. 215415  
Lisa Wolgast  
Georgia Bar No. 773399  
*Proposed Counsel to the Official Unsecured Creditors Committee for AstroTurf, LLC*

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT GEORGIA**
**ROME DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ASTROTURF, LLC, | ) | Case No. 16-41504-PWB |
| | ) | |
| Debtor. | ) | |
| | ) | |

**CERTIFICATE OF SERVICE**

I certify that I have this day served a true and correct copy of the **OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF ASTROTURF, LLC'S OBJECTION TO SCHEDULING A FINAL HEARING ON AUGUST 4, 2016 ON DEBTOR'S PROPOSED SALE OF ASSETS, PROPOSED ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND LEASES** upon the attached Master Service List by mailing a copy of same via United States Mail with sufficient postage to ensure delivery.

This 15th day of July, 2016.

**MORRIS, MANNING & MARTIN, LLP**

By: /s/ Lisa Wolgast
    Lisa Wolgast
    Georgia Bar No. 773399

3343 Peachtree Road, N.E.
Suite 1600                    *Proposed Counsel for the Official Committee*
Atlanta, Georgia 30326     *of Unsecured Creditors*
(404) 233-7000

## Master Service List

**AstroTurf, LLC**
**Attn: Sean Harding**
**2860 Abutment Road**
**Dalton, GA 30720**

**King & Spalding LLP**
**Paul K. Ferdinands, Mark M. Maloney, Jeffrey R. Dutson & Karyn D. Heavenrich**
**1180 Peachtree Street**
**Atlanta, GA 30309-3521**

**Armacell, LLC**
**PO Box 751868**
**Charlotte, NC 28275-1868**

**Asphalt, Fabric & Engineering, Inc**
**2683 Lime Avenue**
**Signal Hill, CA 90755**

**Brock International**
**2840 Wilderness Place**
**Boulder, CO 80301**

**C & S Cpt.Logistics, Inc**
**220 Cross Plains Blvd.**
**Dalton, GA 30721**

**Drc Enterprizes**
**1691 Parkway Street**
**Muskegon, MI 49442**

**First Bank Of Dalton**
**PO Box 459**
**PO Box 459**
**Dalton, GA 30720**

**Genan, Inc.**
**PO Box 24187**
**Houston, TX 77229**

**Georgia Attorney General**
**Sam Olens**
**40 Capitol Square, SW**
**Atlanta, GA 30334**

**Georgia Department Of Revenue**
**Compliance Division, ARCS - Bankruptcy**
**1800 Century Center Blvd NE**
**Suite 9100**
**Atlanta, GA 30345-3202**

**Georgia Department Of Revenue**
**Douglas J. MacGinnitie,**
**State Revenue Commissioner**
**1800 Century Boulevard**
**Atlanta, GA 30345**

**Internal Revenue Service**
**Centralized Insolvency Operation**
**2970 Market St**
**Philadelphia, PA 19104**

**Internal Revenue Service**
**Centralized Insolvency Operation**
**PO Box 7346**
**Philadelphia, PA 19101-7346**

**KCC**
**Leanne Scott**
**2335 Alaska Ave**
**El Segundo, CA 90245**

**Kintex Industries**
**102 Brownfield Dr**
**Summerville, SC 29483-3782**

**Liberty Tire Recycling**
**PO Box 645375**
**Pittsburgh, PA 15264-5375**

**Mapei**
**Dept #4820**
**PO Box 87618**
**Chicago, IL 60680-0618**

**Martin P. Ochs**
**United States Department of Justice**
**Office of the United States Trustee**
**362 Richard B. Russell Building**
**75 Spring Street, S.W.**
**Atlanta, GA 30303**

**Miller & Martin PLLC**
**Jonathan Kent**
**832 Georgia Avenue**
**Suite 1200 Volunteer Bldg.**
**Chattanooga, TN 37402**

**Miller & Martin PLLC**
**Bill DuPre, Paul M. Alexander**
**1180 West Peachtree Street, N.W.**
**Regions Plaza Suite 2100**
**Atlanta, GA 30309-3407**

**Office of the United States Trustee**
**Guy G. Gebhardt**
**75 Ted Turner Drive, S.W.**
**362 Richard B. Russell Bldg.**
**Atlanta, GA 30303**

**Playing Surface Solutions, Inc**
**15921 S. Mosiertown Road**
**Meadville, PA 16335**

**Rhode Island Hospital Research Finance**
**One Hoppin Street**
**Suite 1.300 Box 42**
**Providence, RI 02903-0000**

| | | |
|---|---|---|
| Sports Contracting Group LLC<br>10303 Brecksville Road<br>Brecksville, OH 44141 | Sportsfield Specialties, Inc.<br>41155 State Hwy 10<br>PO Box 231<br>Delhi, NY 13753 | Swank Sports LLC<br>168 Pavilion Drive<br>Cedar Creek, TX 78612-3827 |
| Target Technologies Inc.<br>203B Brighton Avenue<br>Burnaby, BC V5A 3H4<br>CANADA | Texas Sports Builders, Inc.<br>417 North Rudd Street<br>Burleson, TX 76028 | Thompson Hine LLP<br>John F. Isbell<br>3560 Lenox Road<br>Two Alliance Center, Suite 1600<br>Atlanta, GA 30326 |
| TPK, Inc.<br>4091 Circle Drive<br>Allison Park, PA 15101 | U.S. Attorney<br>John A. Horn<br>75 Ted Turner Drive, SW<br>600 Richard B. Russell<br>Federal Building<br>Atlanta, GA 30303 | Winston & Strawn<br>Michael L. Brody & Kevin E. Warner; Derek J. Sarafa<br>35 W. Wacker Drive<br>Chicago, IL 60601-9703 |
| SEFL<br>PO Box 100104<br>Columbia, SC 29202-3104 | Sport Install West, Inc.<br>17823 162Nd Avenue SE<br>Renton, WA 98058 | Sports Construction Management<br>4509 South Hwy 150<br>Lexington, NC 27295 |
| P. Keith Lichtman, Esq.<br>Atlantic Center 1201 West<br>Peachtree Street, Suite 2610<br>Atlanta, Georgia 30309 | | |