


**IT IS ORDERED as set forth below:**

**Date: March 30, 2017**

Paul W. Bonapfel

**Paul W. Bonapfel**
**U.S. Bankruptcy Court Judge**

---

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ROME DIVISION**

| | |
|---|---|
| IN RE:<br><br>ASTROTURF, LLC,<br><br>Debtor. | CHAPTER 11<br><br>CASE NO. 16-41504-PWB |
| FIELDTURF USA, INC. AND TARKETT, INC.,<br><br>Movants,<br><br>v.<br><br>ASTROTURF, LLC,<br><br>Respondent. | CONTESTED MATTER |

**ORDER ON MOTION OF FIELDTURF, USA, INC., AND TARKETT, INC. FOR RELIEF FROM AUTOMATIC STAY**

FieldTurf USA, Inc., and Tarkett, Inc. (collectively, "FieldTurf") filed a lawsuit for patent infringement against AstroTurf, LLC ("AstroTurf"), in the United States District Court for the Eastern District of Michigan (the "District Court") in 2010 (the "Patent Case").[1] After five years and four months of litigation, a jury on October 9, 2015 returned a verdict in favor of FieldTurf finding AstroTurf liable and awarding damages of $ 30 million.[2]

AstroTurf filed a Chapter 11 petition on June 28, 2016. At that time, the District Court had not entered judgment on the jury verdict, and some 14 motions were, and remain, pending. The motions include AstroTurf's motions for judgment as a matter of law and for a new trial and motions regarding treble damages, prejudgment interest, attorney's fees, witness misconduct issues, and remaining claims for inequitable conduct.[3] The District Court administratively closed the Patent Case because of the automatic stay of 11 U.S.C. §362(a) that arose upon the filing of AstroTurf's chapter 11 case.

Three important events in this case have resulted in the resolution of substantially all matters relating to the liquidation of assets of AstroTurf and distribution of the proceeds to creditors. First, AstroTurf sold its business. Second, AstroTurf, the Committee of Unsecured Creditors (the "Committee"), and certain affiliates of AstroTurf reached a global settlement of all issues relating to the allocation of assets of the estate between the general unsecured creditors (including FieldTurf) and the affiliates, who held secured and unsecured claims that were subject to various disputes, and the release of all claims of the estate against the affiliates. Third, FieldTurf's claim has been estimated and finally allowed.

---

[1] *FieldTurf USA, Inc. v. AstroTurf LLC, Civil Action* No. 10-12492, U.S. District Court for the Eastern District of Michigan.

[2] Declaration of Sean M. Harding In support of First Day Motions and Applications (the "Harding Declaration") [14] at ¶¶18-19. Mr. Harding is the Chief Restructuring Officer for AstroTurf.

[3] Report and Recommendation of the Special Purpose Examiner Pursuant to the Order of the Bankruptcy Court Entered on 22 September 2016 [334] at 2.

The question now before the Court is whether, in view of the resolution of all major matters relating to the liquidation and distribution of AstroTurf's estate, the Court should terminate the automatic stay to permit FieldTurf to proceed in the Patent Case to assert so-called "specific" alter ego and veil-piercing claims against AstroTurf's equity owners that the estate does not own and that, therefore, the release of claims in the settlement does not cover. For the reasons set forth below, the Court concludes that the answer is "yes."

**I.**

FieldTurf has moved for relief from the automatic stay to permit the Patent Case to go forward.[4] FieldTurf wants relief from the stay for two primary purposes. First, FieldTurf wants the District Court to dispose of the pending motions and enter judgment against AstroTurf as appropriate. Second, FieldTurf wants to file a supplemental complaint to add the equity owners of AstroTurf as additional defendants to assert alter ego and veil-piercing claims against them. Textile Management Associates, Inc. ("TMA") owns almost all of the equity interests in AstroTurf, and two brothers, Bryan and Thomas Peeples (the "Peeples Brothers") each own small interests.[5] (The Court refers to TMA and the Peeples Brothers collectively as the "Equity Owners.")

Neither the entry of judgment against AstroTurf nor FieldTurf's prosecution of claims against the Equity Owners can possibly have any material effect in AstroTurf's bankruptcy case.

[4] FieldTurf's Motion for Relief from the Stay (the "FieldTurf Motion") [260].
[5] FieldTurf Motion at 3 [260 at 5].

The Court has entered an order (the "Estimation Order") that estimated and finally allowed the unsecured claims of FieldTurf for $30,648,721.[6] Whether the District Court in the Patent Case enters a judgment in AstroTurf's favor, grants a new trial, or enters judgment against AstroTurf for treble damages and postjudgment interest is of no concern to AstroTurf's estate or its creditors because FieldTurf's claim is now fixed.

AstroTurf has disposed of any claims it has against the Equity Owners by releasing them pursuant to a global settlement agreement among AstroTurf's estate,[7] the Committee, TMA, and other affiliates of TMA in connection with the sale of the businesses of AstroTurf and of certain non-debtor affiliated entities.[8] The global settlement resolved issues related to secured and unsecured claims of TMA and its affiliates and the allocation of assets of the estate among TMA and the affiliates and other creditors, including FieldTurf. Concessions that TMA and the affiliates made with regard to the allocation of the estate's assets will result in the payment of administrative and priority claims in full and a significant distribution to general unsecured creditors, including FieldTurf.[9] TMA and other affiliates will receive distributions on their secured and unsecured claims that are substantially less than they could receive if they prevailed on some or all challenges to their claims, and any fees and expenses AstroTurf incurs in defending the Patent Case will reduce what TMA receives on its secured claim.

In exchange for the concessions, AstroTurf's estate released claims against TMA and affiliated entities. Because AstroTurf no longer has any claims against the Equity Owners,

---

[6] Order Estimating and Allowing the Claim of FieldTurf (Feb. 21, 2017) [354].

[7] The party to the settlement on behalf of the estate is actually AstroTurf, as the debtor-in-possession exercising the rights and powers of a trustee under 11 U.S.C. § 1107(a). The Court uses the term "estate" to indicate the capacity in which AstroTurf was, and is, legally acting.

[8] Order Authorizing and Approving Settlement Agreement (Aug. 31, 2016) (the "Settlement Order") [224].

[9] See, e.g., Transcript of Hearing on August 12, 2016 [hereinafter "Tr. Aug. 12"] [222] at 24, line 17 to 26, line 6.

FieldTurf's prosecution of alter ego and veil-piercing claims poses no risk of diminution of AstroTurf's assets.

The controversy underlying the dispute over termination of the automatic stay to permit FieldTurf to proceed in the Patent Case is whether FieldTurf has any alter ego or veil-piercing claims that it can assert. Georgia law distinguishes between so-called "general" alter ego or veil piercing claims (which are common to all creditors) and "specific" claims (which involve specific injury to a creditor). Because under Georgia law only general claims are property of the estate, AstroTurf could not, and did not, release any specific claims. In the order approving the settlement and releases over FieldTurf's objections (the "Settlement Order")[10], the Court made express rulings that the releases included only general claims and that FieldTurf retained any specific claims it had.

The Equity Owners have filed an adversary proceeding in this Court (the "TMA Adversary Proceeding")[11] in which they seek a declaratory judgment as to whether FieldTurf has any alter-ego or veil-piercing claims that are specific and that FieldTurf can prosecute against them. [12]

AstroTurf, supported by TMA, opposes termination of the automatic stay. Their central theme[13] is that the automatic stay should remain in effect until this Court has determined in the TMA Adversary Proceeding whether FieldTurf has any alter ego and veil-

[10] Order Authorizing and Approving Settlement Agreement (Aug. 31, 2016) [224].

[11] Textile Management Associates, Inc., William Bryan Peeples, and George Thomas Peeples v. FieldTurf USA, Inc. and Tarkett, Inc., Adversary No. 17-04005.

[12] Complaint, TMA Adversary Proceeding.

[13] AstroTurf also argues that termination of the stay will be prejudicial to the interests of the estate and that the stay should remain in effect because, in view of the estimation of FieldTurf's claim, the Patent Case is moot such that terminating the stay to permit it to proceed is not necessary. For reasons stated throughout this Order, the Court concludes that prosecution of the Patent Case cannot possibly affect, much less prejudice, AstroTurf or its estate. The Court addresses and rejects the mootness argument *infra* note 63.

piercing claims. In this regard, they assert[14] that this Court should enforce the terms of the settlement agreement and exercise the jurisdiction it retained under the Settlement Order to "hear and determine all matters arising from the implementation of this Order and the Revised Settlement Agreement."[15] Because the release occurred as an integral part of settlement in proceedings in this Court, and because the Court addressed the distinction between, and the disposition of, general and specific alter ego and veil-piercing claims, they contend that the Equity Owners are entitled to have this Court first determine what the release includes.[16] In addition, TMA asserts that this Court has exclusive jurisdiction over property of the estate under 28 U.S.C. § 1334(e)(1), which requires it to determine whether FieldTurf's claims are general or specific, and that the Patent Case should remain stayed until the Court has done so.[17]

The Court has resolved disputes in this case over the expedited procedures for approval of the sale of assets and the approval of the global settlement agreement and over the merits of the sale and settlement by balancing the competing interests of FieldTurf, TMA, and other affiliates (including the Peeples Brothers), and the general unsecured creditors, represented by the Committee, in accordance with the objectives and policies of the Bankruptcy Code.[18] The current controversy requires the Court to consider and balance the interests of FieldTurf and those of the Equity Owners; the Committee has no opposition to

[14] Debtor's Supplemental Objection to [FieldTurf's] Motion for Relief From the Stay (the "AstroTurf Brief") [350] at ¶¶ 25-29.

[15] Settlement Order [224] at 5, ¶ 6.

[16] Textile Management Associates, Inc.'s Supplemental Objection and Brief in Continued Opposition to FieldTurf USA, Inc.'s Motion for Relief From the Stay (the "TMA Brief") [351] at 5-13; AstroTurf Brief at ¶¶ 25-29.

[17] TMA Brief [351] at 2, 4-6.

[18] Although AstroTurf as the debtor in possession in this case is a party to all of these disputes, the real parties with economic interests in their resolution are the parties identified in the text.

termination of the stay because the outcome of the Patent Case can no longer affect the interests of general unsecured creditors.

Such balancing must occur in the context of what has happened in this case. Accordingly, Part II discusses the material events in this case that the Court has summarized above. Part III explains the Court's conclusion that, in view of these circumstances, continuation of the automatic stay with regard to the Patent Case no longer serves any bankruptcy purpose such that its termination is appropriate to permit FieldTurf to proceed against AstroTurf to obtain a judgment and to pursue specific alter ego and veil-piercing claims, if any exist, against the Equity Owners.

**II.**

On the petition date, AstroTurf, TMA, and three non-debtor affiliates (the "Other Sellers" )[19] operated the "Turf Business." The Turf Business consisted of the development, manufacturing, marketing, selling, and installing of artificial turf for athletic fields and landscape applications. AstroTurf and the Other Sellers operated the Turf Business through the interrelated activities of the separate entities that collectively provided the services and materials to conduct the business. [20]

TMA and other affiliates held secured and unsecured claims against AstroTurf arising from the financing of AstroTurf's business and inter-company accounts.

Before the bankruptcy filing, AstroTurf, TMA, and the Other Sellers negotiated agreements for the sale of their parts of the Turf Business to APT Acquisition Construction Corp. (the "Purchaser"), an affiliate of Sportfield Deustschland Holding GmbH. The acquisition involved separate asset purchase agreements with each of AstroTurf, TMA, and

---

[19] The Other Sellers are Synthetic Turf Resources, LLC, Crystal Products Co., Inc., and UTGH Equipment LLC. AstroTurf's Motion to Sell Free and Clear of Liens Under Section 363(f) (the "Sale Motion") [15] at ¶ 7.
[20] Sale Motion [15] at ¶ 7.

the Other Sellers. At closing, each seller would sell its assets that were part of the Turf Business.

All of the asset purchase agreements required simultaneous closings. Thus, TMA and the Other Sellers could not sell their assets unless AstroTurf could sell its assets.

Upon the filing of the chapter 11 case, AstroTurf filed a motion (the "Sale Motion")[21] for approval of the sale of its assets on an expedited basis because of provisions in the asset purchase agreements that imposed deadlines for the Court to approve the sale of the AstroTurf assets and for all of the transactions to close. After preliminary conferences to consider the scheduling of a hearing on the motion, the Court scheduled a hearing for August 4, 2016. [32].

FieldTurf and the Committee opposed the Sale Motion on various grounds. In general, they asserted that they needed more time to evaluate whether the sale was in the best interests of the estate and to investigate the validity and priority of the secured and unsecured claims of TMA and the Other Sellers and the extent to which the claims or security interests were subject to avoidance under provisions of the Bankruptcy Code.

AstroTurf, TMA, the Other Sellers, and the Committee began discussions with regard to a global settlement of issues concerning the proposed sale and the allocation of its proceeds. After mediation conducted by Bankruptcy Judge Wendy Hagenau [140], they reached a settlement, and AstroTurf filed a motion (the "Settlement Motion") on August 1 for the Court to approve it.[22] The Court scheduled a hearing on the Settlement Motion for August 11, 2016, and rescheduled the hearing on the proposed sale from August 4 to August 11 to hear both matters at the same time. [150, 151].

---

[21] AstroTurf's Motion to Sell Free and Clear of Liens Under Section 363(f) [15].
[22] AstroTurf's Motion for Entry of an Order Authorizing and Approving Settlement [149].

For present purposes, the material terms of the proposed settlement agreement provided for: (1) payment of general unsecured creditors in full; (2) payment to FieldTurf of the lesser of $ 9.5 million or the allowed amount of its claim; (3) retention by TMA and non-debtor affiliates holding claims against AstroTurf of the balance of the proceeds after payment of administrative and priority claims and other specified claims; and (4) a release of all claims of AstroTurf, the Committee, and the estate against TMA, the non-debtor affiliates, and their officers, directors, managers, members, equity holders, attorneys, accountants, advisors, consultants and agents (which includes the Peeples Brothers).[23] As part of the settlement, the Committee agreed to withdraw its opposition to the proposed sale if the Court approved the settlement.

FieldTurf objected to the proposed settlement on several grounds, two of which are material here. First, FieldTurf contended that AstroTurf could not release any alter ego or veil-piercing claims because it did not own them. FieldTurf asserted that, under Michigan law, such claims belonged to creditors, not to the estate. Second, FieldTurf objected to the payment of other unsecured claims in full while it received only partial payment on its claim.

On August 8, 2011, three days before the hearing scheduled on the Sale and Settlement Motions, FieldTurf filed a motion in the Patent Case to reopen it to file a supplemental complaint to add the Equity Owners as additional defendants and to assert alter ego and veil-piercing claims against them.[24] Two days later, AstroTurf filed an emergency motion to enforce the automatic stay (the "Stay Enforcement Motion"), [25] asserting that the filing of the motion violated the automatic stay.

---

[23] Settlement Motion [149] at ¶ 16.

[24] AstroTurf's Emergency Motion to Enforce the Automatic Stay and For Sanctions [185] at ¶ 8.

[25] AstroTurf's Emergency Motion to Enforce the Automatic Stay and For Sanctions [185].

In the Stay Enforcement Motion, AstroTurf asserted that FieldTurf's motion violated the automatic stay because it was a continuation of litigation against it, the only party in the Patent Case. AstroTurf explained that, because FieldTurf's assertion of alter ego and veil-piercing claims required FieldTurf to litigate its claims against AstroTurf to judgment before it could pursue the Equity Owners, FieldTurf had to proceed against AstroTurf, and AstroTurf would necessarily be forced to defend itself in the litigation. In addition, AstroTurf asserted that FieldTurf's actions in the Patent Case violated the stay because the claims it proposed to pursue were property of its estate. The Court scheduled a hearing on the Stay Enforcement Motion for August 11 in conjunction with the hearings on the proposed settlement and sale of assets. [151].

The Court held a hearing on August 11 and 12, 2016 on the proposed settlement, the proposed sale of the estate's business as a going concern, and the Stay Enforcement Motion.

At the hearing, AstroTurf agreed that it could not release claims it did not own but insisted that Georgia law determined who owned the alter ego and veil-piercing claims and that, under Georgia law, it owned veil-piercing claims common to all creditors.[26] AstroTurf conceded that creditors under Georgia law retain alter ego and veil-piercing claims that are specific to a creditor and that the release could not, and did not, cover such claims because the estate did not own them.

[26] The parties during colloquy agreed that either Georgia or Michigan law applies; that under Michigan law, alter ego and veil-piercing claims do not belong to the debtor and, therefore, are not property of the estate; and that, under Georgia law, general, but not special, claims belong to the estate. See Transcript of Hearing on August 11, 2016 [222] ("Tr. Aug. 12"), *e.g.,* at 201, lines 16 – 18 (Debtor's counsel: "The only alter ego claims that can ever be property of a bankruptcy estate are generalized claims."; 202, lines 2 – 10 (Debtor's counsel agreeing with the Court that if a special claim exists, it is not affected); 209, line 23 – 210, line 4) (FieldTurf's counsel agreeing with the Court that if Michigan law applies the estate has no claims and that if Georgia law applies the estate does not own special claims).

At the continuation of the hearing on August 12, the Court announced its rulings that (1) Georgia, rather than Michigan, law applied to the determination of whether AstroTurf's bankruptcy estate or individual creditors owned veil-piercing and alter ego claims; and (2) under Georgia law, Astroturf's estate owned such claims common to all creditors but not those that are specific to a creditor.[27]

In view of those rulings, the Court overruled FieldTurf's objection to the settlement to the extent that FieldTurf claimed that the release would deprive it of claims that it had because the estate owned, and therefore could settle, any general claims of the estate and because FieldTurf retained any specific claims that it had.[28]

The Court sustained FieldTurf's second objection and declined to approve the settlement. The Court agreed with FieldTurf that the provisions for different treatment of FieldTurf's claim precluded approval of the settlement because they were "inconsistent with established principles of the Bankruptcy Code."[29]

AstroTurf and the Committee then proposed a modified settlement to address the Court's ruling. The revised agreement called for creation of an "Unsecured Creditor Pool" of $ 13.5 million to be set aside from the proceeds of the sale for distribution to unsecured creditors. FieldTurf would be treated the same as other general unsecured creditors, who would receive a pro rata share of the pool, with the percentage distribution depending largely

[27] Tr. Aug. 12 at 19 [222], line 13 – 22, line 15.
[28] Tr. Aug. 12 at 22 [222], lines 11 – 15.
[29] Tr. Aug. 12 at 26 [222], lines 9 – 12; see also Tr. Aug. 12 at 26, line 13 – 31, line 25.

on the final allowed amount of FieldTurf's claim.[30] Over FieldTurf's objections, the Court approved the settlement as revised.[31]

The Court's rulings[32] with regard to the scope of the releases to affiliated entities (including the Equity Owners) were incorporated in its "Order Authorizing and Approving Settlement Agreement" (the "Settlement Order").[33] In the Settlement Order, the Court found and concluded that "General Alter Ego Claims" were included in the release and were property of the estate but that "Specific Claims" were not included in the release and were not property of the estate.[34]

The Settlement Order defined both terms. Thus, "General Alter Ego Claims" are "all alter-ego and veil-piercing claims that are common to all creditors of [AstroTurf's] estate and therefore could be asserted by [AstroTurf] or its estate against any or all of the Released Parties."[35] "Specific Claims" are "claims against the Released Parties that are personal and specific to a particular creditor, including alter-ego claims that could be asserted by a particular creditor but excluding General Alter Ego Claims." The Settlement Order expressly states that Specific Claims include "any Specific Claims consisting of alter-ego or veil-piercing claims (if any) held by [FieldTurf] against any entity, which claims (if any) are deemed to be the property of [FieldTurf ]."[36]

---

[30] Tr. Aug. 12 at 32 [222], line 9 – 33, line 21. The settlement agreement was reduced to writing and attached to the Order Authorizing and Approving Settlement Agreement (Aug. 31, 2016) [224 at 7 – 24]. Section 2 states the terms for the funding of the Unsecured Creditor Pool. *Id.* at 10.

[31] Tr. Aug. 12 at 58 [222], line 5 – 65, line 6.

[32] *Id.* at 19, line 13 – 22, line 15.

[33] Order Authorizing and Approving Settlement Agreement (Aug. 31, 2016) [224].

[34] Settlement Order [224] at 3-4. The terms in the Settlement Order differ from the terms the Court used in its oral ruling because the parties, at the request of the Court, drafted it to set forth the Court's ruling from the bench in more precise terms. See Tr. Aug. 12 at 143, line 14 – 145, line 15.

[35] *Id.* at 3. The Equity Owners are "Released Parties."

[36] *Id.* at 4.

Under the terms of the Settlement Agreement and this Court's rulings set forth in the Settlement Order, then, the estate did not release Specific Claims, Specific Claims are not property of the estate, and FieldTurf retains any Specific Claims that it holds.

After the Court ruled at the hearing that it would approve the settlement, the Committee withdrew its opposition to the sale and to the Court's approval of it.

FieldTurf opposed the sale, raising two principal arguments. First, FieldTurf contended that the sales process had been so expedited that it and other creditors had not had time to evaluate whether the sale was in the best interest of the estate. Second, FieldTurf argued that AstroTurf's share of the total consideration for the assets of all of the entities was inadequate.[37]

The Court approved the sale,[38] concluding that, in the context of the settlement – which was conditioned on the sale being approved – the sale was in the best interests of the estate. In summary, the Court concluded that the sale and the settlement together unquestionably produced more value for the estate and its unsecured creditors (including FieldTurf) than they would get even if the allocation of sales proceeds to AstroTurf were increased by the largest amount the evidence showed could be appropriate.[39]

The Court deferred consideration of AstroTurf's Stay Enforcement Motion pending further discussions among counsel.[40]

After entry of Orders approving the sale on August 12 [202] and approving the settlement on August 31 [224], AstroTurf and the Committee filed a motion to estimate FieldTurf's claim pursuant to 11 U.S.C. § 502(c). [229]. FieldTurf agreed to estimation of

[37] Tr. Aug. 12 [222] at 129, line 23 – 131, line 2.
[38] Tr. Aug. 12 [222] at 131, line 6 – 138, line 6.
[39] Tr. Aug. 12 [222] at 136-137.
[40] Tr. Aug. 12 [222] at 145, line 20 – 155, line 16.

its claim for purposes of distribution in this case and to the appointment of a Special Purpose Examiner to evaluate FieldTurf's claim and the likely outcome of the Patent Case and any appeal and to provide a report to the Court with a recommendation of the amount that the Court should allow as the estimated claim.

On September 22, 2016, the Court entered an Order for the estimation of the claim and for the appointment of retired Eleventh Circuit Court of Appeals Judge Stanley F. Birch, Jr., as the Special Purpose Examiner. [241]. The Order required the Examiner to file his report on or before January 3, 2016. The Court scheduled a status conference for January 10, 2017, to consider procedures for the Court to estimate the claim.

Two weeks later, on October 5, 2016, FieldTurf filed a motion for relief from the automatic stay to permit it to proceed in the Patent Case. [260]. The Court scheduled a hearing for November 1, 2016.

At the hearing, the Court determined that the Examiner should complete his report and make a recommendation with regard to estimation of the claim before the District Court resolved pending matters in the Patent Case.[41] Although the Court concluded that the automatic stay should not prevent FieldTurf from pursuing its claims against the Equity Owners in the Patent Case, the Court left the stay in place in its entirety to avoid potential complications that might arise in the Patent Case if the Court lifted the stay for some purposes but not for others.[42] Because, once estimation occurred, no reason would exist for continuation of the automatic stay in the Patent Case, the Court announced that it would enter an order lifting the stay upon entry of an order estimating FieldTurf's claim[43] and scheduled

[41] Tr. Nov. 1 [288] at 80, line 18 – 87, line 1.
[42] Tr. Nov. 1 [288] at 84-85.
[43] Tr. Nov. 1 [288] at 86, line 20 – 87, line 1 ("[O]nce I make my decision [on estimation] then as far as I'm concerned all bets are off and the litigation in Michigan goes forward against everybody else, and off we go.");

a status conference for January 10, 2017, in connection with the status conference on estimation. [44] The Court entered an interim order maintaining the stay in effect based on its oral ruling at the hearing. [302].

At the hearing, the Court indicated that it would not decide the issue of whether FieldTurf's claims against the Equity Owners were general or specific claims in the context of the motion for stay relief. TMA's counsel inquired as to whether anything precluded TMA from bringing an affirmative request for such relief.[45] After noting that the inquiry resembled a request for an advisory opinion, the Court responded, "If you want an injunction you need an adversary proceeding. And I think if you want to enjoin [FieldTurf] from doing something, they've got to propose to do it first, because equity won't enjoin a tort or a lawsuit, I don't think. . . . I mean, the point is until [FieldTurf files] something that says this is what they want to sue you for I don't know what I can do."[46]

The Court extended the time for the Examiner to file his report to February 1, 2017 [324], and rescheduled the status conferences on the estimation procedures and FieldTurf's motion to February 7. [321].

The Examiner filed a report (the "Examiner's Report")[47] recommending estimation of the claim for $ 30,648,721.

At the February 7 status conference to consider procedures for estimation and FieldTurf's stay motion, AstroTurf, the Committee, and FieldTurf announced that they had

---

at 87, lines 15-22 ("[W]hen I enter the order saying I estimate the claim at X, I'm going to enter an order that says the stay is terminated. . . . I propose to enter an order that would terminate – modify the stay to permit that litigation to go forward as you've requested at the same time.").

[44] Tr. Nov. 1 [288] at 87, line 23 – 88, line 89, line 6.

[45] Tr. Nov. 1 [288] at 89, lines 7 – 14.

[46] Tr. Nov. 1 [288] at 89, line 21 – 90, line 2.

[47] Report and Recommendation of the Special Purpose Examiner Pursuant to the Order of the Bankruptcy Court Entered on 22 September 2016 [334].

agreed not to oppose estimation of the claim in the amount that the Examiner recommended.[48] With regard to FieldTurf's motion for stay relief, AstroTurf and TMA asserted renewed opposition to its termination, and TMA advised the Court of the filing of the TMA Adversary Proceeding requesting that this Court decide whether the proposed third-party complaint filed in the Patent Case and any other complaint that FieldTurf might file violated the Court's settlement order and the settlement agreement.[49]

The Court announced that, assuming no other party filed a timely objection to the Examiner's Report, it would enter an order estimating the claim and gave the parties additional time to file briefs with regard to the stay issue.[50]

No other party filed an objection to the Examiner's Report, and the Court entered an order (the "Estimation Order")[51] estimating FieldTurf's claim for $ 30,648,721. FieldTurf,[52] AstroTurf,[53] and TMA[54] filed written arguments in support of their positions on termination of the stay.

**III.**

The starting point in the consideration of whether the stay should be lifted is the fact that the Patent Case can have no possible effect in AstroTurf's bankruptcy case.

On the liability side of this case, FieldTurf's claim has been finally allowed in the Estimation Order. Nothing that happens in the Patent Case will change that.[55] On the asset

[48] Tr. Feb. 7 [341] at 5 – 7.
[49] Tr. Feb. 7 [341] at 16, lines 7 – 24.
[50] Tr. Feb. 7 [341] at 24-26.
[51] Order Estimating and Allowing the Claim of FieldTurf (Feb. 21, 2017) [354].
[52] FieldTurf's Supplemental Brief in Support of FieldTurf's Motion for Relief From Stay (the "FieldTurf Brief") [349].
[53] Debtor's Supplemental Objection to [FieldTurf's] Motion for Relief From the Stay (the "AstroTurf Brief") [350].
[54] Textile Management Associates, Inc.'s Supplemental Objection and Brief in Continued Opposition to FieldTurf USA, Inc.'s Motion for Relief From the Stay (the "TMA Brief") [351].
[55] It is arguable that AstroTurf has a theoretical interest in defending the Patent Case.

side, FieldTurf's prosecution of alter ego and veil-piercing claims – even if it asserts claims that cross over the line into general claims that *were* property of the estate – will not interfere with property of AstroTurf's estate or deprive AstroTurf or its estate of one penny. AstroTurf has already disposed of such claims and realized the value of them from the settlement.

So no bankruptcy purpose exists in this Chapter 11 case for the continuation of the stay of the Patent Case. The lack of any bankruptcy purpose for continuation of the automatic stay provides sufficient cause for its termination under 11 U.S.C. § 362(d).

AstroTurf and TMA, however, argue that the stay should remain in effect until this Court has determined in the TMA Adversary Proceeding whether FieldTurf has any alter ego and veil-piercing claims against the Equity Owners.[56] This Court, they explain, is the proper one to distinguish between the general claims released under the settlement agreement and Settlement Order and the specific claims that FieldTurf retained. They ask the Court to enforce the terms of the settlement agreement and exercise the jurisdiction it retained under the Settlement Order to "hear and determine all matters arising from the implementation of this Order and the Revised Settlement Agreement." [57] Because TMA made concessions that provided substantial benefits to the estate and its creditors, they contend, TMA (and the

---

AstroTurf will not get a discharge in this case because it has liquidated its assets, will not continue in business, and is not an individual. 11 U.S.C. § 1141(d)(3), § 726(a)(1). Because the estimation of FieldTurf's claim is only for purposes of this case, a judgment against it will remain enforceable against AstroTurf to the extent that it exceeds what FieldTurf receives in this case. AstroTurf similarly remains liable for the unpaid portion of general unsecured debts.

Although the entry of a judgment against AstroTurf in the Patent Case would theoretically affect AstroTurf, it makes no real difference to AstroTurf because it will not be conducting any business or have any assets at the conclusion of this case.

[56] AstroTurf Brief [350] at ¶¶ 3, 25-29; TMA Brief at 7-13.

[57] Settlement Order [224] at 5, ¶ 6.

Peebles Brothers) are entitled to have this Court first determine what the release, obtained under this Court's authority and pursuant to the Settlement Order, includes.[58]

Indeed, TMA insists that this Court is the *only* court that can make this determination. The argument is based on the propositions that the general alter ego and veil-piercing claims are property of AstroTurf's estate and that this Court[59] has exclusive jurisdiction over property of the estate under 28 U.S.C. § 1334(e)(1). TMA concludes that other courts do not have jurisdiction to determine whether veil-piercing claims that FieldTurf asserts are general veil-piercing claims in view of the bankruptcy court's exclusive jurisdiction over them as property of the estate. [60]

This jurisdictional analysis is flawed for two reasons.

First, AstroTurf has released its veil-piercing claims. The release effectively transferred the claims out of AstroTurf's estate, and accordingly they are no longer property of its estate.

Second, the fact that a bankruptcy court has exclusive jurisdiction of property of the estate under 28 U.S.C. § 1334(e)(1) does not mean that it has exclusive jurisdiction of *civil proceedings* with regard to property of the estate. Section 1334(e)(1) is an *in rem* provision that establishes the jurisdiction of bankruptcy courts over property of the estate, but it does

---

[58] TMA Brief at 11; AstroTurf Brief at ¶ 3, 25, 28-29.

[59] The parties – and the Court in its discussion of jurisdiction – refer to bankruptcy jurisdiction in terms of the *bankruptcy* courts having jurisdiction under 28 U.S.C. § 1334, but this terminology is not legally accurate. Section 1334 does not vest any jurisdiction in the bankruptcy courts. Instead, it vests bankruptcy jurisdiction in the *district* courts.

The statement that a bankruptcy court has jurisdiction is legal shorthand that reflects the routine practice of the district courts to refer all bankruptcy matters to the bankruptcy courts pursuant to 28 U.S.C. §157(a) and for the bankruptcy courts to exercise that jurisdiction by entry of final judgments, orders, and decrees when 28 U.S.C. § 157(b) or (c) authorizes them to do so. Thus, a statement such as "the bankruptcy court has jurisdiction" really means, "the district court has jurisdiction that it has referred to the bankruptcy court *and* that the bankruptcy court has authority to exercise."

[60] TMA Brief at 4-7. The argument is undermined to some extent by AstroTurf's recognition that FieldTurf is "absolutely free to pursue such claims in a separate lawsuit." AstroTurf Brief at ¶ 4.

not negate the provisions of 28 U.S.C. § 1334(b) that grant the bankruptcy courts *original but not exclusive* jurisdiction of civil proceedings "arising under title 11, or arising in or related to cases under title 11."[61]

The District Court in the Patent Case has jurisdiction under 28 U.S.C. § 1334(b) to decide whether an alter ego or veil-piercing claim that FieldTurf asserts is or is not property of AstroTurf's estate in a civil proceeding before it, and § 1334(e)(1)'s vesting of *in rem* jurisdiction of that property in this Court does not deprive the District Court of jurisdiction to make that determination.

The proper question, then, is whether this Court *should* keep the automatic stay in effect to prevent FieldTurf from asserting alter ego or veil-piercing claims in the pending litigation, not whether it *must.*

An initial problem is that FieldTurf has not yet asserted the specific claims it contends it has. FieldTurf concedes that, in its motion filed in the Patent Case, it asserted claims against the Equity Owners that are general claims that the release covers. FieldTurf, however, insists that it has specific claims that it is entitled to assert and that it will modify its proposed complaint to fit within the terms of the Settlement Agreement and this Court's Settlement Order distinguishing between general and specific claims.[62]

Because FieldTurf has not yet filed the specific claims it intends to assert, the Court at this point cannot determine whether FieldTurf will assert general claims that have been released. AstroTurf and TMA propose that the Court solve this problem by requiring FieldTurf to file its proposed complaint in this Court and that the Court then decide the issue

[61] *Accord, e.g., Noletto v. Nationsbanc Mortgage Corp. (In re Noletto),* 244 B.R. 845 (Bankr. S.D. Ala. 2000).

[62] Tr. Nov. 1 [288] at 45, line 5 – 46, line 15; Tr. Feb. 1 at 12, line 22 – 14, line 6; at 75, line 15 – 77, line 15.

in the TMA Adversary Proceeding, with the automatic stay remaining in effect in the meantime.

As previous discussion makes clear, the only parties with a substantive economic interest in whether the stay should remain in effect are FieldTurf, on the one hand, and the Equity Owners, on the other.[63]

FieldTurf unquestionably is entitled to assert specific alter ego and veil-piercing claims against the Equity Owners. TMA[64] and AstroTurf[65] recognize this with the acknowledgement that the automatic stay does not prevent FieldTurf's assertion of its claims in a separate lawsuit in any other court. FieldTurf, however, does not want to do that. It wants to proceed in the Patent Case.

The Equity Owners have bargained for, and made substantial concessions to obtain, a release of general alter ego and veil-piercing claims and this Court's Order that specifically

---

[63] AstroTurf's estate has no continued interest in prosecution of the Patent Case against it because of the final allowance of FieldTurf's claim in the Estimation Order. AstroTurf relies on the final allowance of FieldTurf's claim as the basis for an argument that the Patent Case is moot and that, therefore, it should remain stayed because its prosecution can serve no purpose. AstroTurf Brief [350] at ¶¶ 2, 19-24.

AstroTurf's conclusion does not follow from the premise. First, precisely because the Patent Case cannot possibly affect this case, the estate has no reason to concern itself with the outcome. Second, the Court cannot conclude that the Patent Case is moot with regard to the claims FieldTurf may assert against the Equity Owners. FieldTurf's theory may be that the entry of a judgment against AstroTurf will be preclusive on the Equity Owners in alter ego or veil-piercing actions against them. It may also be that the entry of a judgment is a requirement for such claims or strengthens their merits.

The Court declines to consider in the context of FieldTurf's motion whether the Patent Case is moot. For whatever reason, FieldTurf is entitled to a judgment if it wants one, and AstroTurf in the current circumstances of this case has no cognizable basis for seeking to avoid the entry of judgment based on the existence of the automatic stay.

The Court is sensitive to the fact that the entry of judgment against AstroTurf may have adverse consequences for the Equity Owners and that the effective assertion of their interests may require opposition to entry of judgment against Astroturf and an appeal from any such judgment. It may be that, for legal, strategic, or tactical reasons their interests are best served if AstroTurf defends itself. It is, therefore, fully appropriate for AstroTurf to have the ability to oppose entry of judgment and to appeal it. To the extent that the Equity Owners think that this Court must or should enter appropriate orders to insure their ability to protect their interests in AstroTurf's effective representation in the Patent Case, they are welcome to seek such orders. As AstroTurf and the Committee have recognized, TMA will effectively bear the burden of AstroTurf's defense under the terms of the settlement. Tr. Feb. 7 at 8, lines 14 – 22.

[64] Tr. Nov. 1 [288] at 90, lines 15 – 18.

[65] Tr. Nov. 1 [288] at 20, line 24 – 23, line 11.

deals with the release and distinguishes what claims are and are not released. They invoke these considerations to support their request that this Court determine the scope of the release before they have to defend in the Patent Case.

The continuation of the automatic stay to impose a requirement that this Court act as a "gatekeeper" for the assertion of FieldTurf's claims in the Patent Case is not appropriate for several reasons.

First, the primary purpose of the automatic stay with regard to litigation involving a bankruptcy estate is to preserve the status quo for the benefit of the estate and its creditors. Continuation of the stay here does not serve that purpose. It is true that the estate has a theoretical interest and may derive a theoretical benefit from continuation of the stay because the settlement agreement contemplates the payment of fees and expenses in the Patent Case with estate funds otherwise allocated to TMA. The substance of this arrangement is the same as distributing assets of the estate allocated to TMA to TMA and TMA's payment of AstroTurf's fees and expenses incurred in litigating the Patent Case for the benefit of the Equity Owners. TMA's money is at stake, not the estate's.

Second, continuation of the stay until this Court determines whether FieldTurf's claims are specific or general effectively answers the question of whether this Court or the District Court should make that ruling. When a bankruptcy estate has no stake in such a dispute, the existence of the *automatic* stay has no proper role in such an analysis.

The settlement agreement and the Settlement Order do not include any injunction against FieldTurf's improper assertion of released claims or any requirement that this Court rule on the scope of the release before FieldTurf could assert *any* claims in the Patent Case. The Court declines to transform the automatic stay into such a requirement.

Third, in view of FieldTurf's right to proceed to assert specific claims (and, again, the absence of any interest of the estate in its doing so in the circumstances of this case), it is an unwarranted burden on FieldTurf to interpose this Court as an automatic gatekeeper. FieldTurf has already been burdened since November with a delay in asserting its claims as it wants in the forum it has selected because the Court in balancing the interests of the estate and FieldTurf decided that the estate's interest in avoiding litigation expenses in view of the estimation proceeding required a maintenance of the status quo in the Patent Case until conclusion of the estimation proceeding. The Court can find no continuing interest of the estate that justifies continuance of the automatic stay after final estimation and allowance of FieldTurf's claim in this case. It is time to terminate it.

The Court in the TMA Adversary Proceeding will decide whether the Equity Owners are entitled to this Court's determination of whether FieldTurf has specific claims, but in the circumstances of this case it is no longer appropriate for the Equity Owners to have litigation in the Patent Case against them *automatically* stayed by § 362(a) when that lawsuit no longer involves the interests of the estate or its creditors.

Whether considerations other than the automatic stay permit or require this Court to decide that it should or must determine whether FieldTurf is asserting claims in the Patent Case that are general claims remains an issue for determination in the TMA Adversary Proceeding. The Court emphasizes that it is not determining that issue here. It will not have to if, as FieldTurf insists, the revised pleadings in the Patent Case that it will now be permitted to file assert only specific claims.

At the November 1 hearing, counsel for FieldTurf stated, "We are very happy to have the stay relief order insofar as it involves these parties specify that we're only allowed to

proceed on specific alter ego claims and not general alter ego claims."[66] The Court concludes that such a limitation is appropriate and will limit the termination of the stay accordingly.

**IV.**

For reasons set forth above and in this Court's findings of fact and conclusions of law announced on the record at the November 1[67] hearing, the Court concludes that cause for termination of the stay for cause pursuant to 11 U.S.C. § 362(d) is appropriate to the extent set forth herein.

It is, therefore, hereby **ORDERED and ADJUDGED** as follows:

1. With regard to the civil proceeding pending in the United States District Court for the Eastern District of Michigan styled *FieldTurf USA, Inc. v. AstroTurf LLC*, No. 10-12492 (the "Patent Case"), the automatic stay of 11 U.S.C. § 362(a) is hereby terminated to the extent set forth herein.

2. The automatic stay of 11 U.S.C. § 362(a) is terminated with regard to prosecution of the Patent Case against AstroTurf, LLC, provided, however, that (a) the automatic stay will remain in effect to prevent FieldTurf USA, Inc., and Tarkett, Inc., from enforcing any judgment against AstroTurf, LLC, its property, or property of its estate, and (b) any judgment entered in the Patent Case will not affect the claims of FieldTurf USA, Inc., and Tarkett, Inc., that have been estimated and allowed in this case in this Court's Order Estimating and Allowing the Claim of FieldTurf [354].

3. FieldTurf USA, Inc., and Tarkett, Inc., may proceed in the Patent Case against non-debtor entities to assert any and all claims against them that are not General Alter Ego

[66] Tr. Nov. 1 at 45 [288] , lines 5-9.

[67] Tr. Nov. 1 [288] at 80-87.

Claims and that are Specific Claims. For purposes of this Order, and in accordance with this Court's Order Authorizing and Approving Settlement Agreement entered on August 31, 2016 [224]:

a. "General Alter Ego Claims" means alter ego and veil-piercing claims that, under Georgia law, are common to all creditors of AstroTurf's estate and therefore could be asserted by AstroTurf or its estate against non-debtor entities (including, without limitation, Textile Management Associates, Inc., Bryan Peeples, and Thomas Peeples); and

b. "Specific Claims" means alter ego and veil-piercing claims against non-debtor entities (including, without limitation, Textile Management Associates, Inc., Bryan Peeples, and Thomas Peeples) that, under Georgia law, are personal and specific to a particular creditor, including alter-ego claims that could be asserted by a particular creditor but excluding General Alter Ego Claims.

4. Counsel for FieldTurf is directed to serve a copy of this Order on all parties on the Master Service List within three days after the entry of this Order and file a certificate of service with the Court.

This Order has not been prepared for publication and is not intended for publication.

**[End of Order]**

DISTRIBUTION LIST:

Paul K. Ferdinands
King & Spalding, LLP
1180 Peachtree Street
Atlanta, GA 30309-3521

Daniel J. McGuire
Winston & Strawn LLP
25 W. Wacker Dr.
Chicago, IL 60601

Ron C. Bingham, II
Baker, Donelson, Bearman, Caldwell & Berkowitz, P.C.
1600 Monarch Plaza
3414 Peachtree St. NE
Atlanta, GA 30324

Donald J. Aho
Miller & Martin PLLC
Volunteer Building Suite 1200
832 Georgia Ave.
Chattanooga, TN 37402

Frank W. DeBorde
Morris, Manning & Martin, LLP
1600 Atlanta Financial Center
3343 Peachtree Rd., NE
Atlanta, GA 30326

Martin P. Ochs
Office of U.S. Trustee
75 Ted Turner Dr.
Atlanta, GA 30303